Thomas A. Banducci (ISB: 2453)
*tbanducci@bwslawgroup.com*
Wade L. Woodard (ISB: 6312)
*wwoodard@bwslawgroup.com*
Dara Parker (ISB: 7177)
*dparker@bwslawgroup.com*
**Banducci Woodard Schwartzman PLLC**
802 W. Bannock St., Suite 500
Boise, ID 83702
Telephone:  (208) 342-4411
Facsimile:  (208) 342-4455

Danny C. Kelly (Utah Bar No. 1788), *admitted pro hac vice*
Mark E. Hindley (Utah Bar No. 7222), *admitted pro hac vice*
**STOEL RIVES LLP**
201 South Main Street, Suite 1100
Salt Lake City, UT  84111
Telephone:  (801) 578-6979
Facsimile:  (801) 578-6999
dckelly@stoel.com

Counsel for Alamar Ranch, LLC and
YTC, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>BOISE COUNTY,<br><br>Debtor. | Case No. 11-00481<br><br>Chapter 9<br><br>[Filed Electronically] |

## ALAMAR RANCH, LLC'S (I) OBJECTION TO CHAPTER 9 CASE
## OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................... 1

II. BACKGROUND ................................................................................................... 3

    A. The Federal Court Litigation Between Alamar and Boise County ....................... 3

    B. Pre-Petition Negotiations ................................................................................... 3

    C. The County's Resolution to File for Bankruptcy ................................................. 7

    D. The Chapter 9 Filing .......................................................................................... 9

    E. Postpetition Events and Negotiations ............................................................... 10

    F. The County's Financial Condition ..................................................................... 12

ARGUMENT .............................................................................................................. 13

III. BOISE COUNTY DOES NOT MEET CHAPTER 9'S ELIGIBILITY
REQUIREMENTS ............................................................................................. 13

    A. Chapter 9's Eligibility Requirements ................................................................ 13

    B. Chapter 9's Eligibility Requirements Indicate That a Municipality Must
Develop a Plan and Negotiate With Creditors Prior to Filing Bankruptcy .......... 14

    C. The County Has the Burden of Proof With Respect to Its Eligibility for
Chapter 9 ......................................................................................................... 16

    D. The County Cannot Satisfy the Insolvency Requirement of § 109(c)(3) ............ 16

    E. The County Cannot Meet Any of the Requirements of § 109(c)(5) .................... 20

        1. The County Has Not Obtained the Agreement of the Class
It Intends to Impair ................................................................................... 20

        2. The County Did Not Negotiate With Alamar in Good Faith ....................... 20

        3. It Was Not Impracticable for County to Negotiate with
Creditors .................................................................................................. 27

        4. The County Cannot Show that Alamar Attempted to Obtain
an Avoidable Preference ........................................................................... 28

IV. THE COUNTY FILED ITS CHAPTER 9 CASE IN BAD FAITH .............................. 29

V. CONCLUSION .................................................................................................... 32

i

Alamar Ranch, LLC and YTC, LLC (together, "Alamar"), judgment-creditors of Debtor Boise County ("Boise County" or the "County"), hereby object to the County's voluntary petition (the "Petition" or "Case") under Chapter 9 of the United States Bankruptcy Code (the "Bankruptcy Code" or "Code") and move this Court for an Order dismissing the Case.

## I.    <u>INTRODUCTION</u>

In December 2010, United States District Court Judge Winmill entered a multi-million-dollar judgment against Boise County and in favor of Alamar (the "Judgment"). Since then, the County has been in a tailspin and has desperately tried to stop it. Now the County believes it has found a way to do so: Chapter 9. Boise County freely admits that it was the Judgment – and the Judgment alone – that led to the filing of its Petition. The Petition was an instinctive, ill-conceived reaction to the Judgment.

Chapter 9 imposes upon would-be filers strict requirements that the County cannot satisfy. Specifically, the County cannot meet its heavy burden of proving (among other things) that (a) it is an "insolvent" municipality; (b) it "has negotiated in good faith" with its creditors; and (c) the Petition was filed in good faith. The County's bankruptcy was completely unnecessary.

Boise County is not insolvent. The County admits that it was current on its debts as of its petition date and will be able to pay its debts going forward – other than the Judgment. The Judgment, however, does not render the County insolvent. The County's bankruptcy schedules show that it has significantly more assets than liabilities. Moreover, the County's own cash-flow projections showed that it would have a significant cash surplus for 2011 and 2012.

Further, the County failed to negotiate with Alamar in good faith. For example:

1

- Chapter 9 requires that pre-filing negotiations revolve around a potential plan of adjustment.  But here, the County has acknowledged that, as of May 4, 2011, it had not even begun working on a plan, let alone shared or negotiated any proposed terms with Alamar.

- The County waited over two months after the judgment to make its first – and only – settlement offer (which was patently unacceptable).  Such a "half-hearted" and "lackadaisical" effort defeats the County's claim of good faith.  *In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 77 & 79 (Bankr. D.N.H. 1994).

- In addition, the County had several alternatives to filing bankruptcy.  Specifically, the County failed to adequately consider its ability to assess a tax under the Idaho's Tort Claims Act and its ability to issue bonds as potential avenues paying the Judgment.  Given these tools at its disposal, the County can neither prove that it is insolvent nor demonstrate that it negotiated in good faith.

Instead of using the time after the Judgment to develop a proposed plan of adjustment and work with Alamar toward resolution, the County went at its problem backwards.  It declared bankruptcy without any idea of where it was going, and only afterwards tried to do what it should have done in the first place: put its financial house in order and try to find a way to pay the Judgment.  Even now, more than two months after the County commenced this Case, and five months after the entry of the Judgment, the County *still* has identified a way to pay the Judgment.  Indeed, its offers to settle have gone backwards since the bankruptcy filing.  A private party's use of bankruptcy as a litigation tactic is improper, but a government's use of bankruptcy as a bargaining chip is inexcusable.  Because the County cannot satisfy Section 109(c) of the Bankruptcy Code and cannot show that it filed its Petition in good faith, the Court should grant this Motion and dismiss the Case.

2

## II.    BACKGROUND

**A.    The Federal Court Litigation Between Alamar and Boise County.**

1.    On April 19, 2007, Alamar submitted an application to Boise County requesting a Conditional Use Permit ("CUP") to allow it to operate a residential treatment facility and private school within the County for at-risk youth.

2.    On April 21, 2008, the Boise County Board of Commissioners (the "Board" or "County Commissioners") entered a written Decision and Order imposing conditions on the CUP that were illegal and discriminatory under the Fair Housing Act, 42 U.S.C. §§ 3604, *et seq.*

3.    On January 8, 2009, Alamar filed a complaint against the County in the United States District Court for the District of Idaho.  (Case No. 01:09-cv-00004 (the "Dist. Court Case") Docket No. 1.)

4.    On December 16, 2010, a jury rendered a verdict in Alamar's favor and against Boise County for $4,000,000, finding that the County intentionally discriminated against Alamar and its development.  (Dist. Court Case Docket No. 207.)

5.    The following day, on December 17, 2010, the District Court entered the Judgment against the County in "the sum of $4,000,000.00, with interest to accrue at the applicable federal rate."  (Dist. Court Case Docket No. 210.)

6.    On December 30, 2010, Alamar filed a Motion for Taxation of Costs and Attorneys Fees as of that date in an approximate amount of $1,398,000.  (Dist. Court Case Docket Nos. 223 & 224.)

7.    If the Motion for Taxation of Costs is granted, the total Judgment amount will be approximately $5.4 million or more.

**B.    Pre-Petition Negotiations.**

8.    Immediately following the entry of the Judgment, Alamar told the County that it

was willing to negotiate a potential settlement.  At that time, counsel for the County, Andy

Brassey, told counsel for Alamar, Tom Banducci, that he would call Mr. Banducci on Thursday,

December 30, 2010 to discuss settlement.  (Declaration of Tom Banducci in Support of

Objection & Motion to Dismiss ("Banducci Dec.") ¶ 3.)

