**United States Bankruptcy Court**
**District of Idaho**

In re  BOISE COUNTY                                    Case No.  11-00481-TLM

                              Debtor                  Chapter   9

# DISCLOSURE STATEMENT, DATED JUNE 14, 2011

## I. INTRODUCTION

This is the disclosure statement (the "Disclosure Statement") in the Chapter 9 case of Boise County ("Debtor").  This Disclosure Statement contains information about the Debtor and describes the Chapter 9 Plan filed contemporaneously with this Disclosure Statement (the "Plan").  ***Your rights may be affected.  You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney.  If you do not have an attorney, you may wish to consult one.***

The proposed distributions under the Plan are discussed in this Disclosure Statement.  General unsecured creditors will receive a distribution based upon their allowed claims and Debtors' cash flow; secured creditors will be paid as set forth in the Plan.

### A.  Purpose of This Document

This Disclosure Statement describes:

♦   The Debtor and significant events during the bankruptcy case,

♦   How the Plan proposes to treat claims or equity interests of the type you hold (i.e., what you will receive on your claim or equity interest if the plan is confirmed),

♦   What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan,

♦   Why the Proponent believes the Plan is feasible, and how the treatment of your claim under the Plan compares to what you would receive on your claim or equity interest in liquidation, and

♦   The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement.  This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

### B.  Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan described in this Disclosure Statement.  This section describes the procedures pursuant to which the Plan will or will not be confirmed.

  1.  *Time and Place of the Hearing to Approve This Disclosure Statement and Confirm the Plan:*  The hearings at which the Court determined to approve this Disclosure Statement will be scheduled at the United States Courthouse, Boise, Idaho, before the Hon. Terry L. Myers, Chief Bankruptcy Judge.  Confirmation of Debtor's proposed Plan will be set thereafter.   You will receive a separate notice for the hearing on confirmation of the Plan.

DISCLOSURE STATEMENT–Page 1
M:\MB\mbwork\Blair\Boise County\Plan\25B_SBDISC-1.wpd

2.  *Deadline For Voting to Accept or Reject the Plan:*  If you are entitled to vote to accept or reject the plan, you are to vote on the ballot which will be submitted with a formal Order of this Court. Return the ballot to the Clerk of this Court, at the address shown in the Notice, or to Debtor's attorney. See section IV.A. below for a discussion of voting eligibility requirements.

3.  *Deadline For Objecting to the Adequacy of Disclosure and Confirmation of the Plan:* Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon debtor's counsel by the date set forth in the Order setting the hearing on approval of this Disclosure Statement. Once this Disclosure Statement is approved (with such amendments as the Court requires) it will be submitted, with the Plan and a ballot, to the creditors. You must submit your ballot before the due date set forth in the ballot.

4.  *Identity of Person to Contact for More Information:*  If you want additional information about the Plan, you should contact D. Blair Clark, Attorney for Debtor, at 1513 Tyrell Lane, Suite 130, Boise, ID 83706.

C.   Disclaimer

***The Court has not yet approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, If the Court has approved this Disclosure Statement, that does not constitute an endorsement of the Plan by the Court, or any recommendation that it be accepted.***

II.   BACKGROUND

A.   Description and History of the Debtor

Boise County, Idaho is a County organized under the Idaho State Constitution and statutory authority. It is large in size, but small in population. Boise County originated during the Idaho gold rush of 1863. During those times, the areas surrounding Idaho City (the County Seat) and the adjacent areas of Placerville, Centerville, and the Boise Basin mining area were settled. The gold boom lasted through 1866 and then were thought to be 'panned out.' Hydraulic placer mining than began, which persisted through the 19th and into the 20th century. Some towns, like Quartzburg, disappeared altogether, but others remained.

Boise County is geographically diverse and wide-spread. There are few areas that easily access other areas due to the state of the roads, the mountains and rivers that divide the various small communities, and the small size of the population as a whole.

The County Seat has always been in Idaho City. The Courthouse has been used for well over a century. The County government has had to expand, however, and the County acquired the neighboring saloon known as the "Miner's Exchange."   Today, the Boise County offices occupy this building. The original bar and back bar have become the desk for the County Commissioners meetings.

One of the other "populated" areas is that of Horseshoe Bend, which is on Highway 55 north of Boise. The town of Horseshoe Bend derives its name from its location. A lower part of the city lies on a fertile horseshoe shaped peninsula cut by the Payette River. The Boise National Forest and private rangeland surround the city. Because of the Boise Basin's cold winters and deep snows, many miners came out of the mountains to winter in the Horseshoe Bend area and to graze any livestock on the grass covered foothills. Cattle and sheep ranching would later become a major industry in the low lying western foothills of the Boise Basin.

As a result of the mining industry, the timber industry also developed and grew in the Horseshoe Bend area. However, the last major mill, Boise Cascade Corporation's mill, closed in 1998.   Horseshoe Bend's

population remained around 500 during the 1960's and 1970's. Subsequently, the population swelled to around 900, where it has remained for the past several years.

With the decline of the natural-resource based economy, the Horseshoe Bend area is becoming an attractive community for people seeking small town affordable housing within an easy commute to their jobs in nearby Boise.  There is also a project underway in the area for generation of hydropower using flows from the Payette River.

Another area is that of Garden Valley and Crouch.  Crouch was established in 1934 with a new post office.  It is the commercial district for Garden Valley. The town is named after a miner who homesteaded near the confluence of the Middle and South Payette Rivers. In the 1920's, Mr. Crouch donated property for a new community hall in Garden Valley.

