D. Blair Clark ISB#1367
Jeffrey P. Kaufman ISB#8022
LAW OFFICES OF D. BLAIR CLARK PLLC
1513 Tyrell Lane, Suite 130
Boise, ID 83706
Phone: (208) 475-2050
Fax: (208) 475-2055
Email: dbc@dbclarklaw.com
Email: jeffrey@dbclarklaw.com
Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| In re: | Case No. 11-00481-TLM |
| **BOISE COUNTY** | Chapter 9 |
| Debtor. | |

## POST-TRIAL MEMORANDUM OF BOISE COUNTY
## IN OPPOSITION TO MOTION TO DISMISS

### STATEMENT OF THE CASE

Boise County was, and is, a valid Debtor for purposes of Chapter 9 of the Bankruptcy Code.

After three days of testimony and presentation of evidence, the Court should so hold, and should deny

the motion of Alamar to dismiss this case.

### SUMMARY OF EVIDENCE PRESENTED

The documentary and testimonial evidence submitted proves the following:

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 1

1.      Boise County is governed by three Commissioners and various elected officials.  These include

the Clerk and the Treasurer.

2.      The Clerk serves many functions:

    a.      She is the Clerk of the District Court, which is her elective title.

    b.      She is the Auditor, and as such processes the warrants and checks for payment of bills.

    In this capacity, she works with the Treasurer on a very limited basis, mainly to

    countersign checks (both are required) and to reconcile her "Fund" balances with the

    Treasurer's "Statement of Treasurer's Cash" on a monthly basis.

    c.      She is the Chief Budget Officer.  A greater explanation of her duties and functions in this

    regard is set out in Idaho Code §31-1602.

    d.      She serves as Clerk to the Commissioners.

    e.      She processes all indigency claims for medical and non-medical purposes.  As the time

    for submission to the State Catastrophic Health Fund is limited, this job must be done in a

    timely manner.  Failure to do so results in the medical claims being fully owed and the

    County liable for the entire sum.  There is no reduction to Medicare rates,.

3.      The Treasurer handles all of the County's banking, reconciles her balances with the Clerk's

balances, and is in charge of all of the County's investments.  However, her position does not

require her to familiarize herself with the various Fund balances.  She does not trace any of the

cash accounts or investments into any of these Funds, nor identify what Funds are in her

accounts.

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 2

4.      The County, by law, operates on a "Fund" system, whereby appropriations are put into various

categories.  Most of these Funds are required by Idaho law.  From these Funds, only the General

Fund can be used for general expenses, and is the only Fund from which money could legally be

paid to claims such as that of Alamar.[1]

5.      Once the County prepares its annual budget, it then submits it to the State Tax Commission for

approval.  The County is required to comply with the determinations of the State Tax

Commission in this regard, and cannot send out a levy without that approval.

6.      Alan Dornfest is the Property Tax Policy Supervisor for the State Tax Commission.  His

department is the one who checks County levies for compliance with two main sets of limits.

a.      The "3% cap" of Idaho Code §63-802.  This statute mandates that property tax levies may

not exceed 3% of prior levies, except in certain instances set out in the statute.  One of

those exceptions is the "foregone amount," which is the increase not taken in the prior

year (§63-802(1)(e)).

b.      The "levy limits" as shown in Exhibit 141.  This document was prepared by Mr.

Dornfest's office and used to show the amount of levy for each specific Fund that makes

up the overall levy.

c.      If the County's levies do not comply with both the 3% cap and the levy limits, they are

rejected and sent back to the County for revision.

_____

[1] In this Memorandum, the word "Fund" or "Funds" will be used in its strict sense to denote money appropriated
therein.

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 3

d.    Mr. Dornfest testified that unless the exception sought was within the guidelines of the statutes in this state, he would not approve a levy for <u>any</u> purpose or in <u>any</u> circumstance, and that an attempt to circumvent his determination would result in his reporting this fact to the Attorney General.

7.    In January, 2011, newly elected County officials took office.  They included Mary Prisco, the new County Clerk, and Robert Fry, a new County Commissioner.

8.    Mr. Fry had previously been a Commissioner for Boise County.  He later served in the Idaho legislature and was an Idaho State Tax Commissioner.  His testimony was:

a.    Since the new officials took office, they have been attempting to work within their system to find a way to pay the Alamar judgment, but could not do so.

b.    The prior Clerk had not been properly keeping track of matters.  The records of the County were a shambles in his opinion.

c.    The new Clerk and the Commissioners had examined all Funds and investments, and had hired outside counsel (Moore Smith Buxton & Turcke) to advise them on what their legal options were in settling the judgment.

d.    The Commissioners cannot use public Funds for any purpose not so provided, and that payment of the Alamar judgment from these Funds would subject them to civil and criminal liability for so doing.

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 4

e.     He was not sure if the accounts and investments were, or were not, exempt from

execution, although he knew that they could not be used by the County to pay the

judgment.  This was a definite concern.

f.     Contrary to Mr. Woodard's testimony, Mr. Fry did not look at the Application for the

Writ of execution as simply a means of "leverage" in the negotiations.  He believed that

the correspondence of Messrs. Banducci and Woodard showed that they fully intended to

levy on all of the County's accounts, and the Commissioners needed to protect the

County.

g.     He had examined and approved of the proposed Plan that is filed in this case.  He

believed that the Alamar creditors were required to take "all" of the provisions of the Tort

Claims Act since Alamar is the one who broached the point at the outset.  That would

include the $500,000 limit on uninsured claims.

h.     The Commissioners did consider "Registered Warrants" but did not believe they were

viable, because they could only go for one year and were themselves restricted by the 3%

cap.

9.     Mary T. Prisco is the new County Clerk.  She is an experienced CPA and has previously audited

municipalities (in particular, the City of Mountain Home).  A summary of her testimony shows:

a.     When she took office, she also found several errors in the prior clerk's records and

performance.  Examples of this included the neglect of the $550,000 in indigent claims;

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 5

that reconciliations were not done timely; that reports were not only delinquent but incorrect; that some reports were done using 2008 information.

b.     There is a severely negative effect for failure to handle indigency claims timely and properly, because untimeliness eliminates the ability to reduce the claim to the Medicare rate and submit to the State Catastrophic Health Fund.

c.     There are IRS penalties because of late reporting.  There are also tax issues concerning the impact of the prior clerk's not completing "Form 8038" as required.

d.     Ms. Prisco was involved in all aspects of the County Commissioners' discussions about payment of the Alamar judgment.  The officials looked at the various restricted and non-restricted Funds.   They looked at the possibilities of incurring long-term debt via a bond election, but determined that it likely would fail.[2]   She also confirmed that bond elections can only be held a few times per year by law.3   They looked at issuance of warrants and other methods of increasing revenue.   They examined all cash balances and needs, and considered all alternatives.  They looked at deferring construction of a bridge, but realized that this would not eliminate the restrictions on the money paid by the Federal government for the bridge; if the bridge were not done, the money would have to be

[2] Two bond issues this year were voted on in Boise County; one was for an override levy for the Garden Valley schools and another was a revenue bond for the City of Crouch.  A simple majority was required for these, not a supermajority as would be for the bond in this case.  Neither of those elections passed, and according to Ms. Prisco, it wasn't a close vote.  Mr. Fry, Mr. Day and Ms. Anderson also confirmed this opinion and the results of these elections.

