Thomas A. Banducci (ISB: 2453)
*tbanducci@bwslawgroup.com*
Wade L. Woodard (ISB: 6312)
*wwoodard@bwslawgroup.com*
Dara Parker (ISB: 7177)
*dparker@bwslawgroup.com*
**Banducci Woodard Schwartzman PLLC**
802 W. Bannock St., Suite 500
Boise, ID  83702
Telephone:  (208) 342-4411
Facsimile:  (208) 342-4455

Danny C. Kelly (Utah Bar No. 1788), *admitted pro hac vice*
Mark E. Hindley (Utah Bar No. 7222), *admitted pro hac vice*
**STOEL RIVES LLP**
201 South Main Street, Suite 1100
Salt Lake City, UT  84111
Telephone:  (801) 578-6979
Facsimile:  (801) 578-6999
dckelly@stoel.com
mehindley@stoel.com

Counsel for Alamar Ranch, LLC and YTC, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| In re: | Case No. 11-00481 |
| BOISE COUNTY, | Chapter 9 |
| Debtor. | [Filed Electronically] |

## ALAMAR RANCH, LLC'S POST HEARING BRIEF RE
## (I) OBJECTION TO CHAPTER 9 CASE OF BOISE COUNTY
## AND (II) MOTION TO DISMISS THE CASE

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     ARGUMENT ....................................................................................................... 3

      A.      Boise County's Case Must be Dismissed Because the County is Solvent ........... 3

          1.      Boise County has sufficient surplus cash to pay the judgment after meeting all of its expenses.................................... 5

          2.      Boise County's surplus cash is not restricted ............................... 6

          3.      Boise County is not insolvent because its surplus cash is not exempt from execution .......................................... 12

          4.      The County is not insolvent because it could have issued bonds to pay the judgment ...................................... 15

          5.      The City of Vallejo case is inapposite ......................................... 18

      B.      As a Matter of Well-Settled Law, the Idaho Tort Claims Act Cannot Limit Damages Awarded for an FHA Violation .......................................... 19

          1.      Boise County has long since waived its ability to assert that its judgment should be reduced.................................... 22

          2.      Boise County's argument concerning the Idaho Tort Claims Act undermines its allegations of insolvency ............................. 23

      C.      Boise County Filed its Chapter 9 Case in Bad Faith ........................................... 23

          1.      Boise County is using the bankruptcy to relitigate issues it waived in prior proceedings....................................... 24

          2.      Boise County is improperly using the bankruptcy to obtain a stay of execution without filing a supersedeas bond................. 25

          3.      Boise County's chapter 9 petition "was not a final alternative chosen as a last resort." ............................................. 26

III.    CONCLUSION ................................................................................................... 27

Alamar Ranch, LLC and YTC, LLC (together, "Alamar"), judgment-creditors of Debtor Boise County ("Boise County" or the "County"), hereby submit this Post Hearing Brief in support of their objection to the County's voluntary petition (the "Petition" or "Case") under chapter 9 of the United States Bankruptcy Code (the "Bankruptcy Code" or "Code") and move this Court for an Order dismissing this Case.

## I.   **INTRODUCTION**

Boise County is not eligible for protection under chapter 9 because it is not insolvent. The evidence is undisputed that the County has sufficient surplus cash to satisfy the judgment and continue to operate and provide <u>all</u> of its services. The County Treasurer's unrebutted testimony was that the County has over $5.5 million in "idle or surplus" funds that would not be needed for operation in the next 1 to 4 years. The County's cash flow projections for the fiscal years 2011 and 2012 both show that the County after meeting all of its expenses will have over $5 million in surplus cash at the end of those years. Moreover, the County's current financial statement shows that the County can satisfy the judgment, meet all of its expenses and still have $3.3 million in surplus unrestricted funds.

Because the County cannot deny that it has sufficient cash to operate and satisfy the judgment with surplus funds, it will claim that its surplus funds are restricted. That argument fails for several reasons. First, as noted in Boise County's Opposition Brief at 22 (Docket No. 96), the law is clear that cash is not exempt from execution. Thus, Alamar had the ability to attach the County's surplus cash regardless of whether it was restricted. As set forth above, had Alamar attached this "restricted cash," the County still would have been able to meet all of its other expenses and remain solvent.

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9 CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 1

Second, Boise County has failed to meet its burden to show that its surplus cash is restricted. The County's financial statement listed its surplus cash as <u>un</u>restricted. Indeed, as noted above, the County in its financial statement has actually booked the payment of the judgment with its surplus funds. The fact that the County's policy has been to pay its bills with restricted funds first, coupled with the fact that the County has not and cannot trace which monies in which funds are restricted, means that the County cannot prove what amount, if any, of its surplus cash consists of monies from restricted sources.

The County's surplus cash is not restricted under Idaho law. Idaho Code § 31-1605A provides that counties may accumulate fund balances at the end of a fiscal year and carry over such fund balances into the ensuing fiscal year. For the carry over cash in those funds to retain any restricted status, however, the County commissioners must pass a resolution rededicating the surplus cash in those funds to a specific purpose. The County failed to introduce any resolutions rededicating any surplus restricted cash. Therefore, it cannot be assumed that the County's surplus cash is restricted.

Third and more importantly, even if the surplus cash was restricted, Idaho law provides in Idaho Code §§ 31-1608 and 63-806 that surplus cash in restricted funds may be used to satisfy judgments. Consequently, because surplus cash, restricted or not, can be used to satisfy Alamar's judgment, and because there is sufficient surplus cash to satisfy the judgment, the judgment did not render the County insolvent.

Finally, the evidence adduced at the hearing demonstrates that the County filed the Petition in bad faith to litigate issues it waived in prior proceedings, to avoid posting a supersedeas bond, and without using various tools at its disposal to pay the judgment. Therefore, the County's bankruptcy petition should be dismissed.

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9
CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 2

## II.    ARGUMENT

From the outset, it must be remembered that "Congress consciously sought 'to limit accessibility to the bankruptcy court' by municipalities." *In re Cottonwood Water and Sanitation District,* 138 B.R. 973, 974, 979 (Bankr. D. Co. 1992) (quoting H.R. Conference Report, 94-938, p. 10, U.S. Code Cong. & Admin. News 1976, p. 539). Thus, Boise County has the burden to prove that it meets the chapter 9 eligibility requirements of Section 109(c). *In re City of Vallejo,* 408 B.R. at 289; *In re Valley Health Sys.*, 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995). Because the County failed to satisfy its burden, the Case must be dismissed. *In re City of Vallejo,* 408 B.R. 280, 289 (9th Cir. BAP 2009); *citing In re County of Orange,* 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995).

### A.    Boise County's Case Must be Dismissed Because the County is Solvent.

To seek chapter 9 protection a municipality must be insolvent. 11 U.S.C. § 109(c)(3). As set forth in Alamar's opening brief, a municipality is insolvent for purposes of chapter 9 if it is "(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due." *In re Pierce County Housing Authority*, 414 B.R. 702, 710 (Bankr. W.D. Wash. 2009). *Id.* at 710-11 (quoting *In re City of Bridgeport*, 129 B.R. 332, 337 (Bankr. D. Conn. 1991).