      9.    Mr. Brassey, however, failed to call on the agreed date.  (*Id.*)  Instead, on January

18, 2011, without communicating with Alamar concerning settlement, the County filed a notice

of appeal of the Judgment.  (Dist. Court Case Docket No. 225.)  Since the filing of the appeal

suggested the County's intention to procure a supersedeas bond, counsel for Alamar, Wade

Woodard, sent an email to Mr. Brassey asking whether the County was in fact going to post a

bond.  (Ex. A, Email from W. Woodard to A. Brassey, 1/18/11; Declaration of Wade Woodard in

Support of Objection & Motion to Dismiss ("Woodard Dec.") ¶ 3.)  Mr. Brassey never

responded to that email.   (Woodard Dec. ¶ 3.)

      10.   On January 19, 2011, Mr. Banducci wrote to counsel for the County stating: "As

we indicated to you shortly after the judgment was rendered against Boise County, my clients are

willing to negotiate a settlement of the amounts due under the judgment.  You told me at that

time that you would call me on Thursday, December 30, 2010, to discuss 'options.'  You did not

call then, nor have you made an effort to contact me subsequently. . . .  [I]f this matter is not

resolved through settlement, or if a bond has not been posted by January 28, 2011, my clients

will commence efforts to collect on the judgment."  (Ex. B, Letter from T. Banducci to A.

Brassey, 1/19/11; Banducci Dec. ¶ 5.)  Mr. Banducci also asked the County to provide available

dates for a debtor's exam if it did not intend to settle the matter or post a bond.  (*Id.*)

      11.   Prompted by this letter, Mr. Brassey called counsel for Alamar, and the parties

agreed to meet on Wednesday, January 26, 2011.  (Banducci Dec. ¶ 6.)  However, the County

did not make a settlement offer at that meeting.  Instead, the County's attorneys stated that the

County was considering all of its options including: (1) pursuing the appeal, (2) filing

bankruptcy; and/or (3) finding a way to fund a settlement.  (*Id*.)

12.     Susan Buxton, also counsel for the County, claimed difficulties paying the

Judgment and stated that the books and records of the County were in such disarray that they

could not determine what the County could offer.[1]  (*Id*. ¶ 7.)  Ms. Buxton indicated that before

the next meeting (scheduled for February 15, 2011) she would further investigate the County's

ability to pay the Judgment in either a lump sum or over time, and that she would meet with the

County Commissioners to get a settlement proposal approved.  (*Id*. ¶ 8.)  Thus, Alamar was left

with the impression that the County was going to make a firm settlement offer at the next

meeting.  (*Id*.)

13.     As scheduled, the parties met on February 15, 2011.  (*Id*. ¶ 9.)  But again, the

County failed to make a settlement offer.  (*Id*.)  After a short break, and in order to jump-start

negotiations, Alamar said that it would be willing to reduce its claim from $5.4 million (the

anticipated full amount of the judgment with an award of attorneys' fees and costs) to $5 million

and accept payment over time with a reasonable interest rate.  (*Id*.)  The parties then scheduled a

meeting for February 22, 2011.  (*Id*.)

14.     At the meeting on February 22, 2011, the County delivered to Alamar a

---

[1]  This message, that Boise County's records are in such disarray that it cannot determine what funds it
has or will have available to pay the Judgment, is a continuing theme in this case.  For example, even
though the County has repeatedly promised to deliver to Alamar an actual proposal, its latest
correspondence, dated May 4, 2011, states that "[t]here were more issues found with the budget
projections.  And the funding the proposed plan as we had thought simply does NOT work. . . .  There
were admittedly errors that occurred previously in booking in [*sic.*] debts owed by the County."  (Ex. Q,
Letter from D.B. Clark to D. Kelly, 5/4/11.)  The level of the County's ignorance of its own finances and
ability to collect revenue is striking, especially since the County has had nearly five months – *since
December 2010* – to evaluate its books and start to develop a plan as to how to pay the Judgment.

settlement letter, attached as Exhibit C (the "February 22 Letter").  (Banducci Dec. ¶ 10.)  In the

Letter, the County proposed pay, at most, a total of $3.2 million (through a variety of

mechanisms) with an initial payment of $1.9 million and the remaining cash component being

paid over time with no interest.  The County also proposed that, to the extent that the balance of

the $3.2 million had not been paid in ten years through incremental, ordinary tax levies, the

remaining balance remaining  would be "forgiven."  (Ex. C at 2 & exhibits thereto; Banducci

Dec. ¶ 10.)  The County claimed that it could do little more because it was limited by the Idaho

Code and Constitution in its ability to raise the money necessary to pay the Judgment and

because of restrictions on the cash.  (*See* Ex. C at 1; Banducci Dec. ¶ 11.)  Alamar requested that

the County provide Alamar any legal authorities supporting these assertions.  (Banducci Dec. ¶

11.)

15.    Given the anticipated Judgment of approximately $5.4 million, the County's offer

in the February 22 Letter to pay such a discounted amount, over 10-years time and without

interest, was unacceptable to Alamar.  (*Id*.)  This was particularly true given that the County's

cash-flow forecast, which the County attached to the February 22 Letter, anticipated a cash

surplus of $6.289 million in 2011, more than enough to pay the full amount of the Judgment.

(*Id.* ¶¶ 10-11; Ex. C at 1st exhibit thereto.)

16.    Thereafter, Alamar tried once more to engage the County in settlement

negotiations.  On February 24, 2011, Mr. Woodard wrote two separate letters to the County's

counsel.  (Woodard Dec. ¶ 4.)  In one, Mr. Woodard reaffirmed Alamar's position that it was

"still willing to consider a reasonable offer to settle" and reiterated its request for the claimed

legal authority backing-up the County's contention that "certain funds belonging to Boise

County are exempt from execution because those funds have been dedicated for certain uses."

(*Id*.; Ex. D, Letter from W. Woodward to S. Buxton, 2/24/11.)  Mr. Woodard added that "[i]f you

provide us with such legal authority in the next week, we will take it into consideration when

undertaking efforts to collect the amount owing under the judgment."  (*Id*.)

> 17.    In the other letter, Mr. Woodard wrote

> At the meeting, Tom asked whether the County intended to seek a stay of
> execution proceedings during the pendency of the appeal by posting a supersedeas
> bond.  Tom and I both came away with the impression that the County did not
> intend to procure a bond.  If our impression is inaccurate, please let us know
> immediately as we intend to proceed with efforts to collect the amount owing on
> the judgment.  In that regard, it is not our intention to disrupt the operations of the
> County any more than necessary to obtain satisfaction of the judgment.
> Consequently, if the County will commit by March 2, 2011, to paying the full
> amount of the judgment on or before March 25, 2011, we will not proceed with
> efforts to collect the judgment by way of a writ of execution (or other authorized
> procedures).

 (Ex. E, Letter from W. Woodward to A. Brassey, 2/24/11; Woodard Dec. ¶ 5.)

> 18.    The County's response, however, neither provided the requested legal authority,

nor improved upon its February 22 offer.  Despite this, the County dryly stated that it is "happy

to work with you toward a reasonable and lawful settlement to address the Judgment."  (Ex. F,

Letter from A. Brassey & S. Buxton to W. Woodard, 2/25/11; Woodard Dec. ¶ 6.)[2]

## C.    The County's Resolution to File for Bankruptcy.

> 19.    But, contrary to its statement, the County wasn't "happy to work with" Alamar.

In fact, the County never made a proposal to Alamar other than its February 22 offer.  (Banducci

Dec.¶ 13.)

> 20.    Instead, on February 28, 2011, just three days after stating that it was "happy" to

work toward a settlement, the Board of Commissioners adopted Resolution # 2011-9, entitled "A

---

[2] In view of this meaningless response, Alamar filed its application for a Writ of Execution on February
28, 2011.  (Dist. Court Case Docket No. 236.)

Boise County Resolution to Declare Chapter 9 Bankruptcy."  (Ex. G.)

21.     The Resolution to file for bankruptcy was "a direct result" of the Judgment.  (Ex. H, Deposition of Jamie Anderson ("Anderson Dep.") at 17:14-17.)  In fact, the County had been considering bankruptcy as a potential option for dealing with the Judgment since December 27, 2010, just days after the Judgment was entered.  (*Id*. at 20:11-21:9.)