Garden Valley's population was originally quite diverse.  The residents were themselves, or were descended from, immigrants from several European nations, as well as settlers from Illinois, Iowa, and Ohio who were skilled farmers and merchants. By the turn of the century, the valley's population had grown from seventy-nine people in 1870, the year of Idaho's first census, to three hundred people. Most of the men were engaged in farming, the rest were miners. Garden Valley developed into a close-knit community.  Terrace Lakes development began a new growth for recreational vacation properties, but more and more people have moved their residences to the area permanently.  While descendants of many of the old families still live in the area, more have come from other places.  Like Horseshoe Bend, many people who now reside in Garden Valley work in Boise.

### B.    Functions of the County

Some statistics concerning Boise County will hopefully assist the reader in learning about the County, its needs, requirements, mandates and issues.

The County owns and maintains 289 miles of roads, most of them dirt or gravel composition.  There are 25 Federal bridges and 28 local bridges of less than 20' in length.  Due to the mountainous terrain and the isolated status of many of the residents, maintenance of these roads and bridges is of paramount importance.

In 2010, there were 93 building permits issued for the entire county, 21 of which were 'enhanced.'  There were also 50 septic permits.  Boise County is not a "growth" area.  This poses another problem, as the property tax revenues are in decline due to the overall Idaho economy.  To put it bluntly, many property owners are simply not paying.

Law enforcement is handled through the Boise County Sheriff.  There were 4,637 calls to which response was made, and an additional 1,854 calls.  There were 1,267 citations and 286 arrests.  However, the Boise County jail is no longer usable and is closed.  Jail facilities are contracted through the Ada County Sheriff on a written contract.  A motion was filed to assume that contract.

The County also provides health department services through the Central District Health Department. In Boise County in FY2010, there were  99 health inspections.  There were also benefits to children under the State's WIC program; this provided 792 clinic visits, 53 vaccinations and disbursed $15,355 in vouchers.

The role of County government in Idaho is designed to be active.  The County is the designated entity designed to handle various aspects of citizens' needs.  In one respect,  Counties serve as an arm of the state government in administering elections, enforcing state laws, and performing many other state-mandated functions.  However, they also serve as a unit of local government which has responsibilities in meeting the needs of its own citizens. The following is a list of many of those required services. Most are supported by either property taxes, fees and state shared revenues, federal revenues, or a combination of sources.

PUBLIC SAFETY

The visible part of law enforcement is Patrol, both On and Off-Road. This is handled via the Boise County Sheriff. As stated, the County is mandated to provide for jail services, which it does. The Sheriff is also responsible by law for service of civil process. The Sheriff also handles drug enforcement programs, issues drivers' licenses, maintains and operates a juvenile detention facility, arranges for training of law enforcement officers. The County also has to provide for probation services, and provide mandatory training for probation and juvenile detention officers. It also has to provide for the prosecuting attorney and public defender to prosecute and defend criminals, and to maintain and operate the courtroom.

HEALTH CARE AND SOCIAL SERVICES

The County is also mandated to provide medical and related non-medical Indigent Care. Persons who become ill or injured and cannot afford treatment are referred to the County Indigency Program, run by the Commissioners, who must pay for health care for those less fortunate persons. However, this is a burden that the County must provide, and for which must budget.

The County also sponsors the local Public Health District and pays for maintenance of ambulance service.

OTHER REQUIRED FUNCTIONS. County Government is charged by law with various responsibilities:

1. Assess and Value All Property–this is handled by the County Assessor.

2. Collect Taxes/Fees/Special Assessments both for County operations and for Other Entities that certify their budgets annually to the County who then handles the billings and disbursements through its property tax levies. This is handled through the Treasurer, but the budgeting is done by the Commissioners and the County Clerk. As will be discussed hereafter, there is a major mandate on raising property taxes, however, and all county levies and collections must be approved by the Idaho State Tax Commission.

3. Solid Waste Collection/Disposal. This is not property tax dependent as it is paid for with user fees. However, the County maintains waste disposal transfer stations at various places around the County and has arrangements with various trash haulers for the benefit of its patrons.

4. Planning/Zoning. This is mandated by the Idaho Land Use Planning Act. The responsibilities of the Planning and Zoning Commission and the Planning and Zoning Department are more than just approval of subdivision plats. They are responsible for enacting and enforcing the regulations for the County's Comprehensive Plan, including building permits, land use interaction with wildlife, preservation of historic sites, working with the utility grid, and providing proper safeguards for the rights of private property owners and the general public. They also have to monitor "404 Wetlands Regulations" as development pertains to impact upon wetlands; storm water management; traffic flows and studies as may be necessary with regard to developments; setbacks and other like duties.

5. County Road and Bridge Operations. Again, these are mandated by law. However, the Federal government subsidizes this aspect of the County's operations by providing funds to go along with County revenues, but those funds may _only_ be used for road and bridge related matters. The Road & Bridge Fund can be, and is, used for payment for the road equipment as well as the personnel costs of those working in this division. Materials for road building and maintenance, snow plowing,

6. Noxious Weeds. The County has a mandatory duty to provide for weed control in public and private areas. It can bill the property owner if it has to do so on private lands.

7. Conducting Elections. This is required by statute. The County is responsible for providing facilities and personnel for all elections–local, state and federal.

DISCLOSURE STATEMENT–Page 4
M:\MB\mbwork\Blair\Boise County\Plan\25B_SBDISC-1.wpd

8. Recording of Legal Documents.  These recordings–for deeds, property declarations, mortgages and trust deeds, and other like documents– are paid for by the recording entity, but the County must perform this task, and index all records so recorded.  This is the basis for all real estate transactions.

9. Vehicle Registration and Titling for the State Transportation Department.

10. GIS and Mapping of parcels of real estate, including subdivisions, plats, and the like.

11. Paying Portion of Junior College Tuition.  This is a newer duty, but a junior college fund must be maintained.  Payments for tuition expenses for local, needy students at the College of Western Idaho in Nampa and others are made from this program.