3 Effective January 1, 2011, Idaho consolidated elections so that an election to approve long-term indebtedness could only be held on the third Tuesday of May or the second Tuesday of November each year. §34-106(1)

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 6

repaid.  They also looked at trust accounts.  She testified that these are commingled with other County Funds in the Treasurer's office, even though the true trust accounts, such as for the East Boise County Ambulance, were for separate taxing districts.

e.      Ms. Prisco was in attendance at settlement meeting with Alamar.  She also participated in the making of the settlement proposal, Exhibit 204.

f.      Exhibit 204, which was the County's settlement proposal of February 22, basically provided for the payment of $1.9 million down and the balance, up to $3.4 million, from the 3% cap increases per year.  The $1.9 million came from the Auditor's Trust Fund, the County Improvement Trust Fund (which were not true "trust funds") and the General Trust, and the debenture that the County had referred to as the "Freddie Mac" debenture. The balance would come from borrowing from the Solid Waste Fund.  Exhibit 204 was created by the Commissioners, the Clerk, and the County's attorneys as a joint effort.  It was presented to Alamar on February 22, 2011, and was rejected.  After the rejection of the offer, Alamar applied for the Writ of Execution and advised the County in writing that they were pursuing to collect all of these sums.

g.      Presently, the County is working on its 2012 budget.  Ms. Prisco and her contracted assistant, Edwin Eijckelhof, have attempted revenue projections and cash flow statements for the County to formulate a budget that would pay the Alamar judgment over a reasonable period of time.

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 7

h.      Among the errors that Ms. Prisco found were the use of "carryover" money from prior years not just to meet the County budget, but also counted <u>again</u> as new revenue.  This error inflated the County's prior projections, including some of those submitted to Alamar after the filing of the petition herein.  Exhibits 101, 102, 111 and 112 are believed to be correct.

i.      County revenue is declining.  Property tax collections are behind, and more property tax defaults are occurring.  However, the County cannot do anything about those tax delinquencies for a full 3-year period until they can take tax deed to the property involved.  Reasons for the revenue decline, in her opinion, are the general economy, but also some decline in governmental contributions.

j.      The State and Federal governments contribute a substantial amount to the County in the form of grants, revenue sharing, sale and liquor tax redistributions, Payment in Lieu of Taxes (PILT), and the "Secure Rural Schools" program.  At the present it appears that all of those sources will be reduced; in particular, the Secure Rural Schools program is facing elimination after 2012.   Moreover, the County's population is declining, which affects the amount that the County receives from State and Federal sources.

k.      Only approximately 1/3 of the County budget comes from property taxes.  Property tax revenue is $3.6 million out of a $9.1 million budget.

l.      The Indigency Fund claims shown in the budgets submitted do not include the $550,000 in unknown indigency claims discussed infra.  Indigency claims are growing this year

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 8

more than anticipated; Ms. Prisco's information at a recent Health & Welfare conference

this April was that these claims are growing statewide.  While claims were usually

running 1-3 (average 2) per month, in a recent five week period there were 10 claims

filed.

m.  The 2012 budget presented does not include payment of creditors to be paid through the

Plan.

n.  She explained the budgeting process, including the public hearing requirements for

approval of the budget.

o.  In her opinion, with the current financial situation of the County, there is no viable way to

propose treatment of this judgment claim without the involvement of this Court

10.  Abbie Mace, the Clerk from Fremont County, also testified.  She believed that their County was

much akin to Boise County in several respects: it was a small county in terms of population; it

had substantial income from PILT and Secure Rural Schools because of the amount of Federal

land; it used the same computer software for the County (Computer Arts).

a.  Ms. Mace has been the Clerk of that county for 11 years and previously was a deputy

clerk.  Ms. Mace teaches budgeting at the Idaho Association of County Seminar for

Newly Elected Officials each year and has been selected to assist in the revision of the

Idaho Association of Counties Budget Manual.

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 9

b.      She explained the various duties and job of the Clerk, and stated that it was the same in

Boise County.  She confirmed that the Clerk is the chief budget and fiscal officer for the

County.

c.      Ms. Mace explained the Secure Rural Schools program, and how the Titles I, Title II and

Title III portions are allocated by the Commissioners.  Again, the Secure Rural Schools

money can only be used for the purposes under that program.  She also explained 'PILT,'

the Payment in Lieu of Taxes Program.  The County's share of PILT money is dependent

on the amount of Federal land located within the County and several other factors.

d.      She confirmed that the use of designated "Funds" and their existence as Funds are

statutorily mandated.   She also stated she uses Mr. Dornfest's Exhibit 141 constantly, and

that State Tax Commission has to approve all County levies.

e.      She confirmed the relationship between the Clerk and the Treasurer.  The practice is

much akin to that of Boise County's Clerk. The two offices are completely separate and

have very little interrelation except to pay checks and reconcile balances.

f.      Ms. Mace stated that in the "cash forward," the cash left over from various Funds are kept

within the Funds.  This was not only her practice, but also the practice of counties around

the state.

g.      She, too, is concerned about reductions in State and Federal funding, as those provide

substantial County requirements.

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 10

h.    She has reviewed the Boise County budget, cash flow, Funds and accounts.  She does not

believe that the County legally could have paid this judgment as it became due because of

restrictions by law on the Funds.  She concurred that the only Fund usable would be the

General Fund.  She corroborated the procedure pertaining to the indigency claims and the

effect of their failure to be processed.

i.    Referring specifically to Exhibit 111, she did not believe that there were moneys in the

County's control that could be used to pay a $4 million judgment.  She did not know how

they could pay it.  If a levy was made, it would devastate the County and its ability to

operate.

j.    She confirmed that the Commissioners could borrow from other "Funds" if needed, if

there were monies available therein, and if they were evidenced by notes, payable at

interest over a short period of time.

k.    Ms. Mace also explained about the consequences of not properly handling the indigency

claims, which were the same as those of Ms. Prisco.

l.    Although she was asked if Boise County did have surplus cash, she rejected that

contention because that simply looked at net assets without considering the restrictions.

She believed that ignoring the restrictions on the Funds was improper.

m.    She was also asked about emergency levies and registered warrants.  Although counsel

for Alamar asked her about the use of registered warrants in 'emergency' situations and

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 11

the warrant redemption Funds, she confirmed that was still subject to both the 3% cap and the levy limits.

11.   Jamie Anderson, the Commission Chair, testified as to her belief that negotiations had failed. She also believed that the "counteroffer" made by Mr. Woodard contemporaneously with the bankruptcy filing, had been withdrawn.

   a.   In her opinion, the February 22 offer was the best faith offer that could be made, recognizing the needs and finances of the County, the available cash, and the likely requirement that use of the 3% cap money be approved by "judicial confirmation."

   b.   In cross-examination, she stated that she did tell Alamar that they would be paid, as "that was my hope."  She also confirmed on redirect examination that the offers and discussions made post-petition between Debtor's counsel and Alamar's were proposals, which had to be reviewed and resolved by the Board of Commissioners.  In her opinion, she cannot authorize payment of restricted Funds contrary to their use and purpose and approval of the annual budget.  Neither can the County pay long-term debt without an election.

   c.   She confirmed that if the County's Funds were garnished, the County could not have provided the essential services mandated.  Further, on reviewing Exhibit 141, she confirmed that if the Funds from the Indigency Fund were garnished, they could not have been replenished effectively with the levy limit on the Indigency Fund by law.

12.   Terry Day, the third Commissioner, testified that:

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 12

a.     He had read Exhibit 205, and believed <u>all</u> of it.  He was especially concerned about the personal liability threat made in that letter.

b.     He and the other Commissioners knew that the judgment had to be paid.  However, he disagreed that the judgment could have been paid with the idle sums in Ms. Hutchings' accounts.  (The word used to answer the question was "negative.")  The Commissioners were all concerned about Funds that could not be used.   He recalls that Mr. Fry was concerned about the ability to use the 'Freddie Mac' investment, but a specific Fund for that account was unable to be identified.

c.     The remittance of property taxes on the other property owned by the Alamar owners was originally <u>Alamar's</u> idea.  Mr. Day concurred with putting that remittance in the offer of February 22, to "sweeten the pot."

d.     Neither he nor the rest of the Commissioners believed that negotiations were ongoing after Exhibit 205 and 206.   He did note Mr. Woodard's language in Exhibit 205 of them being willing to consider a reasonable offer, but also that they were proceeding to collect the entirety of the judgment.  He believed without question that on February 28, when the Board voted to file the petition, Alamar was going to garnish the County's bank accounts.