In its opposition brief, the County argued that it is insolvent because it had not paid approximately $550,000 in indigency claims and that "the Alamar judgment adds to this insolvency."[1] (Docket No. 94 at 3.) Importantly, the County did not undertake a solvency analysis prior to filing its Petition, and has not presented any competent financial analysis to

---

[1] The County's suggestion that $550,000 in indigency claims makes it insolvent and that the judgment only increases the insolvency is an indication of the County's extreme and unsupported views of what constitutes insolvency.

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9 CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 3

demonstrate that it was insolvent when it filed the Petition or, for that matter, insolvent now. (Transcript of Hearing ("TR") at 140:23-141:2, attached as Exhibit B to the Declaration of Wade L. Woodard in Support of Post Hearing Brief re Objection to Chapter 9 Case of Boise County, filed concurrently herewith.)[2]  Likewise, there is no competent evidence of $550,000 in unpaid indigent claims.  Mary Prisco testified that although there are unpaid indigent claims, she does not know what the amount of those claims will be because the County has not been billed for the claims.  (TR at 223:4-225:2.)  She further testified that the claims are not yet due and the amount could be significantly less than $550,000.  (*Id.*)  Thus, the testimony concerning the alleged amount of the indigency claims is completely speculative and without foundation.

Furthermore, even if there were $550,000 owing in indigency claims, Boise County has sufficient surplus money in its indigency fund to pay those claims.  (Ex.[3] 111 at 6.)  Indeed, Mary Prisco testified that, other than the judgment, the County was able to pay all debts as they came due.  (TR at 136:5-139:18.)  Commissioner Jamie Anderson likewise testified that there was sufficient cash to pay the indigent expenses.  (TR at 491:22-492:13.)  Further, the County Improvement Fund has an additional $450,000 that could be used to pay those claims.[4]  Because there is sufficient cash to satisfy potential indigency claims even in the unlikely event the claims are as high as $550,000, the only remaining issue is the County's ability to satisfy Alamar's $4 million judgment.

---

[2] Alamar had the tapes from the three days of hearings transcribed by Simmons Court Reporters, Inc. Copies of those transcripts have been attached to the Declaration of Wade Woodard for the Court's reference.

[3] Citations to the exhibits admitted during the hearing will be by the abbreviation "Ex." Followed by the exhibit number.

[4] The testimony at the hearing was that this fund is not encumbered or dedicated.  (TR at 166:15-22.) Moreover, as set forth in Part II.A.2.c *infra.,* the county can establish a warrant redemption fund and use "restricted" surplus cash to pay the alleged claims.

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9 CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 4

1. ***Boise County has sufficient surplus cash to pay the judgment after meeting all of its expenses.***

The evidence is undisputed that Boise County has sufficient surplus cash to pay the judgment and still meet all of its projected expenses for the fiscal years 2011 and 2012. (Ex. 258; TR at 652:21-653:8; 661:17-662:9; 669:17-677:20; 682:12-16.) The County has projected that by year end 2011 it will have $5.5 million in surplus cash, excluding the over $2 million in trust account money that is taken off of the projection beginning May 2011.[5] (Ex. 111 at 118.) For 2012, after meeting all of its expenses, the County has projected that by year end it will have over $5.875 million in surplus cash, again excluding the over $2 million in trust account money that is taken off of the projection beginning May 2011. (Ex. 112 at 118.) Thus, the County's surplus cash is expected to grow from fiscal year 2011 to fiscal year 2012. These cash flow projections, which were prepared by the County, are corroborated by the testimony of April Hutchings that the County has over $5.6 million in idle cash not needed for operations.[6] (TR at 368:9-24.) Thus, even after the County meets all of its budgeted expenditures and provides all necessary services, there is sufficient surplus cash to pay the judgment. The County is not insolvent if it has access to such surplus cash. *In re Ellicott School Building Authority*, 150 B.R. 261, 265 (Bankr. D. Colo. 1992); *In re City of Bridgeport*, 129 B.R. 332, 337 (Bankr. D. Conn. 1991). And that is what Scott Philips found in his review of the County's finances. (TR at 661:17-662:9.)

---

[5] According to Mary Prisco, trust account monies are unrestricted. (TR at 166:19-22.)

[6] April Hutchings testified that the investment accounts referenced on page 6 of Ex. 106, which total $4.172 million, consist of idle cash not needed for operations. (TR at 355:1-362:3; 368:9-24.) She also testified that the State of Idaho Local Government Investment Pool account in the amount of $1.549 million is comprised of idle funds not needed for operations. (*Id.*)

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9 CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 5

## 2. *Boise County's surplus cash is not restricted.*

Boise County's mantra has been that its surplus cash is not available to satisfy the judgment because it is "restricted." The County, however, cannot satisfy its burden of proving the surplus cash is restricted.[7] The evidence shows that the County's surplus cash has been accumulating for years. (TR at 160:23-162:24.) This is money that was raised/appropriated for a given fiscal year, but not used in that fiscal year or in succeeding years. (*Id*. at 160:23-162:24; 165:23-166:3.) As set forth above, over time, when trust accounts are included, that surplus cash has accumulated to the extent that it is now over $9.3 million. (TR at 172:10-19; Ex. 111 at 18.)

Moreover, Boise County has not treated these surplus funds as restricted. The County's financial statements for 2009 and 2010 list the surplus cash as <u>un</u>restricted. (Ex. 116 at 5; Ex. 226 at 5.) Consistent with its treatment of this surplus cash as unrestricted, the County 2010 financial statement actually books the payment of the judgment with these unrestricted surplus funds. (*Id.* at 5-6.) The County now attempts to run away from its past position of treating this surplus cash as unrestricted by claiming that the designation of the surplus cash as unrestricted was in error. Furthermore, the evidence demonstrates that the County made settlement offers with what it believed were monies from restricted funds. (TR 323:23-326:17.) Additionally, although Boise County contends that money becomes restricted once it is budgeted to a fund, the

---

[7] For that matter, the County does not even define the term restricted and the County Auditor, Mary Prisco, testified that she did not know what the term means. (TR at 198:24-199:5.) Although at times the County appears to be taking the position that restricted means appropriated to a budget, that is simply not the case. If so, all of the county's monies would be restricted (other than surplus) because it is appropriated to a budget. Moreover, the County does not believe as much since it has testified that its current expense fund, which is budgeted, is not restricted. (TR at 239:8-24.) Furthermore, GASB 34 defines restricted as being restricted from the source, not by being budgeted by the County. (TR at 722:25-723:24.) Finally, the County's policy to spend restricted monies in a fund before spending unrestricted monies in the fund demonstrates that monies do not become restricted by being appropriated to a fund. (Ex. 116 at 15; Ex. 226 at 16.)