22.     The Resolution recited that (1) a jury had awarded Alamar $4,000,000 in the litigation, (2) approximately $1,400,000 in fees and costs had been requested by Alamar; and (3) the Board "has determined that the County cannot satisfy the judgment and at the same time continue to operate and satisfy its obligations to provide basic services to County residents." (Ex. G.)  Thus, the Board concluded that "it is in the best interest of the County to file municipal bankruptcy under Chapter 9 of the Internal Revenue [*sic*.] Code."  (*Id*.)

23.     The County did not afford its residents any notice of the possibility that it intended to file bankruptcy, and did not put it on the agenda for the Board meeting.  In fact, the Agenda for the February 28 Board Meeting did not even mention bankruptcy.  Instead, it merely noted that the Board would consider in "Executive Session" (*i.e*., away from the public's view) "Pending Litigation to consider consultation and advice from legal representative on the Alamar Ranch litigation."  (Ex. I, Amend. Agenda, 2/28/22 ; *see also* Ex. J, Meeting Minutes of Boise County Board of Commissioners , 2/28/11 ("Minutes"), at 4.)[3]

24.     Coming out of executive session, and with no public input or discussion, the Board voted unanimously to (1) adopt the Resolution; (2) hire Mr. Clark as bankruptcy counsel; and (3) issue "the press release concerning the bankruptcy."  (Ex. J, Minutes, at 5.)

---

[3] When asked if there was a reason why the issue of filing for bankruptcy "was not discussed and opened up to public debate," Ms. Jamie Anderson, the Chair of the Board, could say only that it was because the

D.      **The Chapter 9 Filing.**

25.      Unaware of the Resolution and the imminent filing, Alamar again tried to engage the County in settlement discussions.  On March 1, 2011 at 4:12 p.m., counsel for Alamar sent an email to counsel for the County offering to reduce the amount of the Judgment and accept payments over 9 years at a reasonable rate of interest.  (Ex. K, Email from W. Woodard to S. Buxton & A. Brassey, 3/1/11; Woodard Dec. ¶ 7.)

26.      As it turned out, however, the County had decided to move in the opposite direction, and had already filed its Petition at 4:11 p.m., just one minute before Mr. Woodard sent his email.  (March 1, 2011 is referred to as the "Petition Date.")

27.      The County said nothing to Alamar about its adoption of the authorizing Resolution or that it would be filing a Chapter 9 petition immediately.  (Banducci Dec. ¶ 13.) Instead, it appears that that the filing was designed to surprise Alamar, even though there was no immediate threat to the County or its assets.[4]

28.      Moreover, at no time prior to the Petition Date did the County ever discuss with Alamar a potential bankruptcy plan or how the County might seek to adjust the Judgment.  (*Id*. ¶ 13; Woodard Dec. ¶ 8; Banducci Dec. ¶ 13)  In fact, as of March 30, 2011 – a month after the Petition Date – the Board had not yet even seen a draft of a plan.  (Deposition of Mary Prisco ("Prisco Dep.") at 107:1-7; 122:14-123:17; Anderson Dep. at 127:22-23.)  The "formulation of an outline" of a potential plan was not even scheduled to be discussed by the Board until sometime in April.  (Anderson Dep. at 200:23-201:9.)

---

issue wasn't agendized."  When asked why the issue wasn't "agendized," she testified that she did not know.  (Ex. H, Anderson Dep. at 54:22-55:6.)

[4]  A further purpose was political expediency:  Knowing that the County would ultimately have to pay the Judgment, it is politically advantageous to the Board to be ordered to pay through a court-approved plan than to voluntarily agree to pay it through a settlement.

E.    **Postpetition Events and Negotiations.**

29.    Soon after the Petition was filed, Alamar again reached out to the County in an effort to find out why the County filed its Petition and to see if a settlement could be reached promptly in order to avoid litigation regarding the filing of the Case.  To facilitate these discussions, the parties stipulated to extensions of the deadline for Alamar to file an objection to and motion to dismiss the Case, which stipulations were approved by the Court.  In the meantime, Alamar and the County continued to communicate, and Alamar continued to try to engage the County in meaningful settlement negotiations.

30.    When it became obvious that negotiations between the parties were going nowhere, Alamar attempted to persuade the County that (a) Chapter 9 was unnecessary to accomplish a settlement between the parties, (b) the County was not considering all of the alternatives available to it to resolve the matter, and (c) the parties must reach a settlement or Alamar would have no alternative but to challenge and seek dismissal of the Case.

31.    For example, on April 27, 2011, counsel for Alamar sent to counsel for the County a letter setting forth in detail the reasons why the County's Chapter 9 was unnecessary and the continuation of the Case was not required to resolve the disputes among the parties.  Alamar also discussed alternatives that, in Alamar's view, were not only available to the County but were affirmatively required under applicable law.  The letter also expressed dissatisfaction with the manner in which the County was approaching settlement discussions and asked the County to provide a proposal promptly.  (*See* Ex. M, Letter from D. Kelly to D.B. Clark, 4/27/11.)  The County's counsel responded promptly and said that the Board would arrange

10

another meeting "to finalize an offer," but the meeting could not be held before May 2, 2011.[5]

32.     Finally, on May 4, 2011, the County wrote to Alamar and acknowledged that it was still discovering significant errors in its assessment of and projections relating to the County's finances and, therefore, was pulling all negotiations off the table.  The letter also reported that (a) the Board had finally met on May 3 and would be "meeting again on May 11 to prepare *a new line-item budge*t [*i.e.*, not to "finalize an offer" as the County said it would do on May 2] for the remainder of FY 2011 . . . and new FY 2012," and (b) the County's bankruptcy counsel was "going *to start working* on a plan and disclosure statement forthwith."  (*See* Ex. Q, Letter from D.B. Clark to D. Kelly, 5/4/11 (emphasis added).)

33.     For its part, throughout this process, the County had been moving *backwards* in its proposals.  Originally, the County offered $1.9 million as a down payment.  (Ex. C.)  On March 30, 2011, the County reduced the proposed down payment to $1.5, *but* proposed to pay $3.5 over 15 years at 3%.  (Ex. N, Email from D.B. Clark to M. Hindley & W. Woodard, 3/30/11.)  Alamar considered this as a legitimate offer and, with the County's subsequent statement that $1.7 million could work, it appeared hopeful that the parties might ultimately be able to reach a settlement agreement.

34.     However, the County once again retreated from these numbers.  In response to Alamar's letter of April 27 (Ex. M), counsel for the County wrote that "it appears that we **could** do $1.2 down."  (Ex. O, Email from D.B. Clark, 4/28/11 (emphasis in original).)  But even *that* was not a firm commitment.  Indeed, counsel for the County was quick to note that "[t]his is not a 110% firm proposal because I still have to go to Idaho City and meet with the Commissioners

---

[5] Alamar's counsel sent another letter to the County's counsel asking, among other things, for a firm proposal from the County.  (*See* Ex. P, Letter from D. Kelly to D.B. Clark, 5/2/11.)

to get their vote." (*Id.*)[6]

## F.    The County's Financial Condition

35.    According to the testimony of Mary Prisco, the County's auditor, the County was current on all debts (other than the Judgment) as of the Petition Date. (Prisco Dep. at 56:6-11.) Ms. Prisco also testified that (other than the Judgment) that County has been able, and will continue to be able, to pay those debts through fiscal year 2011. (*Id.* at 56:12-24.)

36.    Also, as stated above, the County's February 22 Letter attached a spreadsheet outlining the County's available cash and its purported cash flow forecast through 2015. These cash-flow projections anticipated a cash surplus of $6.289 million for 2011 and $5.283 million in 2012. (*See* Ex. C, at 1st exhibit thereto.)