12. Various Federal Programs (Clean Air/Water, etc.). The County has some duties under various programs mandated and funded (at least in part) by the U.S. government.

13.  Emergency and Dispatch Services.   Boise County Emergency Management is tasked with planning for and response to large-scale disaster conditions such as landslides, forest fires, flooding, earthquake, pandemic illnesses and other such events.  This County agency is the focal point with the Idaho Bureau of Homeland Security.  Emergency Management interacts with and supports all first responders in the County including Law Enforcement, 10 Fire Departments and 6 EMS units.

Emergency Management assists in development and coordinating tabletop and full scale exercises in all areas of the County during which the response agencies have the opportunity to work together in a controlled environment.   In addition we maintain 2 response trailers in the County stocked with HAZMAT and Medical response equipment as well as some basic survival equipment.   We work with the Fire Departments, EMS units, Senior Centers and other organizations to provide emergency generators so that these facilities can be utilized for emergency response shelters or meal providers during emergency conditions.

Emergency Management interacts with Planning & Zoning and the Fire Departments regarding subdivisions, conditional use permits and building in the Wildland Urban Interface (WUI).  Boise County currently has wildland fuel mitigation projects in progress in four areas of the county.  Since so much of the County is forested, this is extremely important.

Emergency Management is currently tasked with upgrading, maintaining and planning for future communication needs within Boise County.  This includes the radio repeater system consisting of 6 sites, GIS mapping and the radio receiver site serving the Public Safety Building in Idaho City.

Boise County Dispatch is a separate department within Boise County providing 24/7 dispatch for the County Sheriff, Horseshoe Bend Police Department, Idaho City Police Department, the 10 Fire Departments, Coroner and Emergency Management.  Dispatch coordinates calls for medical response with the 6 EMS units and State Communications.  This is the 911 call center for Boise County.  We currently have a Supervisor, 5 Full-time dispatchers and 1 part-time dispatcher.

In addition the dispatch center coordinates with Boise County Road & Bridge, the snow groomers, Idaho Transportation Department, the U.S. Forest Service and Bureau of Land Management, Idaho Fish & Game and other law enforcement agencies including Idaho State Police.

NON-MANDATORY COUNTY FUNCTIONS.  While not necessarily mandatory, some additional duties still fall to the County.

1. Agriculture Extension.  This is run through the University of Idaho, but the County provides for part of the facilities.  These agents are to help in agricultural research and applications.  In addition, these funds support 4-H participants from Boise County.

DISCLOSURE STATEMENT–Page 5
M:\MB\mbwork\Blair\Boise County\Plan\25B_SBDISC-1.wpd

2. Historical Society/Museum.  Considering the history of the County, the museum memorializes a unique heritage.  The County does not provide funding for the museum, but does own the building.

3. Snowmobile & Waterways.  These are administered through the Sheriff's Office, and provide for search and rescue efforts for persons involved in boating, snowmobile and off-road activities.  The Sheriff maintains boats and vehicles set up for this purpose.

### B.   Insiders of the Debtor

The Debtor, as a governmental entity, has no "owners" as such.  "Insider" as defined in 11 USC §101(31)(D) would include the three Commissioners, the Clerk, and the <u>elected</u> officials described in the next paragraph.

### C.   Management of the Debtor Before and During the Bankruptcy

A County government consists of various elected and appointed officials.  Elected officials include the Assessor, Treasurer, Sheriff, Coroner, Prosecuting Attorney, Clerk (who also acts as Auditor and Recorder, as well as Clerk of the District Court) and three Commissioners.  The Commissioners have the overall supervisory jurisdiction over the County and its administration.

The current Commissioners are Jamie Anderson, Terry Day and Robert Fry.  Mr. Day is a retired law enforcement official and has been a commissioner for several years.  He was formerly Chair of the Commission.  Ms. Anderson is a long-time resident of Garden Valley.  She has a degree in Forest Engineering, is a licensed water system operator, the past president of the Garden Valley Recreation District, and is an Emergency Medical Technician.  She became a Commissioner in 2009, and is the current Commission Chair.  Mr. Fry is the newest Commissioner, having run for the office in 2010 on the platform of helping the County sort out its financial issues.   He had served on the commission in the early 1980's, and later was a state legislator.  He also served as a member of the Idaho State Tax Commission.

The County Clerk is Mary Prisco.  Like Mr. Fry, she was just elected in 2010 and took office in January.  She is a CPA, and has audited several businesses and governmental entities during her years of practice.  She works closely with the Commissioners, and in her capacity as County Auditor, is the budget officer responsible for compilation of the annual budget submitted to the Commissioners.  She is the chief accounting officer and responsible for maintaining all accounting transactions by fund and preparation of quarterly and annual financial statements.  Moreover, she interacts with the Idaho State Tax Commission regarding tax assessment rolls, including levy calculations, certification of new construction rolls, and the semi-annual valuation notification to all taxing districts.   As will be discussed hereafter, Ms. Prisco has been reviewing and revising much of the cash flow and budgeting information in order to resolve substantial inaccuracies which were contained in the County's reports.

The Commissioners and Clerk are the ones primarily responsible for preparation of the budget, evaluating the County's finances, projecting income and expenses, financial needs, and maintaining the County on a viable financial footing while performing its duties.   The governmental legal duties of the County receive advice from Cherese McLain, the Civil Deputy Prosecuting Attorney, who was hired by the County.  Her immediate supervisor is the Prosecuting Attorney, R.J. Twilegar.