13.     Wade Woodard, the author of the Alamar "collection letters," was also called.  The major points of his testimony are:

a.     At the time he wrote Exhibit 205, they were concerned about potential fraudulent conveyances, but he did not see anything that led him to believe that any would occur.

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 13

b.      He did write an email which contained a proposal, but it crossed with the filing of the petition.

c.      He was going to execute on whatever non-exempt assets were available.  He read I.C. §11-605, and knew that he could not levy on real property or equipment, but believed he could levy on the County bank accounts.  He was intending to give the writ to the US Marshal.  He also admitted telling a reporter from the Idaho World that Alamar and his firm believed the County had enough cash to pay it all in cash.

d.      Mr. Woodard was aware when he sought the Writ that the undiscovered indigent claims had been discovered and that they were in the range of "half a million."

e.      He was aware of the term "preference," and admitted the judgment was entered several months prior to the filing of the case.

f.      While he would not explain when a judgment was "due," he was aware that execution on the entire judgment could be done at the time the Writ was sought.

g.      He is not in the habit of "mincing words" and usually says exactly what he means.

## ISSUES PRESENTED

In Debtor's original Memorandum, five issues were presented and discussed.  Those same issues still exist, and the evidence to support them has been proven without dispute.  They will be discussed in this Memorandum in the same order as in the opening memorandum.

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 14

1.      <u>Was Boise County insolvent on the date of the petition?</u>   The test for "insolvency" is set forth in §101(32)(C) to be <u>either</u> generally not paying its debts as they become due, or unable to pay its debts as they become due.   Both are shown.

A.      FINANCIAL STATUS:

1.      <u>Not paying debts as they become due:</u>  Boise County had failed to pay $550,000 in indigency claims which were filed by various providers.  Regardless of the reason for this, the County had not done so.  There was no dispute about these claims; they simply were not paid.  They had long since past the cutoff periods where they could be submitted to the State Catastrophic Health Fund, and could not be reduced to the Medicare limits.  The full amount of each claim was well past due.

2.      <u>Unable to pay debts as they become due:</u>  More importantly, the County is indisputably unable to pay its debts as they become due.  Alamar will argue that this is false because there is a surplus of cash and cash equivalents, and the County could simply "cut them a check."

The problem with that position is that it ignores Idaho law.  Almost every witness testified that the County has restricted Funds, which by law may only be spent for their designated purpose.  This was even conceded by Alamar's expert witness, Scott Phillips.  While he would not say that he knew if certain of the County's Fund were restricted or not, he knew that there were such Funds and knew the effect of them.  Neither Ms. Prisco, Ms. Hutchings nor anybody else could legally write checks on the restricted Funds to pay the Alamar judgment.   All of Boise County's witnesses, including Jared

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 15

Zwygart, its auditor from Bailey & Co., substantiated that all of the Funds, except the General Fund, were restricted Funds.[4]

The argument that Alamar advances was rejected in the Ninth Circuit years ago, in a case under Chapter 9 of the 1938 Act.  In re Corcoran Irrigation Dist., 27 F. Supp. 322 (D. Cal. 1939), *affd*. 114 F.2d 690 (9th Cir. Cal. 1940).  The Corcoran case rejects the normal "assets over liabilities" test of insolvency for municipalities, which is the approach the Code adopted in 1978.  Corcoran also sets forth tests which are as usable today under the Code as they were under the Act:

A.    The fact that the entity could not meet its expenses without resorting to extraordinary means is "conclusive proof of its precarious financial position."

B.    "Ultimately, the question of inability to pay one's debts is not to be determined by flights into the realm of the impossible, but by the realities of a particular situation. And there being no showing that there were sources through which additional warrants could have been floated to pay the bondholders, the presumption arises that, in the opinion of the directors, the borrowing limit from that source had been reached."

This is virtually identical to the analysis used recently in the case of In re Pierce County Housing. Authority. 414 BR 702 (Bankr. W.D. Wash. 2009), where the Court held that insolvency under the "unable to pay debts as they become due is a prospective test, based upon the petition date."

B.     RESTRICTED FUNDS:  The County was also correct on the legal analysis of these Funds, thereby rebutting Alamar's attempt to claim that the County could pay this judgment out of these restricted Funds.  Looking at the statutory limitations on these Funds leaves no other interpretation.

---

[4] Mr. Zwygart, recognizing his error in the listing of the Funds as "unrestricted," testified without equivocation that the only unrestricted Fund was the General Fund.

For example, please review the restrictions on the Road & Bridge Fund, §Idaho Code §40-701[5] provides that 38% of money generated from the State of Idaho in the Highway Distribution Account is to be paid to local governments under Idaho Code §40-709.   Most importantly for this discussion, §40-709(7) states:  "No part of Highway Funds or any apportionment from it shall ever be used for any purposes other than those provided in this section, except as specifically otherwise provided. At the end of any fiscal year an unexpended balance of highway funds shall be carried forward and retained and subsequently applied to the maintenance and construction of highways or the payment of bond interest and principal and sinking fund requirements."   Contrary to Alamar's position, the language does not seem to leave much room for interpretation.

Reviewing next the Justice Fund, there is no room for argument in that statute.  It reads (emphasis added):

"§31-4602. JUSTICE FUND ESTABLISHMENT
The board of county commissioners of any county may, in conjunction with development of their annual budget, by resolution adopted at a public meeting of the board, establish a county justice fund to provide funding for *the operation of the county sheriff's department, construction, remodeling, operation and maintenance of county jails, juvenile detention facilities and/or county courthouses, operation of the prosecuting attorney's office, provision of public defender service and otherwise court-appointed counsel, and operation of the office of the clerk of the district court, to the extent that operation of that office provides support for the district court.* The justice fund shall be separate and distinct from the county current expense fund and expenditures from the justice fund shall be solely dedicated to the purposes set forth in this section.

At the discretion of the board of county commissioners, funds deposited in the county justice fund may be allowed to accumulate over a period of years for designated capital improvements or be expended on a regular basis.

---

[5] The provision cited herein applies to the pre-July 1 statute as well as the currently effective revision.

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 17

There is no provision for payment of judgments in that statute. The only discretion allowed the Commissioners is to accumulate any surplus for capital improvements, or spend it for the purposes set out in the statute.

Another of the "big" Funds is the Solid Waste Fund. That is governed by Idaho Code §31-4404. The statute gives the County the option of using property tax money or user fees; Boise County opted for user fees. It can use money from other sources, but per the wording of the statute, arguably cannot expend those Funds for other purposes. This is why the testimony of Ms. Anderson was that they believed they could <u>borrow</u> from it <u>if</u> it were repaid in one year, and why Mr. Fry testified that he originally felt in the making of the February 22 offer that the $1.9 million was too high, as it included Solid Waste money. Again, there are restrictions on the use of a portion of such money, as it is required to be maintained for the closure of facilities as required by Federal law.[6]

All of the other restricted Funds were discussed in the initial Memorandum, docket 98. Suffice it to say that Boise County believes it has shown the evidence and the legal authority to substantiate its position that it <u>cannot</u> pay this debt. See also the further discussion infra at part E.

C.      WAS THE JUDGMENT "DUE?"   Alamar will likely opine that the Writ of Execution was not really intended to be used; indeed, Mr. Woodard testified that he was using this for "leverage in the negotiations." However, that argument is not only fallacious, it is absurd. This was a judgment of a Federal Court, which is governed by the Federal collection rules and statutes. FRCP 62 only allows a

---

[6] This was discussed in the opening Memorandum in more detail; docket 96, pp. 18-19.

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 18

14-day stay on an execution.  FRCP 69 provides that the judgment may be pursued by Writ of Execution as allowed by state law and may obtain discovery for so doing.  Mr. Banducci's letter (Docket 69.2) is a request for such an examination.  The Writ was sought.  The judgment was clearly "due."  And there is no dispute −legal or factual- that the judgment is a legal debt.

Directly considering Alamar's contention that the Writ of Execution was just a tool to get "leverage," it is impossible to believe that Alamar and its counsel would consider such as a valid tactical purpose and then complain when Boise County's Commissioners and counsel took them at their word. The use of the Writ of Execution, when taken in that light, smacks of abuse of process.