evidence demonstrates that the County has consistently moved money between funds.[8]  (Exs. 248-252.)  This practice is consistent with Idaho law which allows money to be transferred between funds  upon a resolution by the commissioners.  Idaho Code Ann. § 31-1605.  The County "cannot squirrel away money it can use for operations in a fund, argue the fund is restricted and then claim insolvency." *In re City of Vallejo,* 408 B.R. 280, 290 (9th Cir. BAP 2009).  Accordingly, the County's newly devised claim that its surplus cash is restricted is inconsistent with the County's prepetition conduct of treating the cash as unrestricted.

a.  *Boise County cannot demonstrate what portion, if any, of its surplus cash is restricted.*

It is Boise County's policy to pay its expenses with restricted funds first and then if necessary, use unrestricted funds.  (Ex. 116 at 15; Ex. 226 at 16 ("However, when both restricted and unrestricted resources are available for use, it is the County's intent to use restricted resources first, then committed unrestricted resources, then assigned unrestricted resources, and then unassigned unrestricted resources."))  The County's funds consist of both unrestricted and restricted monies.  Yet the County has failed to show whether the monies in any given fund at the end of the year (after expenditures) are restricted or unrestricted.  This is because the County

---

[8] Moreover, applying this argument to surplus cash does not make sense.  The surplus cash is surplus because it was not used for budgeted expenses.  Because it was not used for budgeted expenses, the County cannot claim it became restricted as a result of its internal budgeting process.  Furthermore, under this argument, the County can refuse to set aside a reserve or otherwise budget for a judgment and then claim there is no money to pay the judgment because all of the cash is restricted because it has been budgeted into other funds and thereby makes itself judgment-proof.  Such immunity from judgments clearly was not intended by the Idaho legislature, and has been explicitly rejected by the Idaho Supreme Court: "The provision in § 31-1607 that no warrant shall issue or claim be approved for an expenditure in excess of the budget appropriations, 'except upon an order of a court of competent jurisdiction,' indicates that the budget law was not intended to control the courts. . . . [C]ourts may order the payment of valid claims against the county though not provided for in the budget."  *H. J. McNeel, Inc. v. Canyon County*, 76 Idaho 74, 80 (Idaho 1954) (emphasis added).

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9 CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 7

has not kept track of the expenditure of restricted and unrestricted monies from its funds and,

therefore, cannot determine whether any restricted monies remain at the end of any given year.

(TR 198:24-199:5; 697:15-698:25 713:24-714:14; 715:9-16.)  For this reason, there was no

testimony from the County tracing the expenditure of restricted and unrestricted money from the

funds.  The only evidence is that it is the County's policy to spend restricted monies within a

fund first and that more than half of the money in the funds is unrestricted.  (Ex. 116 at 15; Ex.

215 at 16; TR at 414:13-22.)  Thus, the County cannot prove that its surplus cash is restricted.

Furthermore, because the County's surplus cash is cash that has not been spent, but has

accumulated over time, it most likely consists of unrestricted cash as a result of the County's

policy to spend restricted cash first.  (TR at 692:7-17.)  In other words, if restricted cash is spent

first, any surplus is most likely unrestricted.  (TR at 692:7-17.)  In fact, that is what the County's

auditors concluded when they designated the County's net assets (surplus cash) as unrestricted.

(Ex. 116 at 5; Ex. 226 at 6; TR at 716:5-9.)  That auditor, who did his best to disclaim his work

product, admitted that the judgment would not be paid with restricted funds and that the financial

statement he prepared books payment of the judgment with unrestricted funds.  (TR at 733:4-20;

Ex. 226 at 5.)

   b.    _Pursuant to Idaho law, the surplus cash is not restricted._

Idaho Code § 31-1605A provides that:

> Counties may accumulate fund balances at the end of a fiscal year and carry over
> such fund balances into the ensuing fiscal year sufficient to achieve or maintain
> county operations on a cash basis. A fund balance is the excess of the assets of a
> fund over its liabilities and reserves. Upon resolution by the board of county
> commissioners, such funds may be carried over for the use of specific county
> departments as an additional appropriation in the next fiscal year.

(Emphasis added.)  Accordingly, counties may accumulate fund balances at the end of a fiscal

year and carry over such fund balances into the ensuing fiscal year but, for such cash to retain

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9
CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 8

any sort of dedicated status, the Boise County commissioners must pass a resolution rededicating the surplus cash in those funds to a specific purpose. Thus, contrary to the testimony of Mary Prisco and Commissioner Fry, the rededication of surplus cash to restricted purposes does not occur automatically. Notwithstanding their practice or understanding, the statute is clear that there must be a resolution by the board of commissioners rededicating those surplus funds. If a resolution is not passed, those monies accumulate as unrestricted surplus cash as reflected in the County's financial statements. (Ex. 116 at 5; 226 at 6.) Although Commissioner Anderson testified that she thought such a resolution was included in the resolution approving the budget, the County's resolutions regarding the budget do not contain any express authorization for the use of carry over cash from prior years as an additional appropriation for the following fiscal year. (*See* Exs. 256 & 257.)

      c.    *Idaho law authorizes the use of restricted surplus cash to pay judgments.*

Idaho Code § 31-1608 governs emergency expenditures. That section describes two very different types of emergency expenditures. The first is expenditures for true emergencies such as those caused by flood, fire, explosion, public health concerns, etc. *Id.* The other is to meet "mandatory expenditures required by law." *Id.* There is no Idaho case law expressly dealing with what constitutes a "mandatory expenditure required by law." Under Section 31-1608 the language appears to be only another expression of the well-established principle of "obligations imposed by law" which, as discussed below in the context of Idaho's debt limitations, overrides even constitutional provisions. Where the language of a statute is plain and unambiguous, however, the Court must give effect to the statute as written, without engaging in statutory construction. *State v. Rhode,* 133 Idaho 459, 462, 988 P.2d 685, 688 (1999); *State v. Burnight,* 132 Idaho 654, 659, 978 P.2d 214, 219 (1999); *State v. Escobar,* 134 Idaho 387, 389, 3 P.3d 65,

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9
CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 9

67 (Ct. App. 2000). Thus, the language of the statute is to be given its plain, obvious, and rational meaning. *Burnight,* 132 Idaho at 659, 978 P.2d at 219. If the language is clear and unambiguous, there is no occasion for the court to resort to legislative history or rules of statutory interpretation. *Escobar,* 134 Idaho at 389, 3 P.3d at 67. Here, the language of the statute is clear and unambiguous and the judgment is a debt that the County is required by law to pay. Therefore, it is a mandatory expenditure required by law.

In that regard, Mary Prisco agreed that a judgment is a mandatory expenditure required by law. (TR at 113:8-11.) Likewise, Abbie Mace agreed with the Idaho Counties Uniform Accounting and Budgeting Manual's interpretation of the phrase to include "catastrophic medical indigency payments, extraordinary public defender/court appointed attorney expenses, tort payments, etc." (TR at 576:9-23; Ex. 253 at 5.) A judgment clearly fits under that interpretation since the County has no discretion about whether it will or will not pay the judgment and thereby effectively trump a judgment of a federal district court. Therefore, because the judgment is a mandatory expenditure required by law, it is an emergency expenditure authorized under the second prong of Idaho Code § 31-1608.