37.    In mid-April, the County produced revised projections showing a cash surplus of $3.525 million in 2011, and a surplus of $3.109 million in 2012. (Ex. R, Cash Analysis 4-15-11.xls, at page 5, line-item "Cash Balance Ending.")[7]

38.    On April 4, 2011, the County filed its statement of financial affairs ("SOFA") and its bankruptcy schedules (the "Schedules"). According to the Schedules, as of the Petition Date, the County had assets of $27,765,617.34 and liabilities of $7,377,343.79 (*including* the $5.5 million listed on Schedule F for the Judgment). More than $10 million of its assets consisted of cash and cash equivalents. The County listed vehicles and heavy equipment valued at $6,020,241, with liens totaling only $807,256.

39.    The Schedules also showed that the County had relatively few unsecured

---

[6] To say the least, the County's ongoing discovery of mistakes indicating that it could not have funded its prior proposals to begin with did not inspire confidence in the settlement discussions.

[7] On May 4, 2011, the County yet again revised the projections, this time asserting that the surplus for FY 2011 $3,286,550 and for FY 2012 $1,829,767. (Ex. S, Cash Analysis 5-3-11.xls, at last page, line-item "Cash Balance Ending.")

70582183.4 0099999-00001

creditors, most (if not all) of which were current.  Further, the County had vehicles  (Dock No.

55.)

**ARGUMENT**

**III.     BOISE COUNTY DOES NOT MEET CHAPTER 9'S ELIGIBILITY REQUIREMENTS.**

**A.     Chapter 9's Eligibility Requirements.**

Chapter 9 cases are uncommon for a reason – they invoke "principles of dual

sovereignty, which are deeply embedded in the fabric of this nation and commemorated in the

Tenth  Amendment of the United States Constitution."  *In re New York City Off-Track Betting*

*Corp*., 427 B.R. 256, 264 (S.D.N.Y. Bank. 2010).  Because of the constitutional issues that arise

from a municipal bankruptcy, "Congress consciously sought 'to limit accessibility to the

bankruptcy court' by municipalities."  *In re Cottonwood Water and Sanitation District,* 138 B.R.

973, 974, 979 (Bankr. D.Co. 1992) (quoting H.R. Conference Report, 94-938, p. 10, U.S. Code

Cong. & Admin. News 1976, p. 539).  Accordingly, in Section 109(c) of Code, Congress set

forth strict threshold requirements in the Bankruptcy Code for any would-be Chapter 9 debtor:

> (c) An entity may be a debtor under chapter 9 of this title *if and only if* such
> entity—
>> (1) is a municipality;
>> (2) is specifically authorized, in its capacity as a municipality or by name,
>> to be a debtor under such chapter by State law, or by a governmental
>> officer or organization empowered by State law to authorize such entity to
>> be a debtor under such chapter;
>> (3) *is insolvent*;
>> (4) *desires to effect a plan* to adjust such debts; *and*
>> (5)     (A) has obtained the agreement of creditors holding at least a
>> majority in amount of the claims of *each class* that such entity
>> *intends to impair under a plan* in a case under such chapter;
>> (B) *has negotiated in good faith* with creditors *and has failed to
>> obtain the agreement of creditors* holding at least a majority in
>> amount of the claims *of each class that such entity intends to
>> impair* under a plan in a case under such chapter;
>> (C) is unable to negotiate with creditors because such negotiation
>> is *impracticable*; *or*

13

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c) (emphasis added).

Thus, to be eligible for Chapter 9 relief, a municipality must meet each of the requirements of Section 109(c)(1)-(4) and one of the four requirements under Section 109(c)(5). Moreover, "Section 921(c) contains the added requirement that the court may dismiss the petition if the debtor did not file the petition in good faith." *In re Pierce County Housing Auth.*, 414 B.R. 702, 710 (Bankr. W.D.Wash. 2009). And when reviewing a debtor's qualifications under Section 109(c), bankruptcy courts do so "with a jaded eye." *In re New York City Off-Track Betting Corp.* 427 B.R. at 264; *see In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 82 (Bankr. D.N.H. 1994) (observing that the jurisdiction of bankruptcy courts "should not be exercised lightly in chapter 9 cases, in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment").

**B.**     **Chapter 9's Eligibility Requirements Indicate That a Municipality Must Develop a Plan and Negotiate With Creditors Prior to Filing Bankruptcy.**

Several things set Chapter 9 apart from the other chapters providing for bankruptcy relief. For example, Chapter 9 is the only chapter requiring that a debtor must not only be insolvent, it must be "insolvent" within the meaning of a special definition of the term applicable to municipalities only.[8]

---

[8] The general definition of insolvency under the Bankruptcy Code is a "financial condition such that the sum of [the] entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32).

70582183.4 0099999-00001

Further, subject to one narrow exception,[9] Chapter 9 requires a municipality to demonstrate that it has taken certain steps to formulate a plan *and* to negotiate the terms of the contemplated plan in good faith with the creditors to be adversely affected by the plan before it is eligible *to even file* a bankruptcy petition.  More particularly, Chapter 9 requires a municipality to perform two *prepetition* fundamental analyses in connection with the preparation and confirmation of *any* plan of adjustment.  The municipality must first consider how it intends to classify claims under a plan pursuant to § 1122 of the Bankruptcy Code.  It must then identify which classes of creditors it intends to impair under the plan pursuant to § 1124 of the Bankruptcy Code.[10]  Only then can the prospective debtor begin to go about attempting to satisfy the requirements of Section 109(5)(A)(B) through (C) of the Code, which require either that it (1) has obtained "the agreement of creditors holding at least a majority in amount of the claims of each class that [it] intends to impair" under the plan, (2) has negotiated in good faith with and failed to obtain an agreement of such creditors, or (3) is unable to negotiate with such creditors because it is "impracticable" to do so.  *In re City of Vallejo*, 408 B.R. 280 (9th Cir. BAP 2009).[11] As set forth more fully below, however, the County took *none* of these required steps.

---

[9] As discussed more fully below, § 109(c)(5)(D) allows a municipality to bypass the negotiation requirements of §§ 109(c)(5)(A) through (C) if it reasonably believes that a creditor may attempt to obtain an avoidable preference.

[10] Sections 1122 and 1124 of the Bankruptcy Code are among the Code's Chapter 11 provisions expressly made applicable in Chapter 9 cases.  *See* 11 U.C. C § 901(a).

[11] In *City of Vallejo*, the court ruled that § 109(c)(5)(B) requires that pre-petition negotiation must concern a plan of adjustment:

> because § 109(c)(5)(B) involves classification and impairment, it would be difficult for a municipality to prove that it negotiated in good faith with creditors it intends to impair unless the municipality had a plan of adjustment drawn or at least outlined when it negotiated with the creditors.  Thus, we conclude that the plain language of § 109(c)(5)(B) requires negotiations with creditors revolving around a proposed plan, at least in concept.

70582183.4 0099999-00001

**C.      The County Has the Burden of Proof With Respect to Its Eligibility for Chapter 9.**

The burden of proof falls squarely on the County to establish that it meets each of Section 109(c)'s essential eligibility requirements.  *In re City of Vallejo*, 408 B.R. 280, 289 (9th Cir. BAP 2009); *In re County of Orange*, 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995).  If the County fails to demonstrate that it meets those requirements, the petition must be dismissed.  *In re City of Vallejo*, 408 B.R. at 289; *In re County of Orange*, 183 B.R. at 599.

In this case, and even assuming that the County satisfied the first two requirements under Section 109(c),[12] the County's petition fails because the County cannot satisfy its burden of proof on any of the other requirements.

**D.      The County Cannot Satisfy the Insolvency Requirement of § 109(c)(3).**

To be eligible for Chapter 9, Section 109(c)(3) requires that a municipality be "insolvent."  A municipality is insolvent for purposes of Chapter 9 if it is "(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute[13]; or

---

408 B.R. at 297.  Thus, while negotiations with creditors aimed at avoiding bankruptcy are to be encouraged, such negotiations do not satisfy the good faith negotiation requirement of §109(c)(5)(B).  *Id.* The negotiations must involve "some outline or term sheet of a plan which designates classes of creditors and their treatment is necessary" to satisfy the requirement.  *Id.*; *see In re Pierce County Housing Auth.*, 414 B.R. at 713 (holding that, while extensive prepetition negotiations took place between debtors and creditors, they did not satisfy the good faith negotiation requirement of section 109(c)(5)(B) because those negotiations were not over the possible terms of a plan of adjustment.)