### D.   The Alamar Judgment and ICRMP Suit

Eric Oaas and Steve Laney, owners of Oaas-Laney, LLC, formed Alamar Ranch LLC to develop and construct the "Alamar Ranch," a 72-bed private residential treatment facility and private school that would have treated teens with emotional or substance abuse problems.  The project went through several hearing before the Planning and Zoning Commission and the appeal of the denial to the Boise County Commissioners.  The permit was approved by the Commissioners.   However, Alamar Ranch LLC and a companion entity, YTC LLC (also

owned by Oaas and Laney through Oaas & Laney, Inc.), filed suit in U.S. District Court in January, 2009. (This litigation will be referred to hereafter as "District Court Case" and is case no. 1:09-cv-00004-BLW).

Boise County then tendered the defense of the litigation to its insurer, ICRMP (Idaho Counties Risk Management Program Underwriters) who denied there was coverage for this litigation. Boise County then sued ICRMP in the District Court for Ada County, Idaho, who upheld the decision of ICRMP, holding that there was no coverage for the claims set forth in the Alamar suit. This ruling is on appeal to the Idaho Supreme Court and briefs have been filed by both sides. The matter has not yet been determined by the Supreme Court.

Boise County then proceeded to defend itself in the litigation, but on December 16, 2010, the jury awarded Alamar $4,000,000, and the judgment was entered December 17. The judgment entered upon the verdict has been appealed to the Ninth Circuit, but there has been no decision on that appeal.

On February 28, 2011, Wade Woodard, one of the attorneys for Alamar, applied to the District Court for a writ of execution (District Court Case docket 236). Mr. Woodard has (admittedly) stated in a letter to Susan Buxton, one of the County's attorneys, that his clients were immediately proceeding with a Writ of Execution, and would seek to levy on all of the County's operating cash.[1] When advised that some of these funds were restricted, his statement was that their research found no such exemptions, but would "take it into consideration" when pursuing collection if they were provided with further authority. Finally, his letter to Ms. Buxton said that they would look to impose personal liability on any person who made any effort to impair this collection.

### E.    Negotiations with Alamar

Prior to this judgment, the County was *supposedly* able to meet its obligations as they became due. However, this turned out to be fallacious. Due to erroneous docketing and recordkeeping with prior County personnel, there were hundreds of thousands of dollars in indigent claims that were never processed or paid. The audit report shows a net loss in the General Fund. The current cash flow reports likewise show a substantial annual loss in the general fund, with those continuing for 2011 and 2012. Regardless, the County was certainly insolvent after the judgment was entered in favor of Alamar.

The Alamar Plaintiffs were presented with a proposal by the County to pay $1.9 million in advance, plus the annual 3% increase in property tax levies per year, for a total payment of $3.2 million. This offer was made because Idaho law limits the ability of a County to raise property taxes for any reason beyond 3% more than the preceding year, except if they did not take the full allowed 3% increase in the prior year, they can take that differential plus the 3% in the current year (this difference is known as the "foregone amount"). Alamar rejected that offer completely, stating that it was "not in the realm of reasonability." The details surrounding the negotiations are contained in the Affidavits and Declarations filed with the Court in this case and will not be repeated here in detail. Suffice it to say that Alamar never accepted any proposal of the County, never made a counteroffer except to reiterate their $5 million offer, and went on record both to the press and media, and to the County's attorneys, that they will "move to have the judgment executed and will seek the county's operating cash to satisfy the judgment." Alamar had also rejected the County's assertions that many of the funds that they sought to levy were restricted and could not be used for the payment of this claim.

Boise County thereupon filed for relief under Chapter 9 of the Code.

### F.    Significant Events During the Bankruptcy Case

---

[1] Mr. Woodard made most of these statements in his letters to Mr. Brassey and Ms. Buxton. However, he was quoted by the Idaho Statesman and KTVB, as well as other media sources, as saying that the "Developers said they will move to have the judgment executed and will seek the county's operating cash to satisfy the judgment."

1. <u>Professionals</u>:  Because of the peculiarities of Chapter 9 cases, court approval of the employment of professionals is not required.  Therefore, the County did not seek the formal Court appointment of its attorneys.  D. Blair Clark is the Debtor's bankruptcy counsel.  Debtor has employed other counsel for governmental law issues (Susan Buxton) and the litigation with both Alamar and ICRMP (Andrew Brassey and his firm) as needed.  Debtor has also retained an auditor, as required by law, to audit its books annually.  It has also retained a professional to assist in the preparation of the budget models for the financial analysis needed.

2. <u>Alamar's Motions and Objections</u>:  Alamar has filed a motion to dismiss, claiming that this case was not filed in good faith and that the County is ineligible.  Debtor is fighting this Motion most strenuously.  To the contrary, Boise County believes that only by the Chapter 9 process can it properly survive.  The County needs to meet its mandated duties and to have the funds necessary to do that.  Alamar has said that it does not believe that the funds, such as the Road & Bridge Funds, are restricted and therefore not able to be garnished.  Alamar has overtly stated prior to the bankruptcy filing that it planned on levying upon all of the County's operating cash, and it is believed still plans to do so today.

3. <u>Restricted "Funds" and Exemptions</u>:   The County maintains its "funds" in various accounts.  By law, the "Funds" can only be used for specific purposes and none other.  Thus, those funds may only be used for specific purposes relating to the funds.  Some of these are:  Highways and Bridges Fund; County Justice Fund; Solid Waste Fund;  Indigency Fund:  Emergency Communications Fund.  There are several more.  Those funds are described with their limitations in the Memorandum filed by Debtor in opposition to Alamar's Motion to Dismiss.