"The essential elements of abuse of process are: (1) an ulterior, improper purpose; and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding." Badell v. Beeks, 115 Idaho 101, 104 (Idaho 1988).  Using a Writ of Execution for leverage when there is no real intent to use it at all, as Alamar contends it really meant, is certainly not a proper purpose for such a Writ.   This is not malicious prosecution, where probable cause is a defense.   As was stated in Badell v. Beeks, supra, and cases cited therein, malicious prosecution requires the commencement of an action or causing process to issue without justification.  Abuse of process, on the other hand, is simply misusing process (which is now usually construed as more than just the summons, but including other writs and motions), which may well be valid per se, for an end other than that which it was designed to accomplish.

"Abuse of process requires an improper purpose which 'usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself . . .'" Badell v. Beeks, supra.

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS─Page 19

Although some courts hold that using process to obtain settlement is not necessarily impermissible ("There was no proof of an improper use of judicial process here, as the purpose of settlement is includable in the goals of proper process." Bird v. Rothman, 627 P.2d 1097, 1100 (Ariz. Ct. App. 1981)), the statement by both Mr. Woodard and Mr. Oaas should be considered by this Court in the context of their nature.

Mr. Oaas testified that he does not want to hurt the County, because it would adversely impact his ability to get paid–his "golden goose" argument.  However, that does not square with the facts or the evidence.  Alamar's entire position at trial was that there was enough surplus cash now that Boise County could pay the judgment now, and therefore would not be insolvent.  How does that square with Woodard's and Oaas's testimony?   Couple that with Mr. Oaas's statements that this was a "doomsday budget," that the County has "put them through Hell," and others referred to in the affidavits submitted, it is clear that their real intent was to use the Writ to do exactly what they said-levy on the entirety of the County's bank accounts.   The entire "leverage" argument, which flies in the face of reason and is potentially an abuse of process is the proverbial "pickle" that Alamar's counsel, being excellent attorneys, would try to avoid if possible.  There would be no "abuse of process," however, if they used the Writ to enforce the judgment.

The only conclusion possible is that the County was unable, because of the restrictions on its Funds, to pay its debts as they became due on the date of the petition.   Therefore, under the authorities cited previously and herein, the County was, and is, insolvent.

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 20

D.    COULD THE COUNTY HAVE IGNORED THE 3% CAP?   Alamar will undoubtedly dispute this contention because of Judge Winmill's decisions in <u>Wausau v. St. Clair Contractors</u>, Case No. CV-01-629-S-BLW, (common referred to as the "McCall case")  reported at 2007 U.S. Dist. LEXIS 29907 and 2006 U.S. Dist. LEXIS 76323.   Analysis of the cases, and the comparison of the statutes, however, leads to a different conclusion entirely.

The McCall case related to a claim and the enforcement thereof, against a City, not a County. Cities have their own Idaho Code title and chapters.  Idaho Code §50-217 provides that "the city council shall have power to order paid any final judgment against such city, but none of its lands or property of any kind or nature, taxes, revenues, franchises, rates or interest shall be attached, levied upon or sold in or under any process whatsoever."  Thus, it has a specific directive statute authorizing this act, and also its own exemption statutes.  The County has neither.

Secondly, a judgment against the City is not enforceable by a Writ of Execution.  <u>Wheeler v. Blackfoot</u>, 55 Idaho 599 (Idaho 1935); accord, <u>Lapwai v. Alligier</u>, 69 Idaho 397 (Idaho 1949; reversed on other grounds).  The County does not have the benefit of that exclusion.

Finally, Judge Winmill himself noted the limitations on enforcement of a judgment.  He held:

In <u>Missouri v. Jenkins</u>, 495 U.S. 33, 110 S. Ct. 1651, 109 L. Ed. 2d 31 (1990), the Supreme Court summarized its earlier holding in <u>Griffin v. Prince Edward County School Bd.</u>, 377 U.S. 218, 84 S. Ct. 1226, 12 L. Ed. 2d 256 (1964) as being that "a court order directing a local government body to levy its own taxes is plainly a judicial act within the power of a federal court." Missouri, 495 U.S. at 55. In a separate opinion, Justice Kennedy took a more limited view, pointing out that "Griffin endorsed the power of a federal court to order the local authority to exercise *existing* authority to tax." <u>Missouri</u>, 495 U.S. at 71 (emphasis in original).

Assuming, arguendo, that Justice Kennedy is right, this Court is doing nothing more than ordering the City to exercise its *existing* authority to tax. Here, as the Court has held above and in

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 21

its earlier decision, the City has authority under Idaho law to immediately (1) borrow money to pay the Judgments and add those sums to the tax roles without being restricted by the 3% cap; and (2) issue city coupon bonds to retire the indebtedness represented by the Judgments. Under <u>Missouri</u> and <u>Griffin</u>, this Court has the authority to order the City to immediately pay the Judgments <u>using these options</u>.

<u>Wausau v. St. Clair Contrs., Inc</u>., 2007 U.S. Dist. LEXIS 29907, 11-12 (D. Idaho Apr. 23, 2007)

(emphasis added).

The distinction is that the County, being governed by different statutory and Constitutional frameworks <u>does not have these options.</u>  Judge Winmill himself rejected the idea of elections as being any sort of viable option.  And as the overwhelming weight of the evidence, and the laws pertaining to counties, conclusively show, the County does not have the same rights as a City.  If it did, there would be a different case.  But none of the debt options, save and excepting a long-term debt with voter approval, will pass muster with the State Tax Commission.  Judge Winmill's opinion does not assist the Alamar creditors; rather, it recognizes that the limitations existing under State law must be honored.

Such is indeed the holding of <u>Missouri v. Jenkins</u>, supra.  Addressing the state taxing limitations, the Supreme Court's decision stated "It is therefore clear that a local government with taxing authority may be ordered to levy taxes in excess of the limit set by state statute *where there is reason based in the Constitution* for not observing the statutory limitation."  (Emphasis added)   There is no such reason here.  To the contrary, the authority cited by Alamar in Exhibits 214 and 217 (about which more discussion will follow in the proper subtopic) shows that Alamar was relying on State law in its assertions.

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 22

Courts have also held that <u>Missouri</u> is more limited in scope than perhaps Alamar recognizes.

Consider, for example, <u>Berry v. Alameda Bd. of Supervisors</u>, 753 F. Supp. 1508 (N.D. Cal. 1990),

where the Court analyzed the differences between the case before it and <u>Missouri</u>  thus (emphasis

added):

> First, the interests being protected in <u>Jenkins</u> were well defined rights to an integrated school
> system, granted by the United States Constitution. Here, plaintiffs' alleged interests are in
> medical benefits granted by state statutes. Plaintiffs allege that the implementation of Proposition
> 13 constitutes "invidious intentional economic class discrimination" against the poor of Alameda
> County by depriving them of state health benefits. *Their right to health care was allegedly
> granted to them by California statutes and not by the federal constitution or federal law.  There
> is no fundamental federal right under the United States Constitution to receive welfare benefits*.
> <u>Schweiker v. Wilson</u>, 450 U.S. 221, 234-39, 67 L. Ed. 2d 186, 101 S. Ct. 1074 (1981). And a law
> that "results in some disparity in grants of welfare payments" does not violate the Fourteenth
> Amendment. <u>Dandridge v. Williams</u>, 397 U.S. 471, 484, 25 L. Ed. 2d 491, 90 S. Ct. 1153 (1970),
> reh'g denied, 398 U.S. 914, 26 L. Ed. 2d 80, 90 S. Ct. 1684 (1970).

In this case, Alamar asserts that the <u>right to payment</u> of its judgment derives from Idaho State

law−specifically the Tort Claims Act−even though its judgment was recovered under the Federal Fair

Housing Act.  Furthermore, <u>Missouri</u> itself held that the lower court's determination and order to assess

property taxes was an abuse of discretion, holding that under the principles of comity, the lower court,

before taking such a drastic step, was obliged to assure itself that no permissible alternative would have

accomplished the required task.