Code § 31-1608 then provides that the commissioners may by unanimous vote adopt a resolution stating the facts of the mandatory expenditure and direct the necessary payment. *Id.* The mandatory expenditure must be charged against the proper fund, and any cash available in that fund must be used, including reserve and unreserved fund balances. *Id.* If there is not enough cash on hand in the proper fund then registered warrants <u>must</u> be issued or there may be an ability to transfer monies from other funds as allowed by Idaho Code § 31-1508. *Id.*; Idaho Code Ann. § 31-1608.

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9
CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 10

Idaho Code § 63-806 provides that if the warrants remain unpaid by the next budget year and sufficient levy authority exists in the obligated fund to cover the unpaid warrants and also the new budget, those warrants should be paid from the new budget for that fund. *Id.* If there is insufficient levy authority available in the obligated fund a warrant redemption fund must be established, to levy for and pay the outstanding registered warrants *Id.*; Art VII, Sec. 15, Idaho Constitution. If such levy is still insufficient, then "[a]ll money in the county treasury on the first day of October to the credit of the county current expense fund, county road fund, county bridge fund or any other fund which is no longer needed must be transferred to the county warrant redemption fund upon the books of the county auditor and county treasurer by resolution of the county commissioners entered upon the records of the proceedings." *Id.* (emphasis added).

In sum, Idaho Code §§ 31-16-08 and 63-806 provide that if a judgment cannot be paid from monies in the fund chargeable with paying the judgment, warrants must be issued for the judgment and, if the tax levy authority is not sufficient to pay those warrants, a warrant redemption fund must be established and all surplus cash in any funds, including restricted funds such as the road and bridge funds, must be used to pay off the warrants. Thus, by statute, surplus cash, even in restricted funds, must be used to pay off a judgment.[9]

Here, the County claims that the money in the chargeable fund (the general fund) is insufficient to pay the judgment and that there is insufficient levy authority to pay the judgment. The County then claims that its surplus cash cannot be used because that cash is allegedly restricted. The County, however, ignores Idaho Code § 63-806's requirement that the County issue warrants for the judgment, set up a warrant redemption fund, and then use its surplus cash from all of its funds, regardless of alleged restrictions, to pay off the warrants. Therefore,

---

[9] Additionally, Idaho Code § 31-1507 provides that warrants can be paid through short term borrowing from other funds.

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9 CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 11

because § 63-806 provides a way for the County to use its "restricted" surplus cash to pay the judgment and because Boise County indisputably has sufficient surplus cash to pay the judgment, the County is not insolvent.  Boise County simply cannot ignore its obligation to pay the judgment and then claim insolvency.  *In re City of Bridgeport,* 129 B.R. 332, 337 (Bankr. D. Conn. 1991).

>    **3.      Boise County is not insolvent because its surplus cash is not exempt from execution.**

As set forth above, there is no dispute that the County has sufficient surplus cash to pay the judgment.  That is why the County relies so heavily on its argument that the surplus cash cannot be considered in a solvency analysis because restrictions prevent the County from using the cash to pay the judgment.  In other words, the County claims it is insolvent because it cannot voluntarily pay the judgment.  Even if the alleged restrictions prevented the County from "voluntarily" paying the judgment, those restrictions do not exempt the surplus cash from execution and, therefore, the County could be required to satisfy the judgment from those surplus funds and still operate the County.

Idaho Code § 11-201 provides that "[a]ll goods, chattels, <u>moneys</u> and other property, both real and personal, or any interest therein of the judgment debtor, <u>not exempt by law</u>, and all property and rights of property, seized and held under attachment in the action, are liable to execution."  (Emphasis added.)  "It is well recognized that a debtor's right to exempt property from the claims of creditors is not a common law right but is dependent upon constitutional or statutory allowance."  *Hooper v. State*, 127 Idaho 945, 950, 908 P.2d 1252, 1257 (Ct. App. 1995).  Accordingly, "the general rule is that <u>assets are not exempt</u> from the claims of creditors <u>unless specifically exempted by statute</u>.  Furthermore, a debtor claiming an exemption generally must prove that his claim comes within the exemption provisions."  *Id.* (citations omitted,

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9
CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 12

emphasis added.)  The specific code section exempting County property from execution is Idaho

Code § 11-605(4).  This section exempts property such as schoolhouses, jails, public buildings,

etc.  *Id,* but it does not exempt a county's cash.  *Id.*  Consequently, the County's cash, even if

"restricted" is not exempt from execution because "restricted cash," is not listed in the exemption

statute.  The County admits as much in its opposition brief.  (Docket No. 96 at 22.)

The issue of whether the County's cash is exempt from the judgment is similar to a

central issue in the chapter 9 of Orange County.  There the issue was whether trust funds that had

been commingled with nontrust funds were property of the debtor and, therefore, available for

distribution to all creditors on a pro rata basis in accordance with the Bankruptcy Code's priority

scheme, or whether the commingled funds were available to only the intended beneficiaries of

the commingled trust funds in accordance with California state law.  The bankruptcy court

concluded that the Bankruptcy Code controlled and that the commingled funds were, therefore,

the debtor's property.  More pointedly, the court found that:  "The California legislature cannot

rewrite bankruptcy priorities.  [The Code] explicitly defined the order of creditor priority and

declared the congressional intent of federal supremacy over declared but conflicting state law

orders of priority."  (Citations omitted).  *In re County of Orange,* 191 B.R. 1005, 1017 (Bankr.

C.D. Cal. 1996).  Even though the issue before this Court is whether the County's allegedly

"restricted" funds are included in the determination of solvency for purposes of Bankruptcy Code

§ 109(c)(3) rather than whether the restricted funds are the County's property available to

creditors, there is no logical distinction between the two analyses.  The County alleges that it is

insolvent.  The County's "restricted" money is hopelessly commingled with the County's non-

restricted money and cannot be traced.  Accordingly, the commingled funds should be regarded

as money that is available without restriction for all purposes, including the current solvency analysis and the payment of Alamar's judgment.

Moreover, even if "restrictions" somehow exempted the surplus cash from execution, such exemption has been lost due to commingling of the restricted cash with unrestricted cash. Indeed, the County has stated that its sole reason for filing the bankruptcy is because its cash, while possibly restricted, is not exempt from execution due to commingling or lack of ability to trace. (*Id.* at 22-23; Ex. 118 at 8 ("[T]he 'funds' were split up and put into various accounts, which also contained general fund moneys, surplus funds, and other non-restricted funds. Even if this is common in the administration of County government, it may well take the 'restrictions' away from [those] funds due to the lack of the ability to trace. A major factor in the decision to file this case, and the Plan, is to preserve the sanctity of as many of the "funds" as possible for the proper use of County government.")[10]  The County is correct as Idaho law is clear that exempt cash loses its exempt status if it is commingled with non-exempt cash and there is no ability to trace the exempt cash. *Hooper v. State of Idaho*, 127 Idaho 945, 950, 908 P.2d 1252, 1257 (Idaho App. 1995); *In re Merrill*, 431 B.R. 239 (Bankr. D. Idaho 2009). "There is authority that a deposit of exempt funds in a bank does not affect a debtor's exemption, nor change the exempt character of the fund, so long as the source of the exempt funds is [sic] reasonably traceable. If it is impossible to separate out exempt funds from nonexempt funds, the general rule is that an exemption cannot lie." *Hooper*, 127 Idaho at 950, 908 P.2d at 1257 (citing 31 Am. Jur. 2d § 45). Furthermore, as set forth in Part II.A.2.C, *supra*, the Idaho Code expressly allows a judgment to be paid with restricted surplus cash. Idaho Code Ann. §§ 31-1608 & 63-806.