[12]    The County might satisfy the first two eligibility requirements under § 109(c)(1)-(2):  That it is a "municipality" within the meaning of the Bankruptcy Code, 11 U.S.C. § 101(40), and that Idaho has a statute purporting to authorize municipalities to file bankruptcy petitions.  *See* Idaho Code §§ 67-3901 *et seq.* (the "Act").  However the Act was passed in 1939 in connection with old Chapter IX, and not all of its provisions track today's Chapter 9.  The County has the burden of demonstrating to this Court's satisfaction that the Act still applies.

[13] This standard is similar to the standard in involuntary cases under Section 303(h)(1),which provides for when "the debtor is generally not paying [its] debts as such debts become due unless such debts are the subject of a bona fide dispute."  Under this standard, a "finding that a debtor is generally not paying its debts requires a more general showing than merely establishing the existence of a few unpaid debts."  *In re Focus Media, Inc.*, 378 F. 3d. 916, 929 (9th Cir. 2004) (internal quotation omitted).  Moreover, if an unpaid debt is the subject of a bona fide dispute, it does not even count for this analysis.  Thus, if the

(ii) unable to pay its debts as they become due." *In re Pierce County*, 414 B.R. at 710.  If the

debtor is current on its obligations as of the petition date, it must allege insolvency under the

second prong of the insolvency test.  *Id.*  This is a prospective test, "with the reference point

being the date the petition was filed.  In other words, 'it must be determined as of [the petition

date] whether [the Debtor] *will be* unable to pay its debts as they become due.'"  *Id.* at 710-11

(quoting *In re City of Bridgeport*, 129 B.R. 332, 337 (Bankr. D. Conn. 1991).  This is a cash

flow, not a budget deficit, analysis.  *City of Bridgeport*, 129 B.R. at 337.

     The County cannot demonstrate that it is insolvent under Section 109(c)(3).  As the

County auditor testified, the County is paying, and will be able to pay, its debts (other than the

Judgment) as they become due.  (Fact No. 35.)  The only issue, therefore, is the Judgment.  But

the Judgment does not render the County insolvent.   The Debtor's own schedules show that, as

of the Petition Date, the County had assets of $27,765,617.34 and liabilities of only

$7,377,343.79.  More than $10 million of its assets consist of cash and cash equivalents.  (Fact

No. 38.)  Moreover, the County's own cash-flow projections showed that the County is projected

to have *a cash surplus of $6.289 million for 2011 and $5.283 million in 2012*.  (Fact No. 36; *see

also* Fact No. 37 (showing a cash surplus of $3.525 million in 2011, and a surplus of $3.109

million in 2012.)[14]

     It is clear that municipalities with such surpluses cannot, as a matter of law, satisfy

Section 109's insolvency requirement.  For example, in *Ellicott School Building Authority*, the

---

County still disputes the Judgment, it cannot begin to satisfy this standard.  But even if it does not dispute
the Judgment (and there are no grounds to do so), the County still could not meet this standard because,
other than the Judgment, it is generally paying its debts.  (Fact No. 35.)

[14] In addition, and as described in the "good faith" section of this Motion, the County has failed to
consider significant avenues for raising revenue: the Tort Claims Act, and the ability to issue bonds.

court determined that insolvency had not been conclusively demonstrated where the debtor had

access to a reserve fund from which it could make its current debt payments. 150 B.R. 261, 265

(Bankr. D. Colo. 1992). Likewise, in *City of Bridgeport*, the bankruptcy court found that the city

failed to establish that it was insolvent where it had approximately $28 million in surplus funds

from bond sale proceeds. 129 B.R. at 337. In that case, the city offered evidence that it would

have a $16 million budget deficit in fiscal year 1991-1992 and argued that because the evidence

showed that "its expenditures will exceed its revenue, it has satisfied the burden of proving that it

is insolvent." *Id.* at 337. But the court rejected that argument, finding that the city's solvency

should be judged by a cash flow, not a budget deficiency analysis, because "Section

101(32)(C)(ii) defines insolvency by whether Bridgeport will be able to 'pay its debts as they

become due', not on whether it has a budget gap." *Id.* The Court then found that the city was

not insolvent because it had sufficient cash to make up any shortfall in the fiscal year 1991-1992

due to a surplus which the city kept as "a contingency fund to give Bridgeport 'a cushion to

allow it to be able to meet its obligations when due, [without] having to do the variety of short

term borrowings the city had traditionally done, all at a very high interest rate.'" *Id.*

Here, as in *City of Bridgewater* and *In re Ellicott,* the County is holding a substantial

surplus, which is sufficient to pay down or pay off the Judgment. Accordingly, the County is not

insolvent, and this Court should dismiss the County's Petition.

The County may assert that, even though it has abundant cash-flow surplus now, it has

projected that it will have a deficit a few years from now. This argument, however, gets the

County nowhere. Indeed, courts have routinely rejected such arguments on the ground that

---

Given its ability to raise additional revenue to pay the Judgment, the County cannot demonstrate
insolvency.

70582183.4 0099999-00001

anticipating insolvency is not the correct standard and because such arguments are based on unreliable speculation. For example, in *City of Bridgeport*, the court rejected the city's argument that even if it would not be insolvent for the fiscal year 1991-1992, it would be insolvent by the fiscal year 1992-1993. *Id.* at 338. The court determined, however, that "a prediction at the commencement of this case that Bridgeport will be unable to pay its debts as they become due in the 1992-1993 fiscal year is unreliable," and held that "to be found insolvent a city must prove that it will be unable to pay its debts as they become due in its current fiscal year or, based on an adopted budget, in its next fiscal year." *Id.* Similarly, in *In re Hamilton Creek Metro. District*, the Tenth Circuit found that the "mere possibility or even speculative probability" of insolvency is not enough to meet the insolvency requirement. 143 F.3d 1381, 1386 (10th Cir. 1998). And in *In re Town of Westlake*, the court determined that the town was not insolvent because it could reduce costs and thereby alleviate its projected deficits. 211 B.R. 860, 866-76 (Bankr. N.D. Tex.1997). According to the court, § 101(32)(c)(ii) does not "encompass a situation where a municipality deliberately budgets or spends itself into insolvency." *Id*. at 867.[15]

---

[15] Likewise, the County cannot satisfy Section 109(c)(4), which requires a debtor to "*desire[] to effect a plan* to adjust its debts." No bright-line test exists for determining whether a debtor desires to effect a plan sufficient to satisfy Section 109(c)(4). And at first glance, this requirement may appear pro-forma, and that the mere act of filing of a Chapter 9 petition would suffice as evidence of a desire to confirm a plan. However, when evaluating this requirement, courts may consider a variety of factors, including the debtor's attempts to resolve claims by submitting a draft plan, or by other evidence of intent. Moreover, the "desires to effect a plan" language of Section 109(c)(4) must be construed in the context of Section 109(c)(5)'s requirements that the prospective debtor must develop a plan with classification and impairment in mind and negotiate the terms of the plan. In other words, a municipality must have not only have the subjective desire to effect a plan, it must demonstrate its desire by taking objective actions.

In this case (as discussed in detail in other sections of this Motion), the relevant facts demonstrate the County did not file to confirm a plan, but instead merely to delay Alamar's ability to execute on the Judgment, and as a substitute for a bond pending appeal. For example; (1) the County offered what at best can be described as *de minimus* offer given the amount of the Judgment; (2) the County never tried to negotiate Alamar's potential treatment under a bankruptcy plan; (3) two-and-half months into the Case, and the County has yet to propose any concrete terms to Alamar; and (4) the County has not committed to use the assets it has as its disposal to pay the debt, including the sizable surplus and its statutory authority

19

**E.      The County Cannot Meet Any of the Requirements of § 109(c)(5).**

Section 109(c)(5) "is intended to promote pre-petition negotiations between a municipality and its creditors concerning a plan of adjustment."  *In re Valley Health Sys.*, 383 B.R. 156, 161 (Bankr. C.D. Cal. 2008).  A Chapter 9 debtor must demonstrate that it meets at least one of the four alternative requirements set out in this subsection.  In this case, the County cannot satisfy any of the four.