However, Alamar has stated that it does not believe there is any exemption on such fund.  While this is a matter to be determined by the Court, a major factor to consider is that none of these "funds" was <u>ever</u> exclusively put into a separate <u>account</u> just for this purpose.  Rather, the "funds" were split up and put into various accounts, which also contained general fund moneys, surplus funds, and other non-restricted funds.  While this is common in the administration of County government, it may well take the 'restrictions' away from those funds due to the lack of the ability to trace.  A major factor in the decision to file this case, and the Plan, is to preserve the sanctity of as many of the "funds" as possible for the proper use of County government.

4. <u>Indigency Claims</u>: After the filing of the case, the Clerk discovered that there were over $500,000 in Medical Indigency Claims that had never been properly catalogued.  Those claims remain unpaid, and under §549 of the Code, can only be paid pursuant to a Plan.  Those claims are being proposed for payment as a separate class under the Plan as they are statutorily mandated.  If the classification is not approved, they will simply have to be treated as other general unsecured claims.  The Indigency Fund has inadequate resources to meet these obligations.

5. <u>Inspection and Correction of County Financial Reports</u>: Since the Alamar negotiations began, and more so after this case was filed, the County has been reviewing its records, reporting methods and details, and has attempted to furnish information that allows a valid analysis.  There have been several errors that have been discovered.  Those discovered to date have been corrected.  There may be more that surface, and those will likewise be corrected.   The unfortunate result of all of these reviews shows that the County's General Fund operated "in the red" for 2010, will likely do so for 2011, and again in 2012.  The County's financial situation is in fact far worse than was suspected.

G. **Projected Recovery of Avoidable Transfers**

The Debtor may pursue preference, fraudulent conveyance, or other avoidance actions.  As of this date, those have not been evaluated.  Had Alamar succeeded in levying on Debtor's funds, prosecution of those preference claims would have occurred.  It is the County's duty to do so under its authority and responsibility as Debtor-in-possession.

### H. Claims Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article V of the Plan.

### I. Current and Historical Financial Conditions

The identity and fair market value of the estate's assets are listed in the Debtor's schedules. Attached also is:

- A proposed budget for each 2011 and 2012. These are based on revenue and expenses, not cash carryover.
- Operations in Funds reports for relevant periods.
- Statements of Treasurers' Cash reports.
- Draft of the audit report. The final audit report is not yet completed and will be substituted for this document when it is finalized.

By comparing all of these documents, the actual financial position of the County may be determined. The budgets do not show use of any cash surplus, being based on income and expense. The cash surplus may be put into the State of Idaho Investment Pool. There is also $1,198,046.11 in "Freddie Mac" debentures, which are being administered by Wells Fargo. This account will be terminated and the proceeds paid into the Plan.

Debtor believes that the financial information submitted shows that the County was insolvent as of the date of the filing of the petition, in that it could not meet its debts as they became due. This was exacerbated, certainly, with the Alamar judgment. The County's General Fund has basically been operating on cash flow, not net income. Therefore, it is imperative that the County's Plan be reviewed and considered in order that its debts can be paid properly while not curtailing essential services.

The County is being faced with reductions in revenue. Many property tax payors are simply not doing so. By Idaho law, the County cannot do anything about this until after 3 years' delinquencies, which they can take tax deed. But even then, the County cannot effectively resell the properties involved to raise revenues. The procedure for finally getting properties sold is lengthy at best.

It is important to note that the County's revenues are only generated approximately 1/3 by property taxes. The other 2/3 comes from State and Federal funding, contributions and grants. All of these programs are being cut.

The budget submitted herewith represents the best estimates of the Commissioners after consulting with all County officials, both as to revenues and expenses.

### J. Equipment Purchases and Leases

There are several contracts with various parties for purchase of equipment, mostly for road and bridge-related activities, as shown in the Schedules. Mountain West Bank has already opined that their claims are true leases and should be assumed under §§365 and 1123(b)(2), while Debtor's opinion is that they are secured transactions under Idaho law, and therefore subject to treatment under §§506 and 1123(b)(5). Either Debtor or Mountain West may file an appropriate Motion to have this claim properly classified and the Plan will then treat it accordingly. Any other creditor in the list of Secured Claims who asserts that its claim is a lease may follow a similar procedure and will be treated in the Plan appropriately.

Debtor's intent is to modify those claims as may be "crammed down" and reamortized, as so doing will result in a greater net cash flow for the County which can be used for necessary operations or payment of unsecured claims under the Plan.

## III. SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A. What is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive.  The Plan also states whether each class of claims or equity interests is impaired or unimpaired.  If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

### B. Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Code.  They are not considered impaired, and holders of such claims do not vote on the Plan.  They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.  As such, the Plan Proponent has not placed the following claims in any class:

1. *Administrative Expenses:*  Administrative expenses are costs or expenses of administering the Debtor's chapter 9 case which are allowed under § 507(a)(2) of the Code.  Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition.  The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

| **Type** | **Estimated Amount Owed** | **Proposed Treatment** |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After the Petition Date | $0.00 | Paid in full on the effective date of the Plan, or according to terms of obligation if later. |
| The Value of Goods Received in the Ordinary Course of Business Within 20 Days Before the Petition Date | $0.00 | Paid in full on the effective date of the Plan, or according to terms of obligation if later. |
| Professional Fees. | This amount is unknown at this time.  When this Disclosure Statement is approved for submission, counsel will insert the current amount owed or paid, as disclosure is required. | Paid in full on or before theeffective date of the Plan, or as agreed with Debtor and the professional involved. |
| Other administrative expenses | $0.00 | Paid in full on the effective date of the Plan or according to separate written agreement. |
| TOTAL | $0,000 est. | |

DISCLOSURE STATEMENT–Page 10
M:\MB\mbwork\Blair\Boise County\Plan\25B_SBDISC-1.wpd

2.  *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code.  The Plan proposes that the § 507(a)(8) priority tax claim will receive the present value of such claim, in regular installments paid over a period not exceeding 8 years from the order of relief.  Claims have not yet been filed by the IRS and the Idaho State Tax Commission and none are likely.  However, to be cautious, this classification is provided.