Compare I.C. §§31-1608 with 50-1006.  Unlike the statute applicable to cities, there is no

specific authority for a county to levy especially for such purpose.   §31-1608 authorizes expenditures

outside the approved budget for certain enumerated emergencies, but unlike §50-1006, there is no

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 23

specific mention in §31-1608 of expenditures for judgments.  The "McCall case" is clearly distinguishable.

Another aspect advanced by Alamar was "tax anticipation notes," or "TANs."  Counties are authorized by Title 63, Chapter 31, Idaho Code, to borrow money in anticipation of taxes and other revenues duly budgeted and appropriated but not yet collected for the current fiscal year. The amount borrowed shall not exceed 75% of the amounts budgeted and not yet received, and the proceeds of the TANs are to be used "for the purpose for which said taxes are levied or such other funds or other revenues are appropriated....." §63-3102.  Once the TANs have been issued, all taxes and other revenues, in anticipation of which the TANs were issued, must be placed, as received, in a special Fund pledged to the payment of the TANS when due.  Under §57-232, the holders of the TANs would have a perfected first lien on moneys in the Redemption Fund.  If there is a deficiency, the county can levy a tax to pay the TAN (§31-3105), but there is nothing in the language of that statute that would exempt this levy from the general restrictions of §63-802.

E.     COULD THE COUNTY PAY THE JUDGMENT?   Alamar still persists in its position that the County could just "write them a check."  This is legally impossible and leaves the County officers open for severe repercussions.

See, for example, Bonneville County v. Standard Acc. Ins., 57 Idaho, 657, 67 P.2d 904 (1937). The County Assessor, after the office was closed, placed some money he had received from county fees in a locked vault.  Over the weekend, the vault was burglarized and the money taken.  Demand for the

money was made by the County, but payment was refused by the Assessor's surety.  The County brought

suit against the Assessor and his surety.

A jury found neither of the defendants negligent but rendered a general verdict for the county in

the amount equal to the fees that had been taken.  The County appealed to the Supreme Court.  The

Idaho Supreme Court determined that public officials charged with the care of public funds will be held

to the doctrine of *strict accountability*, regardless if the public official was negligent or not.  The Court

considered article 18, section 6 of the State Constitution as well as the statutes pertaining to the duties of

County Assessors.  The court declared that a more stringent obligation is required of public officials for

the strict accountability of money that comes into their possession.

The Court held, following the rules of strict accountability demanded by the Constitution, that

the legislature provided no exemptions from the obligation to faithfully account for and pay over all

moneys collected and the courts cannot, in the discharge of their duty, create an exception to the

application of such provisions.  Judgment was reversed and the general verdict was reinstated.

The emergency provision referred to by Alamar does not solve this problem. Assuming that the

judgment faced by the County was a "mandatory expense required by law", then money on hand could

be used to pay the judgment from a "fund properly chargeable with such expenditures."  I.C. §31-1608.

However, there is no authorization for a county in Idaho to use monies from Funds not properly

chargeable to pay expenditure, including judgments.

A budget is the creature of, and controlled by, the County Commissioners.  §§31-1604, 31-1605.

But the Commissioners are limited by Art. 8, Sec. 3, Idaho Constitution, to that power conferred by the

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 25

legislature.   Since the Commissioners may not transfer money from one Fund to another or in any

manner divert the money in any Fund to other uses, "except in cases expressly provided and permitted

by law. . ."  (I.C. §31-1508), they are not authorized to pay the judgment out of designated Funds

without strict liability and accountability therefore.

Counties <u>may</u> borrow money from some Funds to pay a judgment; however, counties are limited

in their borrowing.  County budget statutes provide that warrants against a county may be redeemed

through short term borrowing either from other county funds or a financial institution at market interest

rates until a levy is established in accordance with Idaho Code §63-806.  See I.C. §31-1507.  However,

if the County elects to conduct a levy to pay the judgment, there is still no exemption from the

requirement that this tax levy be limited by 3% as established by I.C. §63-802 anywhere in I.C. §63-806.

The testimony of Mr. Dornfest confirms that.

Mr. Dornfest's schedule, Exhibit 141, also shows there to be a limit on repayment of the warrants

that Alamar says should be used.  On p. 4, we are instructed that "Warrant Redemption" under §63-806

has a maximum levy rate of .002.  That for "Emergency Fund" under §63-805 is even less--.0006.

Should Alamar raise the issue again of "registered warrants," this Court should then review

<u>Lloyd Corp. v. Bannock County</u>, 53 Idaho 478, 25 P.2d 217 (1933), which holds that  §31-1608 does not

authorize county commissioners to incur indebtedness in excess of income provided for the county for

the year, in violation of the Idaho Constitution Article 8, Section 3.

Should Alamar note the "no limit" language for certain judgments in Exhibit 141, it should

review for what judgments this 'limit' applies.  For example, "Judgment Obligation" under §33-802 is

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 26

limitless, but that is only for a school levy.  And that of "Judgments and Casualties" under §50-1006 is

only applicable to cities, not counties.

Boise County could potentially borrow money to pay the judgment but this must be done in

accordance with the legal limitations.   First, if it is long-term debt; an election is required.  Secondly,

any repayment plan must be established within the parameters of the law.  Moreover, if the maximum

allowable tax has been levied and all revenues are needed to operate the county, there are no available

funds for the County to borrow against to pay the judgment.   Finally, with regard to Boise County, the

3% cap and the levy limits would so limit the levies allowed that the judgment could not be paid in one

or even two budget years.  Since Commissioners cannot bind future boards without complying with the

legal requirements for long-term debt, payment of the judgment is far more complicated for a county

than a city.

F.      "SO LET'S JUST AMEND THE BUDGET!"    Simple statement, asked over and over by

Alamar at the trial but unfortunately has no simple answer.

County budget statues are unambiguously clear; the budgeting process must be completed in

accordance with clearly defined statutory procedures.  Various statutes adopted by the state legislature

impose a duty upon county officials to both create a budget for the county and then stay within that

budget's constraints.  I.C. §31-1605.  Every county official and employee is limited in making

expenditures or incurring liabilities to the amount of the appropriations adopted as the county budget.

I.C. §31-1606.  Budgets adopted by the commissioners establish the base for the levy of taxes.  I.C.

§31-1605.  Ms. Mace went through that process during her testimony as did some of the

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 27

Commissioners. Budgets require public hearings, determination of levies, review by the Tax

Commission, and are for the entire year.

During the budget fiscal year, the County may only adjust the budget to reflect receipt of

unscheduled revenue, such as grants or donations from federal, state, or local governments or private

sources.  However, the Commissioners may not adjust the budget by <u>increasing</u> anticipated property

taxes.  I.C. §31-1605.  County Commissioners may be personally liable for any expenditure in excess of

the budget appropriations.  I.C. §31-1607.

Once a budget is established and adopted, those items which were not budgeted for may not be

included, except if the county has established a general reserve appropriation fund.   In those situations

where a contingency arises, which could not reasonably have been foreseen at the time of the making of

the budget and requires the expenditure of money not provided for in the budget, the board of county

commissioners may make an appropriation from the "general reserve appropriation" fund in which the

contingency arises.  I.C. §31-1605.  Boise County does not have a general appropriation fund.

Even if they had a general reserve appropriations fund, it is limited to five percent (5%) of the current

expense budget.  I.C. §31-1605.   Moreover, the Commissioners may not increase taxes to cover any

new costs.  As testified by Ms. Anderson, Ms. Prisco and Ms. Mace, the annual budget appropriation

ordinance appropriates any fund balances that accumulated at the end of the fiscal year into the next

appropriation ordinance as required by §31-1605A, Idaho Code.  §31-1605A requires the County to

carry over fund balances into the next fiscal year by passage of a "resolution."