---

[10] Debtor's Proposed Disclosure Statement, Dated June 14, 2011, Docket No. 97 at p.4 of 20.

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9 CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 14

Here, the County's witnesses testified that the cash in the account could not be traced and that there is no way to determine what cash in the County's various accounts and investments is restricted and what is not restricted.  (TR at 127:13-21; 197:22-198:1; 210:10-20; 251:19-252:4; 363:24-364:5; 365:9-22; 409:21-410:12; 537:8-12.)  For that reason, even if the restrictions may have conferred exempt status on the cash at one time, the cash is no longer exempt because it has been commingled with no way to trace what is restricted and what is not restricted.  Therefore, the County is not insolvent because it has sufficient <u>surplus</u> cash not exempt from execution to satisfy the judgment.

### 4.  *The County is not insolvent because it could have issued bonds to pay the judgment.*

As with the warrant redemption fund alternative to pay the judgment, the County did not seriously consider paying the judgment by issuing bonds.  The County claims it quickly dismissed the idea of issuing bonds to pay the judgment because it believed it would never have been able to get voter approval of such bonds.  (TR 81:9-17.)  While it is true that Idaho constitution contains debt limitations which necessitate a special election requiring the approval of two-thirds of the County's qualified electors before a bond can be issued for new voluntary debt,[11] it is clear that under a well-established principle that constitutional and statutory debt limitations do not apply to involuntary indebtedness, such as judgments.  Simply stated, debt limitations apply to debt incurred on a voluntary basis, but they do not apply to obligations imposed by law involuntarily.  This is because (1) the municipality and its voters basically have nothing to vote on—the obligation is there and the only choice they have is to find a way to satisfy the obligation, and (2) in this instance, the issuance of bonds is not the creation of new

---

[11] *See* Idaho Const. Art. VIII, § 3 (2011) ("No county . . . shall incur any indebtedness . . . exceeding in that year, the income and revenue provided for it for such year, without the assent of two thirds (2/3) of the qualified electors thereof voting at an election to be held for that purpose").

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9 CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 15

indebtedness, it just changes the form of the indebtedness from a payment due under a judgment

to a payment due under bonds.

The principle referred to "obligations imposed by law" has been well-established in Idaho

for over a century.  In *Veatch v. City of Moscow*, 18 Idaho 313, 109 P.722, 723 (1910), the Idaho

Supreme Court recognized what even then was a well-established exception to otherwise

applicable debt limitation laws:

> It is stated in sec. 190, 1 Abbott on Municipal Corporations, that it
> has been repeatedly held that the refunding of an indebtedness does not
> increase or create a debt but merely changes its form, and it is said:  "The
> authorities are uniform to the effect that where legislative authority exists the
> proper officials have the power to negotiate for an issue of refunding bonds
> without submitting the question to the electors of the district," and cites *Doon
> Tp. v. Cummins, 142 U.S. 366, 12 S. Ct. 220, 35 L. Ed. 1044*, and other
> authorities, among them, *Pratt Co. Commrs. v. Society for Savings, 90 F.233*,
> [***7] 32 C. C. A. 596.

> In *Geer v. Board, 97 F.435*, 38 C. C. A. 250, in answering a similar
> question, the court said:

> "The answer to the proposition is that the prohibition of the
> constitution of Colorado is against the creation of a debt by loan, and *the
> mere exchange of the judgments against a county for its refunding bonds
> creates no debt by loan, or in any other way*.  The debts existed before
> as well as after the exchange.  *The judgments and the bonds are nothing
> but the legal evidences of the existence of these debts, and the exchange
> of the one for the other merely changes the form of the obligations*."

> It was held in *City of Los Angeles v. Teed, 112 Cal. 319, 44
> P.580*, as follows:

> "A bond is not an indebtedness or liability; it is only the
> *evidence or representative* of an indebtedness.  And a mere change in
> the form of the evidence of indebtedness is not the creation of a new
> indebtedness within the meaning of the constitution.  (*Opinion of
> Justices, 81 Me. 602, 18 A.291*; *Hotchkiss v. Marion, 12 Mont. 218, 29
> P.821*; *Board of Commrs. v. Board of Commrs., 26 Kan. 181, 201*; *City
> of Poughkeepsie v. Quintard, 65 Hun 141, 19 N.Y.S. 944*.)

*Id.*, 317-318 (emphasis added).

In *Independent Sch. Dist. No. 12 v. Manning*, 185 P.723 (1919), the court addressed the same issue we have here (*i.e.*, a tax levy to pay a judgment) and found that the bond obligations were imposed by law and, therefore, not within the constitutional prohibition. *Id. See also Butler v. City of Lewiston*, 83 P.234, 238 (Idaho 1905); *Sebern v. Cobb,* 238 P.1023 (Idaho 1925).

The County's reliance on *Boise City v. Frazier*, 143 Idaho 1, 137 P.3d 388 (2006) to support its position is misplaced. *Frazier* involved <u>voluntary</u> indebtedness, not <u>involuntary</u> indebtedness imposed by law. There, the City of Boise wanted to exceed the debt limit of Article VIII, § 3 of the constitution to finance the expansion of its airport parking facilities by incurring new debt without first obtaining voter approval. *Id.* at 2-6, 137 P.3d at 389-393. The city was not allowed to do so, however, since the debt did not qualify as an "ordinary and necessary" expense, which meant that the city's proposed issuance of bonds required voter approval. *Id.* Accordingly, Idaho law allows Boise County to issue bonds to pay the Alamar judgment without two-thirds approval of the electorate since it is an existing involuntary obligation imposed by law.[12] Therefore, the County is not insolvent because it could have issued bonds to pay for the judgment. Admittedly, and unlike the warrant provisions of Idaho Code §§ 31-16-08 and 63-806 discussed above, the County's issuance of bonds to pay the judgment is not mandatory. Nevertheless, its right and ability to do so should be viewed as a valuable asset.[13]

---

[12] The County's municipal finance lawyer, Susan Buxton, during her testimony agreed that a two-thirds vote is not needed to issue bonds for an obligation imposed by law, such as a judgment. (TR at 612:9-23.)