**1.      The County Has Not Obtained the Agreement of the Class It Intends to Impair.**

The County cannot meet the requirement of Section 109(c)(5)(A) because it has not obtained an agreement with Alamar, its largest and perhaps *only* impaired creditor.  (Ex. L, Prisco Dep. at 107:10-13 (testifying that the County has not obtained the agreement of Alamar to adjust the Alamar judgment in a plan).)  In fact, the County did not obtain the agreement of any other creditor that might be impaired in this Case.  (*Id.* at 107:14-16 (Ms. Prisco testifying that she knows of no such agreements.)

**2.      The County Did Not Negotiate With Alamar in Good Faith.**

Section 109(c)(5)(B) requires that the debtor demonstrate that it "has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter."  In this case, the County is certain to want to impair Alamar's rights under the Judgment.  But the fact of the matter is that the County did not negotiate with Alamar in good faith.

---

to raise revenue.  Given these facts, the County cannot satisfy its burden to show that it truly desires to effect a plan concerning its debts.

70582183.4 0099999-00001

"Good faith" in the Chapter 9 context is so important that courts take an independent analysis of whether it has been satisfied. For example, in *In re Sullivan County*, one of the major creditors, Wheelabrator, stipulated that "'the debtors did negotiate in good faith with Wheelabrator with respect to the contract dispute between the two parties prior to the filing of the petition for relief.'" 165 B.R. at 77. Based on that stipulation, the debtor argued that the good faith negotiation requirement had been satisfied. Notwithstanding the stipulation, the court engaged in its own independent evaluation of the evidence and disagreed. *Id.*

In doing so, the court found that the good faith requirement had not been met. The *In re Sullivan* court considered – as other courts do – several factors in its evaluation. First, the court considered how serious the debtor was during the negotiations. On this point, the court held "that notwithstanding repeated demands from Wheelabrator for a concrete plan of action to [pay the debt], the debtors chose to waffle and evade any serious attempt to come up with a feasible repayment plan until some four or five weeks before the filing, and then only with a half-hearted effort." *Id.*[16]

Second, the court looked to whether the negotiations involved a "plan" to deal with the debtor's financial problems. *Id.* But the record established "that at no time prior to the Chapter 9 filing did the Districts set out for [creditors] a comprehensive workout plan dealing with all of their liabilities and all of their assets in terms comparable to a plan of adjustment that could be effectuated under Chapter 9 of the Bankruptcy Code." *Id.* Because the negotiations were not centered around a plan, the debtors could not satisfy the good faith negotiation requirement.

---

[16] Also significant to the court in *In re Sullivan* was the "lackadaisical pace" of the negotiations. 165 B.R. at 79 n.54. Furthermore, the court did not give any merit to debtor's arguments that Wheelabrator refused to negotiate an "appropriate workout" of the debt finding that "Wheelabrator simply refused to 'negotiate against itself' until the Districts presented a convincing and concrete plan of action that in the real world would be authorized by the member municipality representatives." *Id.*

On this point, the court recognized the black-letter principle that "while the statutory requirement does not require a formal plan as such, *some sort of comprehensive plan is required* as one of the 'screening factors' to avoid a too early and rapid resort to the bankruptcy courts by municipalities." *Id.* at 78 (emphasis added).  Indeed, the court held that "good faith negotiations per se are not sufficient to meet the statutory requirement *unless they revolve around the negotiating of the terms of a plan* that could be effectuated if resort is required to Chapter 9 of the Bankruptcy Code." *Id.* (emphasis added).  The court also noted that because of the constitutional issues that arise from a municipal bankruptcy, "Congress consciously sought 'to limit accessibility to the bankruptcy court' by municipalities.  One way to do so was to require the municipal entity, before rushing to this Court, to first seek to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan to be filed under section 941 of the Code." *Id.* (quoting *In re Cottonwood*, 138 B.R.  at 979 (internal citations omitted).

Third, not only must these negotiations revolve around a "comprehensive plan," they must occur *prior* to filing the bankruptcy petition because "the negotiating posture of the parties changes once the bankruptcy petition is filed."  *In re Cottonwood*, 138 B.R. at 974.  According to the courts in both *In re Sullivan* and *In re Cottonwood*:

> [i]t is one thing to negotiate when the debtor is being confronted with the pressures of defaults on public debt and the requirement of certifying ever-increasing mill levies in order to provide for the payment of such debt.  It is another when the entity is being protected by the stay of section 362 of the Code and the bondholders are being faced with an indeterminate period of nonpayment of their bonds.  The "creditor protection" provided by section 109(c)(5), as interpreted by this Court, insures that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor before their rights are further impaired by the provisions of section 362 of the Code.

22

*In re Sullivan*, 165 B.R. at 78-79 (quoting *In re Cottonwood*, 138 B.R. at 974);[17] *In re Ellicott*, 150 B.R. at 266 (dismissing Chapter 9 petition and concluding that to meet the requirement of § 109(c)(5)(B) a debtor must demonstrate that it "engaged in good faith negotiations with its creditors concerning the possible terms of a plan to be effected pursuant to § 941 of the Bankruptcy Code").

Fourth, the court considered whether the debtor had fully considered its ability to raise revenues. The court noted that a "commercial party can hardly 'negotiate in good faith' regarding unpaid obligations if it chooses to ignore clear, unambiguous contractual rights of the other party and, more importantly, refuses to acknowledge or throw into the negotiating equations a large and significant asset that it holds" – *i.e.*, the debtor's ability to make assessments to meet its obligations. *Id.* at 78. While recognizing that municipalities "do not have to demonstrate that they have fully exercised their taxing powers to the maximum extent possible," the court found that debtors' negotiations were not in good faith because the debtors (1) "*never* exercised their assessment powers prior to coming into the bankruptcy court" and then (2) in their negotiations with Wheelabrator, they "attempted to ignore that primary asset." *Id.*

In this case, each of these factors weighs in favor of dismissing this Case:

- As in *In re Sullivan*, Boise County has "waffle[d] and evade[d] any serious attempt" to resolve this dispute. Despite Alamar's repeated attempts to negotiate with the County, which began immediately after the Judgment was rendered, the County approached settlement lackadaisically. The County waited until February 22 (*two months* after the

---

[17]   There is a difference between traditional "good faith" negotiations and "good faith" negotiations in the context of Chapter 9. "Good faith" in the Chapter 9 context involves factors (including those mentioned above) that would not normally be implicated in a traditional good faith analysis. Thus, in both *In re Sullivan* and *In re Cottonwood*, the courts determined the good faith negotiation requirement was not met

Judgment, and approximately *one week* before the Petition Date) before it made its first and only settlement offer to Alamar.

- Even then, the County's offer was unreasonably low given the amount of the Judgment. To add insult to injury, after the County filed its petition (banking on the disparity of negotiating power once a party filed for bankruptcy) the County has actually *backpedalled* in its negotiations with Alamar.

- Moreover, the County's negotiations with Alamar did not revolve around a potential plan of adjustment. The February 22 Letter does not mention bankruptcy. Indeed, the County has admitted that it did not then, nor does it now, have even a draft of a plan to discuss with Alamar.[18]

- The County also failed to adequately consider alternatives to filing for bankruptcy – one being its ability to raise revenues under the Tort Claims Act, Idaho Code § 6-928, which is one of the County's greatest assets. *See* 6 Collier ¶ 921.04[2], at 921-6 (identifying "the extent that alternatives to chapter 9 were considered" as a factor in the good faith analysis).[19] The act is mandatory and affirmatively mandates that the County "*shall* levy

---

[18] In fact, bankruptcy was merely mentioned to Alamar in passing  an option the County was considering. *In re Pierce County Housing Auth.*, 414 B.R. at 713 (finding that the only mention of bankruptcy by the debtor was the debtor's statement at a mediation that bankruptcy was being considered as an option, which the court found to be insufficient).