Unlike Chapter 11 cases, tax claims in Chapter 9 cases are not required to be paid in sixty months from the date of the order for relief.  The unsecured portions of those claims will be treated as general unsecured claims.

**C. Classes of Claims and Equity Interests**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

1.  *Classes of Priority Unsecured Claims*

Certain priority claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes.  The Code requires that each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim.  However, a class of holders of such claims may vote to accept different treatment.  There are no priority claims believed to exist and none have been filed.

2.  *Classes of Secured Claims*

Allowed Secured Claims are claims secured by property of the Debtors' bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code.  If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.   The Plan submitted herewith describes each of the secured creditors and their proposed treatment under the Plan.

3.  *Classes of General Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

The Plan proposes more than one class of unsecured claims.  The classification is based upon the type of claims that exist and the arguments of Alamar as to the provisions of the Idaho Tort Claims Act.

<u>Medical Indigency Claims</u> to be paid under the Plan are the $550,000 (est.) owed to medical providers that should have been paid prepetition but were not.

<u>Tort Claims</u> are the claims of Alamar to the extent of $500,000 pursuant to Idaho Code §6-926.  During the negotiations between Debtor and Alamar that occurred after filing this case, Alamar advanced the position that the Idaho Tort Claims Act mandates the County "levy and collect a property tax, at the earliest time possible, in an amount necessary to pay a claim or judgment arising under the provisions of this act . . . " While Debtor disputes that this is applicable to the <u>entirety</u> of the judgment, Debtor will recognize, for purposes of the Plan, that a separate classification and payment is warranted.  The Tort Claims Act, however, limits judgments for which there is no insurance to a maximum cap of $500,000.00 (Idaho Code §6-926) and <u>requires</u> a Court to lower a judgment to that amount.[2]  Since this cap does not apply if there is insurance to cover the claim, and

---

[2] The court <u>shall</u> reduce any judgment in excess of the limits provided by this act in any matter within its jurisdiction, whether by reason of the adjudication in said proceedings alone or of the total or aggregate of all such

DISCLOSURE STATEMENT–Page 11
M:\MB\mbwork\Blair\Boise County\Plan\25B_SBDISC-1.wpd

since the ICRMP suit is on appeal, any recover which may come from ICRMP after reimbursement of attorneys' fees and costs for the ICRMP litigation and appeal, shall be paid to Alamar as well.

These two classes of unsecured claims shall be paid in full on or before 90 day after the Effective Date of the Plan or 30 days after allowance whichever is later. The County will liquidate the "Freddie Mac" funds, and provide sufficient other funds from their investment accounts, to pay the allowed amount of the Medical Indigency Funds and the $500,000 due to the Tort Claim. Debtor shall object to any Alamar claim in excess of that sum, save what may be recovered by any successful appeal of the ICRMP litigation[3].

The balance of the unsecured claims shall be classified as "Other Unsecured Claims." Those shall be paid over approximately fifteen years, with the first payment due by December 31, 2011, and annually thereafter. The payment to Other Unsecured Claims is based on Debtor's estimated cash flow, its estimate of what it can use from its investment accounts, its projected future budget needs for its mandatory and statutory duties, and its recognition that its revenues are declining. The payments to General Unsecured Claims is NOT anticipated to pay all of such claims in full if Alamar's deficiency is allowed by the Court to be put into this classification.

    D.    **Means of Implementing the Plan**

        1.    *Source of Payments*

Payments and distributions under the Plan will be funded by the property tax payments, State and Federal fund and contributions, sales of surplus County properties, and other revenue as shown in the projections submitted herewith. Payments to the Medical Indigency Claims and the Tort Claim shall be paid from the Freddie Mac funds and/or other investments to pay such claims in full.

There may be a misconception that the County may unilaterally raise property taxes as it sees fit. This is inaccurate. Idaho Code §63-802 limits the amount that can be increased in any one year to 3%. Secondly, both the County levy and the County budget must be reviewed and passed on by the Idaho State Tax Commission. Attached hereto is a letter from counsel for the Idaho State Tax Commission concerning their position on their duty with regard to the budget.

        2.    *Post-confirmation Management*

The Post-Confirmation Managers are the Board of County Commissioners. They will be assisted by the Clerk and the other elected and appointed County officials as per their duties. The membership will vary over the life of the Plan.

    E.    **Risk Factors**

The proposed Plan has the main risk of a further decline in the general economy of Boise County overall. Property tax revenues are declining–succinctly stated, the taxpayers are not paying all that is levied. While this may lead to tax deeds being issued, that process is a long-term one. Debtor has no control over those items. Also, Federal and State funding are in decline. Debtor believes that the budget attached realistically anticipates revenue and expenses.

    F.    **Executory Contracts and Unexpired Leases**

---

    awards, judgments, settlements, voluntary payments or other such loss relevant to the limits above provided. (Emphasis added).

[3] The Plan provides for any recovery from ICRMP to be paid to Alamar.

DISCLOSURE STATEMENT–Page 12
M:\MB\mbwork\Blair\Boise County\Plan\25B_SBDISC-1.wpd

The Plan lists all executory contracts and unexpired leases that the Debtor will assume under the Plan. Assumption means that the Debtors have elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any. The Plan also states how the Debtors will cure and compensate the other party to such contract or lease for any such defaults.

The real property leases under this Plan are shown on the attachment. Each of these leases is to be assumed or rejected as specified under the Plan.

The equipment leases are treated as purchase and sale contracts in the Plan but alternative treatment is provided should the Court determine they are 'true leases.'