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 28

The "bottom line" on this point is that a budget is a creature of statute, under the control of the Commissioners.  I.C. §§31-1604, 31-1605.  Because powers of Boards of County Commissioners are limited by Art. VIII, Sec. 3 of the Idaho Constitution, they only have the power conferred by the legislature.7  If the Commissioners cannot incur any indebtedness except as specified in Art. VIII, Sec. 3, it must follow that no court has the power to validate such an unconstitutional act.

2.      <u>Does Boise County desire to effect a plan to adjust its debts?</u>  Not only is there a Plan and Disclosure Statement filed, but the Commissioners' testimony reiterated that a confirmation of the Plan was necessary to protect the County from this attack on its Funds and allow it to continue to provide its necessary services.

More importantly, Alamar continues to fail to recognize that only by a Plan approved by this Court can it enter into any sort of a long-term restructuring of its obligations to Alamar, whatever they may turn out to be after the claims are determined.  A review of the email correspondence between Alamar's and the County's counsel (which Alamar put into evidence) shows that this position has been advocated throughout.

---

7  Further, Article XII, section 2 of the Idaho Constitution provides that "[a]ny county … may make and enforce, within its limits, all such local police, sanitary and other regulations as are not in conflict with its charter or the general laws."  A county is a creature of the state and possesses only those powers either expressly or impliedly granted to it. **BLAIR DO YOU WANT CITATIONS FOR THIS? THEY ARE ON PAGE 2-3 OF OUR MEMO -- SUSAN**

The Legislature gave Counties and other 'taxing districts' the authority to file for Chapter 9 to restructure its debts.  I.C. §67-3903.   It is interesting to note that Alamar is looking at every way to defuse the very thing that Mr. Oaas testified he wanted, and bolstered by Mr. Woodard−a payment of the judgment over time.  Not only does this show that Alamar's true purpose in this Motion to Dismiss is to get rid of this Court's authority and let it garnish the entirety of the judgment from the County's accounts, but it ignores the realities of the statutes that set forth what the County can and cannot do.

Under 11 USC §§941-943, the Debtor has a right to file a Plan and to seek confirmation.  Certain provisions of Chapter 11 are a part of the confirmation process under §901.  The only State law restriction in §943, however, is (b)(4)−whether the Debtor is prohibited by law from taking any action necessary to carry out the Plan.

Under the proposed Plan, the Debtor is not entering into new long-term debt.  The debt exists. The Debtor needs to provide for payment of this claim (to the extent that the Court allows it over $500,000) in its budget for future years.  The County has the authority to do this under §67-3905, which states:

> Plan of readjustment authorized:   Any taxing district is hereby authorized and empowered to take *any and all action necessary* to carry out *any* plan of readjustment contemplated in said petition, or as the same may be modified from time to time, *subject only to the provisions of the constitution of the state of Idaho, notwithstanding any other provisions of law*.

The restrictions on the 3% cap are not part of the Idaho Constitution.  Neither are most of the other limitations that have been discussed, save the incurring of new long-term debt, which requires an election.  But restructuring existing debt is especially sanctified by Title 67, Chapter 39.  And most

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS−Page 30

importantly, I.C. §67-3907(d) allows the County "To assess, levy and collect taxes, special assessment taxes and special assessments and to enforce the collection thereof in the manner and with the effort provided in the plan of readjustment." Mr. Dornfest's Exhibit 141 is not applicable to chapter 9 Plans. Only the Constitution does that.

3.    Does Boise County meet the requirements of 11 USC §109(c)(5)(C) or (D)? The County submits that this has been proven. Whether or not the negotiations surrounding the February 22, 2011 offer would be sufficient under Vallejo to constitute the negotiations of a Plan, it cannot be denied that negotiations had ceased as of the petition date.[8]

All three Commissioners, as well as the County Clerk confirmed that after Exhibits 205 and 206 were received, they believed there were no more ongoing negotiations. Alamar was proceeding to obtain its Writ of Execution as it said it would. It stated unequivocally that if the County could pay the judgment in one month, then Alamar would not enforce the Writ. Alamar refused to consider the February 22 letter as "within the realm of reasonability" and made no viable counterproposal that the County could afford.[9]

---

[8]  Debtor's argument on subsection C previously addressed in the opening memorandum is unchanged.

[9]  Exhibit 212, which was sent literally simultaneously with filing of this case, was later withdrawn. However, the County could not have entered into this long-term debt approach, even assuming that it could afford this payment schedule (which the testimony was that it could not).

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 31

The postpetition "negotiations" between Mr. Hindley and counsel for Debtor were also not fruitful.  The Commissioners would have to conduct a vote to approve any offer;  however, not one of the County's proposals ever resulted in a counteroffer from Alamar.

The County was correct in taking Mr. Woodard at his word, and believing that Alamar would garnish the County's bank accounts, which would have been disastrous for Boise County and its residents.

4.    <u>What is the effect of the Idaho Tort Claims Act?</u>    Alamar may well argue that the Plan filed shows a lack of good faith on the County's part.  Far from it.  As was argued in the initial brief, the Tort Claims Act (a concept which was proposed by Alamar) limits the County by law to pay $500,000 "out of pocket" if there is no insurance to cover the claim.  The insurance coverage has been denied, the lower courts have affirmed ICRMP's denial of coverage, and the issue is on appeal.  The Plan also provides that Alamar may seek a determination of this Court that the claim should not be so limited and the Court could rule on the point.

Alamar alleges that Boise County's petition for bankruptcy should be denied because the County "failed to adequately consider alternatives to bankruptcy – one being its ability to raise revenues under the Idaho Tort Claims Act, Idaho Code §6-928."  The Idaho Tort Claims Act, Idaho Code §6-901, *et seq*., subjects governmental entities to liability for negligent or wrongful acts committed by the entity or its employees where a private individual would also be liable.  Idaho Code §6-903.  The Act outlines and defines the required steps that must be taken by parties interested in filing a claim against a public entity as well as limits it applicability. As quoted by Alamar, §6-928, Idaho Code, states that

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 32

"[n]otwithstanding any provisions of law to the contrary and in the event there are no funds available, the political subdivision shall levy and collect a property tax, at the earliest time possible, in an amount necessary to pay a claim or judgment arising under the provisions of this act where the political subdivision has failed to purchase insurance or otherwise provide a comprehensive liability plan to cover a risk created under the provisions of this act."

Alamar is correct when it argues that the act is mandatory as it requires the governmental entity shall levy and collect a property tax, at the earliest time possible, in an amount necessary to pay a claim or judgment arising under the provisions of this act."  However, Alamar fails to read the Tort Claims Act in its entirety and consider its other provisions.  This is clearly an illegitimate argument for Alamar to make.  Of particular note and detrimental to Alamar's argument is Idaho Code § 6-926 which reads:

> [t]he combined aggregate liability of a governmental entity and its employees for damages, costs and attorney fees, on account of bodily or personal injury, death, or property damage, or other loss as the result of any one (1) occurrence or accident regardless of the number of persons injured or the number of claimants, shall not exceed and is limited to five hundred thousand dollars ($500,000), unless the governmental entity has purchased applicable, valid, collectible liability insurance in excess of said limit, in which event the controlling limit shall be the remaining available proceeds of such insurance.  If any judgment or judgments, including costs and attorney fees that may be awarded, are returned or entered, and in the aggregate total more than five hundred thousand dollars ($500,000), or the limits provided by said valid, collectible liability insurance, if any, whether in one or mare cases, the court shall reduce the amount of the award or awards, verdict or verdicts, or judgment or judgments in any case or cases within its jurisdiction so as to reduce said aggregate loss to said applicable statutory limit or to the limit or limits provided by said valid, collectible insurance, if any, whichever was [is] greater.

Idaho Code § 6-926 is unequivocal.  Any underlined uninsured claim brought under the Idaho Tort Claims

Act is limited to $500,000.00.  If certain portions of the Idaho Tort Claims Act apply to this

matter, then all would apply.