[13] Indeed, Idaho's statute allowing taxing districts to file a bankruptcy petition indicates that issuing bonds is one of the underlying purposes of statute: "This act . . . is intended to and does provide, among other matters, an alternative system for the refunding of bonds, the same to be used pursuant to the provisions of, and in conjunction with[,] the Federal Bankruptcy Statute. Idaho Code Ann. § 67-3909.

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9
CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 17

Moreover, even if a two-thirds vote were required, bonds were still a tool that Boise

County could and should have utilized before taking the drastic action of filing a chapter 9

petition.  The County's speculative belief that a vote would fail is not competent evidence.

Absent a failed attempt to pass the bonds through an election, the County cannot support its

position that a vote would fail.

The County has also consistently claimed that it cannot pay the judgment because of the

3% restriction under Idaho's County Budget Law.  But the 3% limitation on tax levies for annual

budgets does <u>not</u> constrain the County's ability to pay the judgment by issuing bonds.  Idaho

Code § 63-802(4) states the revenues needed to pay bonds are not subject to the so-called 3% cap

of § 63-802(1); *i.e.*, funds used for the payment of bonds are not included among the more

ordinary expenses used to determine the maximum amount of tax levies needed to fund a

county's annual budget.[14]

### 5.    *The City of Vallejo case is inapposite.*

It is anticipated that Boise County, to support it erroneous claim of insolvency, will rely

heavily upon *In re City of Vallejo,* 408 B.R. 280 (9th Cir. BAP 2009).  That case, however, is

inapposite.  In *Vallejo,* the city's unions claimed the city "should have pillaged all of its

component agency funds, ignoring bond covenants, grant restrictions, and normal GASB and

GAAP practices" to pay the unions.  *Id.* at 293.  Here, the County introduced no evidence that

---

[14] Section 63-802(4) applies to non-ordinary expenses such as bond payments.  It is true that by its terms this provision refers to voter approved bonds but, where, as here, voter approval is inapplicable under the obligations imposed by law exception to the need to obtain voter approval, the statute should be construed accordingly.  As indicated by § 63-802(4) and other statutes, revenues used to pay special obligations such as bonds are excluded from the 3% cap.  The County's witness on such budget issues, Alan Dornfest of the Idaho Tax Commission, agreed that various bonds and other non-recurring expenses " . . . are not governed by the three percent cap."  (TR at 286:3-12.)  Mr. Dornfest went on to testify that he was unfamiliar with any legal doctrine providing that in some cases otherwise applicable voter requirements are inapplicable, but acknowledged that there are other exceptions " . . . out there [but] that's a separate thing entirely."  (Id. 291:5-6.)  The County's attorney, however, was familiar with the doctrine.  *See* fn. 12, *supra*.

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9
CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 18

paying Alamar from its surplus cash would cause a breach of any bond covenants. Likewise, as set forth above, the County failed to establish that its surplus cash is restricted. Indeed, under Idaho law, that cash can be used to pay Alamar's judgment. *See* Idaho Code Ann. §§ 31-1608 & 63-806. Additionally, the County failed to introduce any evidence that paying Alamar from its surplus cash would violate GASB or GAAP. Furthermore, in this case, unlike in *City of Vallejo*, Alamar is a judgment creditor and the surplus cash, even if restricted, is not exempt from execution. Consequently, unlike the city in *City of Vallejo*, the County is not insolvent since it has sufficient unrestricted, non-exempt surplus cash to pay the judgment even after meeting its operating expenses for the next two fiscal years.

**B.    As a Matter of Well-Settled Law, the Idaho Tort Claims Act Cannot Limit Damages Awarded for an FHA Violation**.

For reasons that do not appear connected to Boise County's eligibility to file its chapter 9 petition, the County spends a fair amount of its Opposition arguing that because the Idaho Tort Claim Act would allow it to raise taxes in order to pay the judgment, that also means that the judgment against it must be decreased to $500,000 in accordance with Idaho Code § 6-926, found in that same Act. (Docket No. 96 at 28-29.) Even though that argument is not relevant to the County's eligibility to seek chapter 9 protection, Alamar addresses it because it is wholly without foundation in the law. Moreover, the County's recent reliance on the statute to support the County's proposed treatment of the judgment in its plan of reorganization demonstrates that the County filed its chapter 9 petition in bad faith.

Several federal courts have considered and rejected this precise argument. Federal jurisprudence appears to be unanimous that state-law caps on damages for claims against governmental entities cannot be applied to federal causes of action, such as § 1983 and FHA claims. For example, in *Patrick v. City of Florida*, 793 F. Supp. 301, 302-03 (M.D. Ala. 1992), a

municipality moved to strike "any claims for damages in excess of $100,000" since, similar to

Idaho, the Alabama Tort Claims Act "place[d] a limit of…on the damages recoverable against a

municipality for damage or loss of property."  In essence, then, the municipality in *Patrick* made

the exact same arguments as those presented by Boise County here.  Yet the *Patrick* Court found

the municipality's contention to be entirely unfounded:

> With regard to Patrick's federal claims, the defendants' reliance on state law is
> misplaced…[because] the availability of damages under § 1983 is a question of
> federal law, not state law. Therefore, state statutes purporting to limit the damages
> available in a suit against a state actor are not applicable to suits brought under
> § 1983.

*Id.*

Stated more simply, then, "when a federal statute provides a remedy," as is the case with

the FHA, "the scope of the [FHA] remedy is interpreted in accordance with federal law.  [As

such,] it is not appropriate to apply state law in this context."  *U.S. v. Big D Enterprises, Inc.*,

184 F.3d 924, 932 (8th Cir. 1999).  Many other cases have held the same.  *See, e.g., Campos v.

Barney G. Inc.*, 2007 WL 1341442, *1 (D. Neb. 2007) ("[T]he assessment of…damages under

the FHA is governed by federal rather than state law."); *Beach v. City of Olathe, Kan.*, 185 F.

Supp. 2d 1229, 1241 (D. Kan. 2002) ("Defendants claim that damages caps contained in the

Kansas Tort Claims Act … limit plaintiff's ability to recover damages in this [§ 1983] case. The

court disagrees."); *Downing/Salt Pond Partners, L.P. v. Rhode Island*, 698 F. Supp. 2d 278,

288 (D.R.I. 2010) ("…the damages cap [in the Rhode Island Governmental Tort Liability Act]

applies in tort actions, but not to § 1983 and constitutional claims."); *Hegarty v. Somerset

County*, 848 F. Supp. 257, 268 (D. Me. 1994) ("We believe, on balance, that the remedial

purpose of § 1983 is better served by not permitting local variations allowing diminution of the

amount of recovery....  The Court, therefore, denies Defendants' request that Plaintiff's damages

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9
CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 20

be limited by [state-law caps].”); *Frett v. Virgin Islands,* 839 F.2d 968, 977 (3d Cir. 1988) (“The

presence of the section 1983 claim against the government ... effectively removes the

significance of the [Virgin Island’s] Tort Claims Act $25,000 limit on judgments....”); *Minter v.*

*Multnomah County*, 2002 WL 31496404, *14 (D. Or. 2002) (“…§ 1983 claims against public

bodies are exempt from the damages cap established by the OTCA.”).[15]  In sum, federal case law

is abundantly clear that neither the Idaho Tort Claims Act nor any other state’s tort claims act has

the legal ability to reduce a federal FHA judgment.