[19] Also, the County has significantly underestimated its ability to raise funds to pay the judgment through other means. For example, under Idaho Code § 31-1608, a county can declare an "emergency" in order "to meet mandatory expenditures required by law" (such as the Judgment) and "make expenditures necessary to . . . meet such an emergency."  If a county does not have sufficient funds, "warrants shall be registered." *Id*.  In turn, "the county treasurer shall identify ways of redeeming warrants, including short term borrowing from other county funds at market interest rates, until a warrant redemption levy is established." Idaho Code § 31-1507.  Among other things, Idaho Code § 63-806 states that "All money in the county treasury on the first day of October . . . which is no longer needed must be transferred to the county warrant redemption fund."

even though "there were prepetition negotiations between the creditors and the debtor that were done in good faith." *In re Sullivan*, 165 B.R. at 79; *In re Cottonwood*, 138 B.R. at 974.

and collect a property tax, *at the earliest time possible*, in an *amount necessary* to pay a claim or *judgment* arising under" the act.  Idaho Code § 6-928 (emphasis added).  And despite any claim by the County that other statutes might contradict the County's ability to use this provision to pay the Judgment, the statute unambiguously requires the County to pay claims under the Tort Claims Act, "*notwithstanding any provisions of law to the contrary*" and even if there are "*no funds available*."  *Id.*

There is no evidence that the County adequately considered this option.  In her deposition, Jamie Anderson, the chair of the Board of Commissioners, would not explain the County's position regarding the Tort Claims Act.  In fact, when asked the baseline question of "[d]id the Commission come to a conclusion as to whether or not [the Tort Claims Act] could apply or could not apply to help pay the Alamar judgment?" Ms. Anderson refused to answer on the grounds of privilege.  (Ex. H, Anderson Dep. at 39:22-41:16.)  And on April 27, 2011, the County's bankruptcy attorney, indicated that he had never considered the Tort Claims Act as a means to pay the Judgment.  (Ex. T, Email from D.B. Clark to D. Kelly, 4/27/11.)

• Another obvious alternative to bankruptcy that the County did not adequately consider is its ability to issue bonds to pay the Judgment.[20]  The County has argued repeatedly that it could not issue bonds, because to do so would exceed Idaho's constitutional debt limitations and, therefore, necessitate a special election requiring the approval of two-thirds of the County's qualified electors.  *See* Idaho Const. Art. VIII, § 3 (2011) ("No county . . . shall

_____

[20]  The Act authorizing the County to file bankruptcy provides that a municipality's bankruptcy protection "is intended to and does provide, among other matters, an *alternative system for the refunding of bonds*, the same to be used pursuant to the provisions of, and in conjunction with[,] the Federal Bankruptcy Statute."  Idaho Code § 67-3909 (emphasis added).  In its initial postpetition discussions with Alamar, the County suggested that its Chapter 9 was based in part on its ability to take advantage of the "alternative system" of issuing bonds to pay the Judgment.  Subsequent communications, however, suggest that the County may never have intended to take advantage of this favorable feature, and it now seems that the County no longer intends to use its Chapter 9 for this purpose in any event.

incur any indebtedness . . . exceeding in that year, the income and revenue provided for it for such year, without the assent of two thirds (2/3) of the qualified electors thereof voting at an election to be held for that purpose"). But the County is wrong. For over a century, the Idaho Supreme Court has recognized that this debt limit does not apply to fund obligations imposed by law. *See Veatch v. City of Moscow,* 109 P.722 (Idaho 1910) (recognizing that "[t]he authorities are uniform to the effect that where legislative authority exists the proper officials have the power to negotiate for an issue of refunding bonds without submitting the question to the electors of the district."). In fact, in *Independent Sch. Dist. No. 12 v. Manning*, the Idaho Supreme Court addressed a tax levy to pay a judgment (the alternative the County has rejected) and found that the bond obligations were imposed by law and, therefore, not within the constitutional prohibition. 185 P.723 (1919); *see also Butler v. City of Lewiston*, 83 P.234, 238 (Idaho 1905); *Sebern v. Cobb,* 238 P.1023 (Idaho 1925).[21]

- Furthermore, the Board did not "approve[] the chapter 9 filing only after a public meeting , noticed in accordance with state law, at which attendees were advised of the Board's intentions to file a chapter 9 petition and given the opportunity to question the Board and its professionals and to be heard on the issues." *Valley Health Systems*, 383 B.R. at 164. To the contrary, Boise County made its decision away from public scrutiny. The issue was not on the agenda; there was no prior public notice; and there was no opportunity for the public to be heard. In fact, the notes taken by the Commissioners in the "executive sessions" in which bankruptcy was discussed were culled from the County's documents it provided during discovery and have still not been produced. (Ex. L, Prisco Dep. at 42:21-43:21.) And the Commissioners have

---

[21] The rationale for these decisions is straightforward: (1) the voters essentially have nothing to vote on – the obligation exists and the only option is to find a way to satisfy the obligation; and (2) the issuance of

evoked "privilege" over whether they even came to a conclusion about the applicability of certain statutes. (Ex. H, Anderson Dep. at 40:17-41:16 (asserting privilege and not answering the question of whether the Board reached a conclusion about the applicability of Section 6-928 to be able to help pay the Judgment).)

### 3.    It Was Not Impracticable for County to Negotiate with Creditors.

Because the County cannot satisfy the good faith negotiation requirement, it may argue that negotiations with the creditors intended to be impaired under a plan were "impracticable" under § 109(c)(5)(C). However, the legislative history of § 109(c)(5)(C) indicates that the "impracticable" requirement "was enacted in 1976 during the time of an impending municipal bankruptcy filing by the City of New York and was intended to cover situations in which a very large body of creditors would render prefiling negotiations impractical." *In re Sullivan County*, 165 B.R. at 79 n.55 (*citing* 2 Collier on Bankruptcy par. 900.03, p. 900-24 (15th Ed.1993)). But the County has only approximately only 50 creditors. (*See generally* Ex. L, Prisco Dep. at 120:1-7 (Mr. Clark's comments). According to the County Auditor, who has the obligation to examine and settle debts of the County, the County could have negotiated with all of those creditors pre-petition. (*Id*. 120:9-23.)

More to the point, however, the County was not required to negotiate with *all* of its creditors. The County was required to negotiate only with those creditors that the County intends to impair under § 1124 of the Bankruptcy Code. Because it currently appears that the

---

bonds on an involuntary debt is not the creation of new indebtedness, it just changes the form of the indebtedness from a payment due under a judgment to a payment due under the bonds.

County intends to impair Alamar only, all it had to do was negotiate with only one creditor:

Alamar. Obviously, negotiations with Alamar were not "impracticable."[22]

### 4.     The County Cannot Show that Alamar Attempted to Obtain an Avoidable Preference.

Section 109(c)(5)(D) permits a Chapter 9 filing if the prospective debtor "*reasonably*

believes that a creditor *may* attempt to obtain a transfer that is avoidable under section 547 of this

title ." *Id*. (emphasis added). The County may try to argue that Alamar's filing of the Writ of

Execution in late February satisfies this prong. Not so. Alamar obtained the Judgment in

December and, throughout all of January and February, Alamar attempted to engage the County

in settlement negotiations. There is no evidence that, had the County been prepared and

knowledgeable about its financial condition, as well as upfront with Alamar regarding its

intentions about treating the Judgment in bankruptcy, Alamar would have continued its

execution efforts. Indeed, the County's actions in this case – (1) having considered bankruptcy

in December; (2) not engaging in any substantive settlement discussions until late February; (3)

making a *de minimus* settlement offer; and (4) filing for bankruptcy, without public comment,

mere days after Alamar filed its Writ of Execution – suggests that that County was setting this

case up, ready to file its Petition the moment that it drove Alamar to take decisive action. The

County should not be able to hang its hat on Section 109(c)(5)(D) under these circumstances.