In addition, there are various contracts such as medical insurance for County employees which will be assumed. These are considered employee benefits. Those contracts are usually renewed and/or modified annually, so assumption thereof does not preclude Debtor from looking for alternatives in the normal course of business.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in the Plan as assumed will be rejected under the Plan. Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

G.    Tax Consequences of Plan

***Creditors Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.***

IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in § 943 of the Code. They are:

(1) the plan complies with the provisions of this title made applicable by sections 103(e) and 901 of this title;

(2) the plan complies with the provisions of this chapter;

(3) all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable;

(4) the debtor is not prohibited by law from taking any action necessary to carry out the plan;

(5) except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that on the effective date of the plan each holder of a claim of a kind specified in section 507(a)(2) (*Administrative Expenses*) of this title will receive on account of such claim cash equal to the allowed amount of such claim;

(6) any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval; and

(7) the plan is in the best interests of creditors and is feasible.

Debtor believes that all requirements are met. A pre-confirmation report will be submitted prior to the confirmation hearing. There are no regulatory or electoral approvals needed, and with the budget reductions, the Plan is feasible.

### A. Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that all classes of creditors are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent believes that classes are unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.

#### 1. *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

#### 2. *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in § 1124 of the Code, which is applicable to Chapter 9 under §901, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

#### 3. *Who is **Not** Entitled to Vote*

The holders of the following types of claims and equity interests are *not* entitled to vote:

♦ holders of claims and equity interests that have been disallowed by an order of the Court;

♦ holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.

♦ holders of claims or equity interests in unimpaired classes;

♦ holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code;

♦ holders of claims or equity interests in classes that do not receive or retain any value under the Plan;

♦ administrative expenses.

**Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan.**

#### 4. *Who Can Vote in More Than One Class*

DISCLOSURE STATEMENT–Page 14
M:\MB\mbwork\Blair\Boise County\Plan\25B_SBDISC-1.wpd

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

### B. Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed later in Section B.2.

#### 1. *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan. A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

#### 2. *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by those provisions of §1129 of the Code that are applicable to Chapter 9, and the requirements of §943. A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of §1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

This Plan will provide for the County's payment of its unsecured creditors to the best of its ability. This is not a 100% payment plan. Neither does Debtor expect Alamar to vote in favor of the Plan. Consequently, Debtor believes it will be necessary to seek confirmation hereof over the objection of creditors. The "cram down" provision of the Bankruptcy Code permit confirmation of a plan even if the plan is not accepted by all impaired classes, so long as at least one impaired class of claims has accepted the plan. If a class of claims rejects the plan, it still is confirmable, so long as it provides that: 1) each holder of a claim included in the rejecting class receives or retains on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or, 2) the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property. This is known as the 'absolute priority' rule. There are no equity security holders or other like claimants, as this is a governmental entity. Therefore, the failure to pay all of the unsecured claims in full is not a violation of the absolute priority rule in this case. There are no junior claims to the class of unsecured claims.

Debtor recognizes that the continued operation of the County is subject to this Plan, and therefore, subject to the payments to creditors' claims. However, the reality is that without confirmation, Debtor would be hamstrung by the collection attempts of Alamar. Should Alamar be successful in levying on all of the County's bank and cash accounts, it would preclude the County from paying for statutorily mandated items, payroll, equipment payments, and cause irreparable disruption of the County, its services and its operations. Not only would this be a severe blow to the people in this region, but it is likely that more unsecured debts would be created, defaults would occur in other mandatory and contractual obligations, and the County's payment mechanism would be destroyed. Alamar would receive some cash, although the extent is still unknown. All cash flow would be in jeopardy and the County would be left with nothing to pay anybody.

Under this Plan, all creditors are receiving payment of their claims.  Debtor recognizes that not all creditors will like the Plan.  However, the Plan proposed is viable, and it is urged that affected creditors vote in favor of the Plan. The Plan does provide for payment on all of the claims.  Debtor urges the creditors to consider all alternatives, and the benefits of this Plan when voting on the Plan.

According to Debtor's schedules, the total unsecured claims are $6,569,636.  This includes $4 million for Alamar and a $1.5 million 'estimated' claim for its attorneys.  There are likely to be other unsecured deficiency claims filed by the secured or priority creditors.  The total to be paid to unsecured claims under the Plan will be determined based on the allocation of the claim of Alamar.  There is not yet a claims register and a bar date has not yet been set.  It is possible that claims may be filed or amended prior to confirmation.  Debtor will compare all claims with schedules prior to the confirmation hearing so a distribution list and percentage allocation may be prepared. This will be submitted with the pre-confirmation report.

***You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

  C. §§943 and 1129 Analysis

To confirm the Plan, the Court must find that the plan is in the best interests of creditors and is feasible.  "Feasibility" will be discussed hereafter.  Some provisions of  §1129 are made applicable to Chapter 9 cases.  There is no requirement in the Code as to how long the Plan may continue to pay claims.  The Plan also has to comply with State law, as per §943(b)(4).  The general assets of the County, save the "funds," are worth no more than is owed on them to secured creditors.  The funds (except the General Fund) and the public buildings are exempt.  The County has to provide for payments of these debts as best it financially can do within the 'balancing' of the requirements of Chapter 9 and Idaho law.

  D. **Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtors, unless such liquidation or reorganization is proposed in the Plan.

   1. *Ability to Initially Fund Plan*

The Plan Proponent believes that the Debtor will have enough cash and cash flow on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date.

   2. *Ability to Make Future Plan Payments And Operate Without Further Reorganization*

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments.