"A statute should be construed so that effect is given to all its provisions, so that no part
thereof will be inoperative or superfluous, void or insignificant, and so that one section will not
destroy another. 2 J Sutherland, Statutory Construction § 4705 (3d ed. F. Horack 1943)" East
Shoshone Hosp. Dist. v. Nonini, 109 Idaho 937, 941, 712 P.2d 638, 642 (Idaho 1985).  When
construing a statute, the Court "will not deal in any subtle refinements of the legislation, but will
ascertain and give effect to the purpose and intent of the legislature, based on the whole act and
every word therein, lending substance and meaning to the provisions."  Ada County Assessor v.
Roman Catholic Diocese of Boise, 123 Idaho 425, 428, 849 P.2d 98, 101 (1993).  The argument
by Alamar that the Tort Claims Act is applicable is tenuous.  As Alamar has argued that is
limited to a judgment not exceeding $500,000, which amount includes costs and attorney fees.
In the underlying civil case between these parties which resulted in the $4 million judgment in
Alamar's favor, the Tort Claims Act was never argued to apply.

Under the legal and factual circumstances of this case, this is far from a "bad faith" provision.

As Mr. Fry put it when asked about the Idaho Tort Claims Act during cross-examination, the whole

statute is applicable, not just the good parts Alamar wants.   The legal effect of the allowed amount of

Alamar's claim can be determined in the normal claims objection process.  If the County is correct, then

the rest of the judgment is disallowed.  If not, then the County may propose a Plan to pay whatever

amount is required under the adopted provisions of §§1129, and 943.  The Plan also proposed that

Alamar be given whatever recovery, if any, the County would receive from ICRMP, which is on appeal.

This provision, too, is in compliance with the Tort Claims Act; it is far from a "throwaway" or "bogus"

proposal.  If the insurance is found to exist, then the $500,000.00 cap is off to that extent, but then that

would be ICRMP's obligation to pay.

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 34

Alamar's inquiry on this topic at trial seems to be a "have the cake and eat it too" position. Although Alamar argues that the Idaho Tort Claims Act should be applicable to Boise County, it then asked at the trial if the witness (Mr. Fry) was aware that Federal law preempts the $500,000 limit.  If this is indeed their position, it is incorrect.

If the Federal Tort Claims Act applied, the statutory maximum amount of $500,000.00 would still remain.  In an action under the Federal Tort Claims Act a court must apply the law the state courts would apply in an analogous tort action.  See United States v. Sutro, 235 F.2d 499 (9th Cir., 1956).  In United States v. Sutro, a farmer brought suit against the federal government for the cost of constructing an irrigation system and buildings due to the government's negligence when it deposited effluent into the stream adjacent to the farmer's property.  The creek became so polluted from sewage that its water was not fit for the irrigation of lands used for growing vegetables intended for human consumption. United States v. Sutro, 235 F.2d 499, 500 (1956).  The Court decided that in an action under Federal Tort Claims Act for a tort committed in California, the legislative and decisional law of the state, applicable between private parties, will control.  The measure of damages as a matter of law is governed by state law.  Id.  In this present matter, the legislative and decisional law of the state of Idaho controls and Alamar will be left with the same outcome.

The Eleventh amendment bars both a federal court action for damages (or other retroactive relief) brought by a citizen against a state and such a federal court action brought by a citizen against a state official acting in his official capacity. Pena v. Gardner, 976 F.2d 469, 472 (9th Cir., 1982).  Under the Eleventh Amendment a state or its agencies cannot be sued in federal court without its

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 35

consent.  O'Conner v. State of Nevada, 686 F.2d 749 (9th Cir. 1982).  Thus, states are generally immune

to individual lawsuits.  "Congress may abrogate the States' constitutionally secured immunity from suit

in federal court only by making its intention unmistakably clear in the language of the statute."  Stanley

v. Trustees of California State University, 433 F.3d 1129, (9th Cir. 2006) as quoting Kimel v. Fla. Bd. of

Regents, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).

Similarly, a state's "consent [must] be unequivocally expressed."  Pennhurst State Sch. & Hosp.

v. Halderman, 465 U.S. 89, 99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).  We could find nothing to suggest

that the state has waived its sovereign immunity under the Federal Tort Claims Act.  The Eleventh

Amendment bars suits for money damages in federal court against a state, its agencies, and state officials

acting in their official capacities. See In re Pegasus Gold Corp., 394 F.3d 1189, 1195 (9th Cir. 2005);

Pena v. Gardner, 976 F.2d 469, 472 (9th Cir. 1992).

As it concerns the present case and the Fair Housing Act, 42 U.S.C. § 3601, *et seq.,* it appears

Congress has successfully abrogated the states' immunity pursuant to the enforcement provisions of the

Fourteenth Amendment to the United States Constitution and provided a statutory cause of action.  42

U.S.C. § 3615 states:

> "[n]othing in this subchapter shall be construed to invalidate or limit any law of a State or
> political subdivision of a State, or of any other jurisdiction in which this subchapter shall
> be effective, that grants, guarantees, or protects the same rights as are granted by this
> subchapter; but any law of a State, a political subdivision, or other such jurisdiction that
> purports to require or permit any action that would be a discriminatory housing practice
> under this subchapter shall to that extent be invalid."

However, there is nothing within the Fair Housing Act to suggest that state sovereign immunity

has been abrogated as it concerns damages.  Furthermore, the Federal Tort Claims Act does not appear

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 36

to limit the amount of damages that may be recovered under a state tort claims act.  In an action under

the Federal Tort Claims Act a federal court must apply the law the state courts would apply in an

analogous tort action.  United States v. Sutro, 235 F.2d 499 (C.A. 9, 1956).   And as stated earlier, the

measure of damages under a federal tort claim act action as a matter of law is governed by state law.

United States v. Sutro, 235 F.2d 499, 500 (1956).

5.      Should the petition be dismissed?    Certainly not.  There are no grounds to do so.  The statutory

elements needed for a municipality to file for chapter 9 relief, have been proven, and according to the

case law, they should be construed in favor of granting the County chapter 9 relief.  Even then, this

Court still has discretion to refuse dismissal under §921(c).

Alamar asked about compliance with the Idaho Open Meeting Act.  Alamar's argument seems to

be that when, during a public meeting on February 28, 2011, the Commissioners approved the filing of

the Chapter 9 bankruptcy petition, that had been discussed in executive session.  Alamar seems to

believe that the Boise County Commissioners did not afford its residents any opportunity to testify that it

intended to file bankruptcy.  Alamar argues that the Commissioners merely noted that the Board would

consider in executive session, "consultation and advice from legal representatives on the Alamar Ranch

litigation."   Indeed, this was one of their grounds set forth in their Objection to Chapter 9 Case of Boise

County and Motion to Dismiss the Case.  Boise County steadfastly denies this contention and maintains

its actions followed state law requirements.

As testified by Susan Buxton, the Idaho Code is very specific in its requirements for public

meetings. All meetings of a governing body of a public agency are open to the public and all persons

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 37

shall be permitted to attend any meeting "except as otherwise provided in this act ..."  I.C. §67-2342(1).

However, the Idaho Code also recognizes some specific exceptions where meetings of a governing body

of a public agency may be closed to the public.  One of those exceptions includes holding an executive

session "[t]o communicate with legal counsel for the public agency to discuss the legal ramifications of

and legal options for pending litigation, or controversies not yet litigated but imminently likely to be

litigated." I.C. §67-2345(f).  In these situations, legal counsel may meet privately with a governing body

of a public agency to discuss threatened or pending legal action.  Id.

Executive sessions may only take place at the time of a scheduled meeting of the governing

body.  Before any executive session may be held, there must be a valid open meeting and a vote to hold

an executive session. I.C. §67-2345(1).  An executive session may only be held if two-thirds of the

Board votes to hold an executive session. Id.  Prior to such vote, the presiding officer must identify the

authorization under the Open Meeting Law for the holding of an executive session. Then, when the vote

is taken, the individual vote of each member of the governing body must be recorded in the minutes.