    Moreover, the Idaho Supreme Court has implicitly recognized the same thing.  In

*Sweitzer v. Dean*, 118 Idaho 568, 572, 798 P.2d 27, 31-32 (1990), the court was faced with a

question surrounding the notice-of-claim requirement found in the Idaho Tort Claims Act.  As

part of its discussion, it noted the difference between a garden-variety tort claim against a

governmental subdivision and one brought pursuant to a federal cause of action.  Said the Court:

“A state’s notice-of-claim statute which provides that no action may be brought or maintained

against a state government subdivision unless claimant provides written notice within a certain

period of time is preempted when a federal civil rights action is brought in state court.”  *Id.*

    While this holding dealt with another provision of the Idaho Tort Claims Act, the result is

the same:  Idaho courts, like federal courts, are not to apply state laws to federal causes of action

so as to create jurisdiction-specific requirements that could create “local variations allowing

---

[15] Some of the cases cited above are in the context of a § 1983 action.  It is common for federal courts to
borrow case law from § 1983 actions when construing the FHA, and vice-a-versa.  *See, e.g., Louisiana*
*ACORN Fair Housing v. LeBlanc*, 211 F.3d 298, 302 (5th Cir. 2000); *Williams v. Kusnair’s Bar and*
*Tavern*, 2007 WL 2071683, *4 (W.D. Pa. 2007) (overruled on other grounds); *Ambruster v. Monument 3:*
*Realty Fund VIII Ltd.*, 963 F. Supp. 862, 865 (N.D. Cal. 1997).  This borrowing would seem to be
especially appropriate here where the key question in all of these cases is *not* what specific federal act is
being discussed, but instead whether it makes sense for a federal cause of action to be subject to “local
variations allowing diminution of the amount of recovery.”  *See Hegarty*, 848 F. Supp. at 268.  As the
cases above indicate, the answer to that question has been answered the same both for the FHA and §
1983.

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9
CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 21

diminution of the amount of recovery." *See Hegarty*, 848 F. Supp. at 268.  This is precisely what the County is attempting to do with its cap argument.  Its Opposition must be disregarded.

1.    ***Boise County has long since waived its ability to assert that its judgment should be reduced.***

It is worth noting that even if the County's theory that it can reduce an FHA judgment through a state tort claim act was correct—and it obviously is not—Boise County long ago lost its ability to bring that argument.  Specifically, the County failed to present this argument to Judge Winmill at trial or even attempt to do so in its appeal.  As such, it cannot now—nearly *seven months* since the case was decided—ask this bankruptcy Court to modify the judgment.

The case law is clear that when "a valid judgment is rendered by a court of competent jurisdiction, res judicata, also known as claims preclusion, prevents a party from asserting a claim or defense which could have been asserted in the first action in any subsequent proceeding." *In re Garafano*, 99 B.R. 624, 629 (Bankr. E.D. Pa. 1989).  This principle "bar[s] relitigation of a claim or defense regardless of whether such claim or defense was raised previously, so long as the debtor was afforded a fair opportunity to do so." *Id.*  This rule is "equally applicable to bankruptcy courts, and parties will not generally be accorded an opportunity to re-litigate a claim previously determined by a court of competent jurisdiction" just because they declare bankruptcy.  *Id.*  In fact, barring some allegation that a fraud prevented a party from asserting its newly-conceived argument, a bankruptcy court should not entertain dilatory requests to consider new defenses.  *Id.* at 630-31.

Boise County does not argue that the district court here did not have "competent jurisdiction" over it such that the judgment against the County might be considered invalid. Moreover, it makes no argument that its new (though legally unsupportable) defensive theory could not have been raised in that matter.  Indeed, the FHA case has been pending in earnest

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9 CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 22

since January 2009, so there seems to be no reason this Court is now seeing this argument for the first time. Similarly, Boise County has not argued that it failed to present this argument because there was some fraud perpetrated upon it; in fact, the County proffers no explanation whatsoever in its Opposition for its failure to present this argument in a timely manner. As a result, the County has long since waived its ability to bring this argument. *Garafano*, 99 B.R. at 629.

> **2.** **Boise County's argument concerning the Idaho Tort Claims Act undermines its allegations of insolvency.**

As is obvious from the foregoing, the County has no legal hope of decreasing the judgment against it under the Idaho Tort Claims Act. That said, it is interesting to note that if the County truly believes that it cannot be legally required to pay any more than $500,000, such a belief would be a tacit admission that it also does not believe it is insolvent. In specific, the County has stated only that there is "no way that the county could pay the $4 million judgment and the attorney fees as petitioned for $1.4 million [and] continue to exist as an operating entity." (Docket No. 7.) It has made no such similar arguments concerning the $500,000 cap it now purportedly claims. Indeed, less than two months ago—and while in the middle of bankruptcy— the County's attorney specifically informed Alamar that it could pay $1.5 million in up-front cash as part of a settlement offer and another $3.5 million over time. (*See* Ex. 215 at 3.) As a result, if the County truly believes it only owes $500,000, then it is also admitting that it does not believe it is insolvent.

## C.   Boise County Filed its Chapter 9 Case in Bad Faith

Boise County's conduct after Alamar filed its opening brief and the evidence at the hearing further demonstrate that the County filed its Petition in bad faith. After Alamar filed its opening brief, the County filed its Disclosure Statement and Proposed Plan of Reorganization wherein it proposes to pay Alamar $500,000 on its $5.4 million claim based on an argument that

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9
CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 23

Alamar's judgment should be reduced pursuant to the Idaho Tort Claim Act.  (Ex. 118 at 11-12;

Docket No. 96 at 29.)  Thus, the County is seeking to use the bankruptcy process to litigate

issues it waived in prior proceedings.  Furthermore, the evidence at the hearing demonstrates that

the County filed the bankruptcy to obtain a stay of execution without posting a supersedeas bond.

Either of these reasons alone is sufficient to dismiss the Petition for being filed in bad faith.