Indeed, the whole idea behind Section 109 is to require good faith negotiations, unless such

negotiations are near impossible. Here, if anything, the County *created* the circumstances which

---

[22] The County may argue (as the debtor did in *In re Sullivan*) that negotiations were impracticable because, the debtor "could not get an agreement with [its largest creditor] as to the debt obligations owing between the parties." 165 B.R. at 79, n. 55. However, this Court should reject any such argument. As the *In re Sullivan* court noted, "'impracticable' was [not] intended to be applied in that context." And as set forth in detail herein, Alamar repeatedly tried to negotiate with the County but it rebuffed or simply ignored such attempts. *Id*.

led Alamar to file the Writ of Execution.  Accordingly, the County cannot satisfy Section 109(c)(5)(D).

In sum, the County cannot satisfy its heavy burden of proving the elements required under § 109(c).  Therefore, the County's case should be dismissed.

## IV.   THE  COUNTY FILED ITS CHAPTER 9 CASE IN BAD FAITH

Even if the County could satisfy the requirements of Section 109(c), the Bankruptcy Code imposes upon would-be Chapter 9 debtors a good faith requirement.[23]  Under Section 921(c), a "court has discretion to dismiss a petition if it finds that the petition was not filed in good faith."  *Orange County*, 183 B.R. at 608.  However, "[g]ood faith in the chapter 9 context is not defined in the Code."  *Id.*  Thus, courts not only look at issues exclusive to the Chapter 9 context that might bear on good faith, they also "appl[y] to chapter 9 cases the judicial reasoning that developed in chapter 11 cases."  *Id.*[24]

Looking at the various factors used by courts (which includes those factors considered under § 109(c)(5)(B)), it is clear that the County did not file its Chapter 9 case in good faith.  For example, in *In re Sullivan*, the court ruled that the petition in that case was filed in bad faith based on its finding that the decision to file bankruptcy:  (1) "was not the end result of a considered debate, weighing the benefits and consequences of the petition" and (2) "was not a final alternative chosen as a last resort."  165 B.R. at 82. The court noted that "[o]n the contrary,

---

[23] Even though there is no express statutory good faith requirement, good faith has been held to be an implicit condition to the filing and maintenance of a bankruptcy case for over a century. As the Court of Appeals for the Fifth Circuit explained: "Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings."  *In re Little Creek Dev. Co.,* 779 F. 2d 1068, 1071 (5th Cir. 1986).

[24] Broadly stated, "the Ninth Circuit test for good faith in a chapter 11 case is whether the debtor is attempting to unreasonably deter and harass its creditors or attempting to effect a speedy, efficient reorganization on a feasible basis."  *Orange County*, 183 B.R. at 608.

the option was not on the written agenda" and that there was "no evidence of any meaningful

discussion of what type of plan might be appropriate under Chapter 9 by the member

municipalities or their representatives before, or even immediately after, the final vote was cast."

*Id.*

     The *In re Sullivan* court further found that the "debtors' immediate post-filing actions

tend to confirm that the bankruptcy option was chosen with no real thought or sincere intention

of debt adjustment in an overall plan sense.  Instead, the decision appears to be a late hour

litigation tactic to hold off Wheelabrator's threatened shut-out and an attempt to position the

Districts to force some compromises."  *Id.*  In that regard, it was significant to the court that the

debtors' correspondence "made no reference to any thoughts of plans or debt restructuring."  *Id.*

     The court summarized its view of the debtors' bad faith as follows:

> The debtors created their own problem of a massive debt by signing a
> contract and then refusing to face up to their obligations under that contract
> with steadfast refusal to exercise their assessment powers.  Even when the
> final opportunity was presented, not 48 hours before the termination
> deadline, the debtors still deliberately refrained from accessing their
> primary asset to attempt to resolve their financial problems.  They opted
> instead to continue their "two-step sidestep" by seeking protection of the
> Bankruptcy Code.  If this case can pass muster as a good faith filing it is
> difficult to imagine any municipality that could not "engineer its way into
> the bankruptcy courts" by simply refraining from paying its debts from
> available assets and then claiming the resulting inability to pay debts as they
> came due justified bankruptcy court relief.  The possibilities for abuse and
> transfer of municipal corporate litigation from the state courts to the
> bankruptcy courts is easily foreseeable.

*Id.*

     This Case is nearly identical.  First, as in *In re Sullivan*, Boise County did not debate the

option of filing for bankruptcy in the public; it was not on the agenda; there was no prior public

notice.  Second, there is no evidence of any "meaningful discussion" of what alternatives were

considered,[25] what type of plan might be appropriate, or how Alamar may be treated.  Third, the

County's immediate post-petition actions "tend to confirm that the bankruptcy option was chosen

with no real thought or sincere intention of debt adjustment in an overall plan sense."  (*See* Fact

Nos. 29-34 (discussing post-petition communications.)  Nearly five months following the

Judgment, over two months since the Petition, and despite all of its vaguely stated intentions, the

County *still* has not provided to Alamar *any* proposed plan terms to deal with the Judgment and,

in fact, has gone backwards in its negotiations.  And it appears now that the County may not

have a plan prepared until Memorial Day.  (Ex. Q, Letter from D.B. Clark to D. Kelly, 5/4/11, at

2.)

In addition, the County created its own problems that, in turn, led to this Case.  It

intentionally discriminated against Alamar which caused the Judgment to be entered; maintained

woefully deficient records and accounting practices; failed to adequately consider significant

assets, such as its surplus cash and revenue-generating abilities; and proceeded at a lackadaisical

pace.  Every time that the County has been given a chance to make a reasonable settlement offer,

the County, like the debtors in *In re Sullivan County*, "opted instead to continue their "two-step

sidestep" by seeking protection under the Bankruptcy Code.

Moreover, the County has improperly used the Chapter 9 process as a vehicle to resolve a

dispute solely between two parties – itself and Alamar.  It is undisputed that the Petition was

filed solely because of the Judgment.  Bankruptcy, however,         is an improper forum for

attempting to resolve two-party disputes.  *See  In re Coastal Cable T.V., Inc.,* 709 F.2d 762, 765

(1st Cir. 1983) (dispute between parties with competing ownership claims to the same asset); *In*

---

[25] Indeed, as set forth above, any such discussions have been shielded from discovery by the County's
claim of privilege.

*re U.S.A. Motel Corp.*, 450 F.2d 499, 504-06 (9th Cir. 1971)("[T]he resolution of the internal

dispute . . . certainly might have been advantageous to USA and its stockholders, but the

achievement of those aims, without more, afforded an insufficient basis for the intervention of a

Chapter X court.")

Finally, the County's Case should be dismissed as a bad faith filing because it was filed

as a substitute for obtaining a subpersedeas bond pending its appeal of the Judgment.  As the

County has admitted, the only reason it filed for bankruptcy was because of the Judgment, which

it has appealed.  But in appealing the Judgment, the County neither filed a bond, nor sought leave

to appeal without a bond, even though the County had the time and financial means to do so.

Instead, it filed the Petition as an alternative to obtaining a bond.  Doing so constitutes bad faith.

*In re Marsch,* 36 F.3d 825, 828-29 (9th Cir. 1994) (where debtor had sufficient assets to satisfy

judgment, it was improper for debtor to file chapter 11 petition simply to delay collection of

judgment and avoid posting appeal bond);  *In re Byrd*, 172 B.R. 970, 973 (Bankr. W.D. Wa.

1994) ("Unless the debtor can demonstrate that he has no alternative to stay the judgment other

than by Chapter 11, his petition must be dismissed."); *see also In re Harvey*, 101 B.R. 250, 252

(Bankr. D. Nev. 1989) (no "badges or indicia of bad faith" were present, but the court

nonetheless dismissed on the grounds that the debtors had failed to apply to the trial court for the

right to file an appeal bond "commensurate with their financial ability").

In sum, not only should the Court dismiss the Petition on the grounds that the County

cannot satisfy the requirements of Section 109(c), the Court should dismiss the Petition because

it was filed in bad faith under Section 921(c).

## V.  <u>CONCLUSION</u>

For the reasons stated above, Boise County's Petition should be dismissed.

DATED this 11th day of May 2011.

70582183.4 0099999-00001

STOEL RIVES LLP


/s/Danny C. Kelly
Danny C. Kelly
Mark E. Hindley
Counsel for Alamar Ranch, LLC and YTC, LLC

33