The Plan Proponent has provided projected financial information; such is attached.  With the reductions made in operating expenses, the restructure of the debts that are required, the revenue from the sale of surplus County assets at appropriate times and the statutory property tax increases, there is sufficient overall income to fund this Plan.  This can be done without invasion of the funds and violation of the Idaho Code, and without violating the 3% cap on increase in property taxes.  Without the Plan, the County could not survive.

***You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.***

V. **EFFECT OF CONFIRMATION OF PLAN**

  A. **Discharge of Debtor**

DISCLOSURE STATEMENT–Page 16
M:\MB\mbwork\Blair\Boise County\Plan\25B_SBDISC-1.wpd

   <u>Discharge.</u>  On the effective date of the Plan, the Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the effective date, to the extent specified in Chapter 9 of the Code.  After the effective date of the Plan your claims against the Debtor will be limited to the debts described in in the Plan or the Order Confirming Plan.

  B. **Modification of Plan**

 The Plan Proponent may modify the Plan at any time before confirmation of the Plan as allowed by §942.  Unlike Chapter 11, the only applicable paragraph of §1127 is subsection (d), which states that "Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection."  Therefore, if the Plan is amended, you will need to modify your approval or rejection if you wish to do so.

  C. **Closing**

 § 945 of the Code allows the Court to retain jurisdiction over the case for such period of time as is necessary for the successful implementation of the plan.  Otherwise, the Court shall close the case when administration of the case has been completed.

          Boise County

          /s/ Jamie Anderson, Chair, Boise County Commissioners
          Signature of the Plan Proponent

          /s/ D. Blair Clark
          D. Blair Clark ISB# 1367; OSB# 05030
          Signature of the Attorney for the Plan Proponent

**FINANCIAL MODEL SUMMARY / FY 2011 AND 2012 MONTHLY BUDGETS**

**(Statement prepared by Mary T. Prisco, Clerk)**

All actual amounts, which encompasses fiscal year 2010 and October-April 2011, were obtained from Boise County's financial accounting system. Amounts were electronically extracted from the accounting software, Computer Arts, Inc. "CAI", into the financial model used to estimate forecasted fiscal year 2011 and 2012 budgets.

As part of the monthly internal control process, the Auditor produces the "Operations in Funds Summary" and the Treasurer produces the "Statement of Cash" for all accounts after monthly bank reconciliations are performed. These statements are compared and any differences in amount totals are investigated and corrected. For all periods where actual amounts were used in the financial model, balances per the reports produced on a monthly basis from the Auditor/Treasurer's office were agreed to the ending cash fund balance (for the period) as shown in the Financial Model.

For fiscal year 2011 remaining budget forecast, monthly budgets, by fund, were developed for the period of May 2011 through September 2011 as follows:

Each fund was analyzed using 4/30/11 year-to-date actuals from the "Revenue Activity Detail" report and the "Remaining Budget Analysis" report. Accounts in a negative "remaining budget balance" position were automatically reviewed. Accounts with a material difference (greater than 5% and appropriated budget greater than $2,000) between time elapsed percentage and budget expended percentage were automatically reviewed.

Each account identified for further investigation was discussed with the Department Head responsible for the budgeted account. Information was gathered regarding the expectation of the account position at 9/30/11, the timing of expenditures (i.e. were certain months to have more impact than others), underlying contracts if applicable and whether there existed other accounts in an under-usage position which might be used to compensate the unknown outcomes.

Any "cash carryover" or "fund transfers" scheduled in the appropriated 2011 budget were not included in the financial model. Also removed "Administrative Fees" which are revenue to the General Fund and an expense item for a number of funds (not all funds are charged). Administrative fees attempt to recoup some of the costs associated with administrative services provided to other departments. These items do NOT represent true revenue or expense (i.e. amounts earned or deposited in the current period) rather, they represent previously accumulated asset balances or cash sourced from another fund of the County. This allows for a "clean" perspective of the operating results of the County as a whole and individual funds for the fiscal year.

All scheduled secured debt payments (equipment and lease-to-own building and equipment) were removed from the expenditures of the appropriate fund. By doing so, the financial model provides a clearer view of what the County might reasonably be able to expend in bankruptcy settlement payments.

After the 2011 forecasted remaining budget was developed, the County Commissioners, Clerk and Deputy Prosecuting Attorney met on three separate dates for all-day meetings to discuss the forecast by fund and by account category.

DISCLOSURE STATEMENT–Page 18
M:\MB\mbwork\Blair\Boise County\Plan\25B_SBDISC-1.wpd

For the 2012 forecasted budget by month, the forecasted 2011 budgeted revenues and expenses was used as a base. The timing of cash received and cash disbursed, by month, was established using the timing reflected in actual month activity in 2011 (October through April) and predicted timing reflected in forecasted activity of May through September.

The 2012 forecasted budget was adjusted, by account, for any categories that were noted to be different from 2011 in communications with Department Heads. Adjustments were made for any secured debt payments made prior to 3/1/11 as these amounts are reflected in the actual financial data and would, under Chapter 9, be included as parts of an overall secured debt restructure payment.

For all items, consideration was made as to whether the assumptions used in developing the forecasted 2011 budget were valid for 2012. Adjustments were made as necessary.

Finally, the draft forecast of 2012 was compared (by fund and by account category) to the budget worksheets submitted by each department as part of the statutory budget appropriation process. All material differences were investigated and discussed with Department Heads for resolution.

**ATTACHMENTS:**

1. Debtors' Schedules of Assets and Liabilities, A-F

2. FY 2011 budget

3. FY 2012 budget

4. Operation in Funds Summary FY 2010-2011 (Parts A and B)

5. Statement of Treasurer's Cash January-April, 2011 (May will be supplemented)

6. 2010 draft audit report

7. Cash Analysis 6-8-11

8. Opinion of Attorney for State Tax Commission re ability to go beyond the 3% property tax "cap"