§67-2345(1).  Furthermore, every such "meeting" must satisfy the notice and agenda requirements of

§67-2343.

In this matter, Boise County followed the requirements for conducting an executive session,

without deviation.  On February 28, 2011, the Boise County Commissioners conducted a regularly

scheduled Commissioners meeting.  Per the posted agenda and after the time for the public portion of

the meeting, the Commissioners unanimously voted to go into executive session pursuant to Idaho Code

§67-2345(1)(f) for the purpose of "[p]ending [l]itigation to consider consultation and advise from legal

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 38

representatives on Alamar litigation."  The purpose of the executive session was clearly identified as

"Alamar litigation."  After concluding the executive session the Commissioners came out of the

executive session and on the record and in front of the public, voted to file for bankruptcy protection for

Boise County.

      Alamar misses the distinction afforded by the statute.  I.C. §67-2347(6) states "[n]o executive

session may be held for the purpose of taking any final action or making a final decision."  The final

action authorizing the bankruptcy filing was made during the <u>open</u> session of the Commissioners

meeting, <u>after</u> the executive session had concluded, per the requirements of Idaho statute.

      There is no requirement in Idaho law that County Commissioners take public testimony before

authorizing the filing of a petition for bankruptcy.  Title 67, Chapter 39, does not so require.  It requires

a resolution, under I.C. §67-3904, but this was done.  See docket 69-7.  See also Exhibit 7 to the

Deposition of Mary Prisco, where the minutes of the Board of Commissioners show that the executive

session was held, the Board voted to come out of executive session, and publicly passed the resolution to

file and to retain this office to do so.  (Ex. 7 to Prisco Depo., pp. 4-5).  Ms. Prisco's deposition is Exhibit

213.

      Furthermore, the Commissioners did not make this decision without good reason or justification.

As has been shown through testimony at trial and argued at length in this Memorandum, as of February

28, 2011, the Commissioners had been sent the Application for the Writ of Execution by Alamar.  They

had also been made aware that Alamar had threatened to go after the County's cash and had read Mr.

Woodard's letters.

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 39

On February 25, 2011, the February 28, 2011, Commissioner's meeting agenda was amended to
include an executive session concerning "[p]ending [l]itigation to consider consultation and advise from
legal representatives on Alamar litigation pursuant to I.C. §67-2345(1)(f)."  Under I.C. §67-2343(4)(a),
an agenda that is posted may be amended 48 hours prior to the start of the regular meeting and the
agenda is deemed amended upon the posting of the amended agenda.

What would happen if this case were dismissed?   Alamar would likely say that all that would
happen is further negotiations.  The County does not believe that, and respectfully submits that no
rational person could believe this.  Alamar's attorneys asked multiple questions to the County's witnesses
about "surplus" cash of several million dollars–enough to pay off this judgment in full.  Their intent is
proven by their actions and their own questions, their protestations of innocence notwithstanding.
Hansel and Gretel were lured into the witch's cave by her promises to them, but her intent was to eat
them when she trapped them.  The County would urge this Court to not cast it adrift to be plundered as
Alamar wishes to do.  The Court is urged to note that only by a Plan can <u>both</u> parties to this litigation, as
well as all of the other creditors, have their interests legally resolved and protected.

The Court is specifically referred to <u>In re City of Desert Hot Springs</u>, 327 F.3d 930, *modified* 339
F.3d 782 (9th Cir. 2003), where a creditor–just like Alamar, a claimant under the Fair Housing Act-
appealed from an order of the Bankruptcy Court and 9th Circuit BAP denying dismissal of the City's
Chapter 9 petition.  While the decision on its face was simply a question of whether the order denying
the motion to dismiss was interlocutory, the decision was cited in <u>Vallejo</u>, a chapter 9 case.  More

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS─Page 40

importantly, a review of the statement of the case in the opinion at 327 F.3d 930 shows that many, if not

most, of the facts and arguments are identical with those of this case.

The Bankruptcy Court in <u>Desert Hot Springs</u> entered detailed Findings of Fact and Conclusions

of Law on the creditor's Motion to Dismiss. These are attached to this Memorandum.[10] The facts of the

case and the legal analysis leading to the denial of the Motion to Dismiss and the approval of the

Petition are:

- The creditor had sued the city for violations of the Fair Housing Act for improperly denying permits for a housing project;

- A large, multi-million dollar jury verdict was rendered.

- There are other debts against the entity.

- The City had restricted Funds that it believed were unable to be used for payment of the judgment.

- The City was faced with declining revenues and had done budget cutbacks previously.

- The City would be unable to pay its obligations in respect of the judgment in favor of the developer "as and when it becomes due."

- The City reviewed its options for negotiating an adjustment of its debts. The activities of the developer were "aggressive, disruptive, and (in the City's opinion) illegal collection activities" and included threats to collect all of the Funds now, demands that the City pay it all <u>now</u>, and assertions that if this payment was not made, they would pursue collection remedies. The City filed a motion to stay collection activities, but this was denied without explanation by the trial

---

[10] The Plan was ultimately confirmed on July 26, 2004, docket 342-1, per docket 342-1 in case #01-bk-30756, Central District of California.

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 41

court.  The conditions imposed by the developer to hold off execution were not believed to be "possible, prudent or in the best interests of its creditors or residents" and were rejected.

- The City reasonably believed that the developer would levy on its accounts, which would dissipate its assets and prejudice its operations, residents and creditors.

Based on this set of facts, the Court found that the City did not act in bad faith in the filing of this case.  Nor was it bad faith to file the case prior to attempting to further increase its taxes or generate other revenues.   The Court concluded that the City was insolvent, that it desired to effect a Plan, that negotiations were impracticable, that the threatened levy would work an avoidable preference, and that the City has satisfied its burden of proof in all respects.  Moreover, the Court also exercised its discretion not to dismiss the petition under §921(c).

The Court in the instant case should not overlook the remarkable parallels between the present matter and that case.  This Court should hold to the same conclusion based on the facts presented at the hearing.  The filing of this case was not made in bad faith.  The discretion allowed under §921(c) should be exercised in favor of the County.  The arguments concerning the claims enforcement and the merits of the Plan itself vis-a-vis the Tort Claims Act and the Missouri and McCall cases are properly raised in objections to the claims, or objections to the confirmation of this Plan.

Dated this 15th day of July, 2011.

LAW OFFICES OF D. BLAIR CLARK PLLC


by /s/_____
D. Blair Clark, Attorneys for Debtor


MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 42

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of July, 2011, I served a copy hereof upon the following parties, as follows:

ECF:

Mark E Hindley on behalf of Creditor Alamar mehindley@stoel.com Bryan Albert Nickels on behalf of Creditor Fred Lawsonban@hallfarley.com  klc@hallfarley.com

Richard Wayne Sweney on behalf of Creditor Mountain West Bankrws@lukins.com

Elizabeth M Taylor on behalf of Creditor Ada Countybtaylor@adaweb.net  jpeterson@adaweb.net

US Trusteeustp.region18.bs.ecf@usdoj.gov

Wade L. Woodard on behalf of Creditor Alamar wwoodard@bwslawgroup.com,
jrose@bwslawgroup.com; tbanducci@bwslawgroup.com; mream@bwslawgroup.com
ksavell@bwslawgroup.com; dparker@bwslawgroup.com

ELECTRONIC MAIL:
Cherese McLain [cmclain@co.boise.id.us], Civil Deputy Prosecuting Attorney

Andrew C. Brassey [acb@brassey.net], for Boise County

Mary T. Prisco [mprisco@co.boise.id.us], Boise County Clerk

Susan E. Buxton [SEB@msbtlaw.com], for Boise County

Jamie Anderson [jamiea@frontiernet.net], Chair, Boise County Commission

FIRST CLASS MAIL:

Recovery Management Systems Corporation for Capital Recovery25 SE 2nd Avenue, Suite 1120
Miami, FL 33131

/s/_____
D. Blair Clark

MEMORANDUM OF BOISE COUNTY IN OPPOSITION TO MOTION TO DISMISS—Page 43