### 1.   *Boise County is using the bankruptcy to relitigate issues it waived in prior proceedings.*

The Ninth Circuit Bankruptcy Appellate Panel has recognized that use of bankruptcy as a

litigation tactic to obtain a better forum is improper.  *In re St. Paul Self Storage Limited*

*Partnership*, 185 B.R. 580 (B.A.P. 9th Cir. 1995) ("The timing of the petition and the

unsuccessful progress of the Minnesota litigation strongly suggests Debtor's intent to use the

bankruptcy code as a means to escape to a forum which it perceived to be more friendly.") *citing*

*In re Marsch,* 36 F.3d 825, 829 (9th Cir. 1994) (holding that filing a petition to delay collection

of a judgment the debtor could afford to pay was in bad faith); *In re Van Owen Car Wash, Inc.,*

82 B.R. 671, 673 (Bankr. C.D. Cal. 1988) **(holding that a chapter 11 petition in a case

involving a two-party lawsuit was not filed in good faith); *Donuts of Seekonk, Inc. v. Panagakos*

*(In re Donuts of Seekonk, Inc.),* 122 B.R. 172, 173 (Bankr.D.R.I.1990) (dismissing debtor's

bankruptcy because it appeared to be nothing more than an attempt to resurrect prior

unsuccessful litigation in another forum); *In re Wally Findlay Galleries (NY), Inc.,* 36 B.R. 849

(Bankr.S.D.N.Y.1984) (finding it evident that the debtor sought not to reorganize, but to

relitigate, where debtor was unable to propose a meaningful plan of reorganization until its state

court litigation was resolved).  In *In re Donuts of Seekonk, Inc.*, the court found after a hearing

that:

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9
CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 24

> there is every indication that the matter before this Court is nothing more than an
> attempt by the Debtor to resurrect its prior unsuccessful state court litigation, in
> another forum. This litigation is simply a dispute—and an acrimonious one by all
> accounts—between these two parties only. No feasible plan of reorganization has
> been discussed, nor do we see any purpose for this petition, beyond seeking to
> retry state issues here. We will not sanction the use of this Court for that purpose.

*In re Donuts of Seekonk, Inc.*, 122 B.R. 172, 173 (Bankr. D. R.I. 1990). The court further found

that "[a]s to Debtor's newly raised issues of material significance, which were not raised in the

state court litigation, we deem them to effect a total waiver of those arguments. To the extent

that these waived issues are now brought to light for the first time before this Court, the

credibility and good faith of the Debtor and its attorney are further eroded." *Id.* at 174.

Consequently, the court dismissed the petition was filed in bad faith. *Id.*

Here, as set forth above and in Part II.B *supra.*, the County has attempted to collaterally

attack Alamar's judgment by asking this Court via the County's proposed Plan of Reorganization

to reduce that judgment to $500,000 pursuant to the Idaho Tort Claims Act. The Idaho Tort

Claims Act provides that "the court [in which a judgment is rendered] shall reduce any judgment

in excess of the limits provided by this act in any matter within its jurisdiction." Idaho Code

Ann. §6-926(5). As set forth above, the County did not ask Judge Winmill to reduce the

judgment pursuant to the Idaho Tort Claim Act, nor did Boise County raise this issue on appeal

to the Ninth Circuit. Having failed to do so, it is bad faith for Boise County to use the

bankruptcy process to obtain another forum to litigate an issue that it waived in prior

proceedings. For that reason, the County's petition should be dismissed.

> **2.    *Boise County is improperly using the bankruptcy to obtain a stay of execution
> without filing a supersedeas bond.***

It is bad faith to use the bankruptcy process to deter or harass creditors. *In re Marsch,* 36

F.3d at 828. In a case similar to this case, *In re Harvey,* 101 B.R. 250 (Bankr. D. Nev. 1989), the

court dismissed the debtors' petition reasoning that the debtors' failure to apply to the state district court and supreme court for relief by posting a bond commensurate with the debtors' financial ability evidenced the debtors' bad faith. In *In re Byrd*, 172 B.R. 970, 973 (W.D. Wash. 1994), the Court agreed "with the reasoning of the court in *Harvey*. Unless the debtor can demonstrate that he has no alternative to stay the [] judgment other than by Chapter 11, his petition must be dismissed." The Court found that the debtor, if it could not procure a supersedeas bond, had the option to pursue a discretionary stay pending appeal of the judgment. "Until the debtor has pursued that option, this Court cannot conclude that his Chapter 11 petition is in good faith." *Id.* at 974.

Here, the evidence is undisputed that Boise County filed for bankruptcy for the sole purpose of staying Alamar from executing upon the judgment. (Ex. 118 at 8; TR 311:9-12.) Despite that purpose, there is no evidence that Boise County was financially unable to procure a bond. Indeed, it appears that Boise County made no attempt whatsoever to procure a supersedeas bond, notwithstanding the surplus funds then available. Moreover, the County did not request either the district court or the Ninth Circuit to stay execution pending appeal. Consequently, the County's petition should be dismissed.

### 3. Boise County's chapter 9 petition "was not a final alternative chosen as a last resort."

As set forth in Alamar's opening brief, bad faith is also shown if the filing of the chapter 9 petition "was not a final alternative chosen as a last resort." *In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 82 (Bankr. D.N.H. 1994). Here, bankruptcy is not the final resort. As demonstrated above, Boise County had several alternatives for paying the judgment that it chose to ignore. First, it could have issued warrants and established a warrant redemption fund that would be financed through the County's surplus cash. That surplus cash is more than

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9 CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 26

sufficient to pay the judgment and the Idaho legislature has authorized the use of that surplus

cash to finance a warrant redemption fund to pay the judgment.  (Ex. 111 at 18; Ex. 112 at 18;

Idaho Code Ann. §§ 31-1608 & 63-806.)  Second, the County could have issued bonds to pay the

judgment because the judgment is an obligation imposed by law, and, therefore, not subject to

the debt restriction caps.  *See* Part II.A.4 *supra.* Therefore, this Case should be dismissed.

### III.    <u>CONCLUSION</u>

For the reasons stated above, Boise County's Petition should be dismissed.

DATED this 15th day of July 2011.

STOEL RIVES LLP


/s/Danny C. Kelly
Danny C. Kelly
Mark E. Hindley
Counsel for Alamar Ranch, LLC and YTC, LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of July 2011, I caused a true and correct copy of the

foregoing document to be served as follows:

**<u>Electronically via ECF</u>:**

- D Blair Clark                   dbc@dbclarklaw.com
- Bryan Albert Nickels            ban@hallfarley.com
- Richard Wayne Sweney            rws@lukins.com
- Elizabeth M Taylor              btaylor@adaweb.net
- US Trustee                      ustp.region18.bs.ecf@usdoj.gov
- Randall A Peterman              rap@moffatt.com
- Noah G. Hillen                  ngh@moffatt.com
- Mark E. Hindley                 mehindley@stoel.com
- Wade L. Woodard                 wwoodard@bwslawgroup.com

**<u>Via Email</u>:**

D. Blair Clark                dbc@dbclarklaw.com
US Trustee                    ustp.region18.bs.ecf@usdoj.gov

**<u>Via email</u>** to the following **parties** who are **not** on the list to receive ECF notice/service for this case:

Andrew C. Brassey            acb@brassey.net
Susan Buxton                 seb@msbtlaw.com
Danny C. Kelly               dckelly@stoel.com

**<u>Via United States Mail</u>** to the following **party** who is **not** on the list to receive ECF notice/service for this case:

Recovery Management Systems Corporation for Capital Recovery
25 SE 2nd Avenue, Suite 1120
Miami, FL  33131

/s/
_____
Danny C. Kelly

ALAMAR RANCH, LLC'S POST HEARING BRIEF RE (I) OBJECTION TO CHAPTER 9
CASE OF BOISE COUNTY AND (II) MOTION TO DISMISS THE CASE - 28