# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | **Case No. 11-00481-TLM** |
| **BOISE COUNTY,** | ) | |
| | ) | **Chapter 9** |
| Debtor. | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION
_____

Before the Court is creditors Alamar Ranch, LLC and YTC, LLC's

"Objection to Chapter 9 Case of Boise County and Motion to Dismiss the Case,"

Doc. No. 69 ("Motion").[1]  The matter was heard by the Court on June 28-30, 2011,

and taken under advisement on July 15, 2011, after the submission of post-hearing

briefing.  This Memorandum of Decision constitutes the Court's findings and

conclusions, based on its review of the record, the parties' arguments, and

applicable authorities.  *See* Fed. R. Bankr. P. 7052, 9014.

**FACTS**

   **A.    Alamar Judgment**

   Alamar and YTC are Idaho limited liability companies.  Boise County (the

_____

   [1]  Unless otherwise indicated, all chapter and section references are to the Bankruptcy
Code, 11 U.S.C. §§ 101-1532, and all rule references are to the Federal Rules of Bankruptcy
Procedure, Rules 1001-9037.

"County") is a rural mountain county in the state of Idaho with a population of approximately 7,000. The County's seat, Idaho City, is located roughly 40 miles northeast of the City of Boise.

On January 8, 2009, Alamar and YTC (hereinafter referred to collectively as "Alamar") filed a complaint in the United States District Court for the District of Idaho against the County, Case No. 01:09-cv-00004-BLW ("District Court Case").[2] The complaint stemmed from conditions the County had imposed on a Conditional Use Permit requested by Alamar in April 2007 in order to operate a residential treatment facility and private school for at-risk youth on a piece of property located within the County.[3] Alamar alleged that the conditions imposed by the County were illegal and discriminatory under the Fair Housing Act, 42 U.S.C. §§ 3601-3619. District Court Case, Doc. No. 1.

The County submitted the Alamar lawsuit to its insurer, the Idaho Counties Risk Management Program ("ICRMP"), and requested that ICRMP defend the lawsuit under the County's policy. ICRMP denied coverage and refused to defend the lawsuit. The County filed a suit for declaratory relief in Idaho state court, seeking a ruling that ICRMP had a duty to defend the County against the Alamar

---

[2]   The Court takes judicial notice of the files and records in the District Court Case. Additionally, the Court takes judicial notice of the filings of record in the County's bankruptcy case. *See* Fed. R. Evid. 201.

[3]   YTC owned the property on which the treatment facility was to be built.

MEMORANDUM OF DECISION - 2

litigation.  The state court eventually rendered summary judgment against the County and in favor of ICRMP.  The County appealed the state court's ruling to the Idaho Supreme Court.  That appeal is still pending.

On December 16, 2010, following a nine-day trial, a jury rendered a verdict in Alamar's favor and against the County for $4,000,000, finding the County had violated the Fair Housing Act.  District Court Case, Doc. No. 207.  The following day, the District Court entered a Judgment against the County for "the sum of $4,000,000, with interest to accrue at the applicable federal rate."  District Court Case, Doc. No. 210.

On December 30, 2010, Alamar filed a "Bill of Costs" and a "Motion for Attorney Fees and Nontaxable Expenses."  District Court Case, Doc. Nos. 223 ("Cost Bill") & 224 ("Fee Motion").  Between the Cost Bill and the Fee Motion, Alamar requested an award of $1,236,557.50 for attorney's fees, $21,692.06 for taxable costs, and $139,864.01 for nontaxable costs.  The County objected, asserting that Alamar's claim for attorney's fees was excessive and unreasonable, that the claim for nontaxable costs should either be disallowed in total or substantially reduced, and that the taxable costs should also be reduced.  District Court Case, Doc. Nos. 228 & 230.  The District Court has yet to rule on Alamar's request for fees and costs.

On January 18, 2011, the County appealed the District Court Judgment to

MEMORANDUM OF DECISION - 3

the United States Court of Appeals for the Ninth Circuit.  District Court Case, Doc. No. 225.

### B.   Post-Judgment, Pre-Bankruptcy Events

Following entry of the District Court Judgment, Alamar and the County had negotiations concerning payment.  On January 26, 2011, legal counsel for the County met with the principals of Alamar, Erik Oaas and Steve Laney, and Alamar's attorney, Thomas Banducci, to discuss settlement.  At that meeting, Banducci indicated that Alamar was interested in further settlement negotiations and requested that the County prepare a settlement offer to propose to Alamar.

The parties met again on February 15.  Present at that meeting as legal counsel for the County were Andrew Brassey, Susan Buxton, Michael Moore and Cherese McLain, a County deputy prosecutor.  The County was also represented by Jamie Anderson, the County Commission Chair, and Mary Prisco, the County Clerk.  Oaas and Laney attended the meeting with Alamar's attorneys, Banducci and Wade Woodard.  The County did not make a settlement offer at the meeting.  However, Banducci represented that Alamar was willing to accept $5 million (a $400,000 reduction from the $4 million judgment plus $1.4 million in fees and costs Alamar expected to be awarded by the District Court) over time with an interest rate tied to the prime rate of interest.  The parties agreed to meet again on February 22 for further discussions.

MEMORANDUM OF DECISION - 4

On February 22 the parties met and the County presented Alamar with a settlement offer, embodied in a letter. *See* Ex. 204. The County offered to pay Alamar $3.2 million, with no interest accruing, in the following manner: (1) $1.9 million in cash to be paid immediately; (2) forgiveness of $164,000 in past due taxes on real property owned by Alamar's principals; (3) forgone property taxes of approximately $123,000; (4) all taxes collected from a 3% annual increase in the property tax levy for 10 years, beginning August 15, 2012; and (5) assignment of any proceeds from the County's lawsuit against ICRMP. However, the letter also provided that if these methods of payment did not generate sufficient funds to satisfy the $3.2 million offer in 10 years, any remaining balance would be forgiven. *Id.* at 2. The County represented that its offer reflected a "good faith effort" to identify all funds available to pay the Judgment given certain limitations placed on it by the Idaho Constitution and Idaho Code. *Id.* Attached to the settlement letter as support for the County's position were several pages of financial documents detailing the County's actual and projected revenues and expenses for fiscal years 2010 through 2015. *See id.* at 5-22.

After consulting with legal counsel Alamar rejected the offer, and the parties again parted without having reached an agreement.

On February 24, one of Alamar's attorneys, Wade Woodard, sent a letter to Susan Buxton, legal counsel for the County, advising her that Alamar would

MEMORANDUM OF DECISION - 5

consider, in its efforts to collect on the District Court Judgment, any legal authorities she could provide on whether the County's funds were exempt from execution, a topic that was discussed at the February 22 settlement conference.  He also informed Buxton that Alamar was still willing to consider a reasonable offer even though it intended to commence collecting on the Judgment, and threatened that any attempts to hinder Alamar's collection "could result in additional liability to the County and personal liability to the individuals involved in such efforts." Ex. 205.

That same day, Woodard also faxed a letter to Andy Brassey, another attorney for the County, stating that "if the County will commit by March 2, 2011, to paying the full amount of the judgment on or before March 25, 2011, we will not proceed with efforts to collect the judgment by way of writ of execution (or other authorized procedures)."  Ex. 206.

Four days after the letters from Woodard, Alamar filed, on February 28, 2011, an "Application and Declaration for Writ of Execution" with the District Court.  Ex. No. 107 ("Writ").

### C.    Bankruptcy

Believing Alamar intended to use the Writ to execute on the County's accounts, and fearing that such execution would significantly interfere with

MEMORANDUM OF DECISION - 6

County operations, the County Board of Commissioners[4] held an executive session during their regularly scheduled County Commissioners' meeting on February 28, 2011, to discuss the Alamar litigation and Alamar's impending collection efforts. Upon emerging from the executive session, the Commissioners voted on the record and passed a resolution to have the County file for bankruptcy protection under chapter 9. *See* Ex. 208.

On March 1, 2011, the County filed a petition for relief under chapter 9, commencing this case. *See* Ex. 224-1. In its schedules, the County listed total assets of $27,765,617.34, and total liabilities of $7,377,343.79, including the $4 million District Court Judgment and a $1.5 million debt to Banducci Woodard Schwartzman, Alamar's attorneys in the District Court litigation, which represented the attorney's fees and costs Alamar had requested from the District Court. Ex. 224-2 at 1, 119-20.[5] The debt for Alamar's legal fees was designated

---

[4] The Board of Commissioners is composed of three members – Jamie Anderson, Terry Day, and Robert Fry. Not one of the current commissioners was in office at the time of the events that gave rise to the underlying Alamar District Court Case. Day has been in office the longest, having served as commissioner just over four years. He was in office when the Alamar litigation was filed in District Court. Anderson has served for approximately two and one-half years. Fry was only recently elected in November 2010, though he had served as a commissioner previously in the 1980's. He took office in January 2011, after the Alamar Judgment had been entered. Like Fry, Mary Prisco, the Clerk (who also serves as ex officio auditor and recorder and ex officio clerk to the Board of County Commissioners) was elected in November and took office in January.

[5] While the County listed Banducci Woodard Schwartzman as the creditor holding the claim to $1.5 million in legal fees, *see* Ex. 224-2 at 120, technically it is Alamar that requested the award of its fees and costs. Thus, any such award by the District Court would presumably be in favor of Alamar itself, not its attorneys.

MEMORANDUM OF DECISION - 7

as contingent, unliquidated, and disputed; the Judgment debt was not.

The County also listed on Schedule F claims for medical indigency payments held by several health care providers reaching back as far as two years that the County had discovered in preparing its bankruptcy schedules. Ex. 224-2 at 121-24.[6] Although the exact amount of each claim was undetermined, the County estimated the total amount to be approximately $550,000. *Id.* at 122. The County designated these claims as contingent and unliquidated.

### D.   County Finances

The County accounts for and reports its receipts and expenditures in various, separate "funds." The County's financial reporting is made pursuant to standards promulgated by the governmental accounting standards board ("GASB"). *See* Idaho Code § 31-1509 (requiring counties to use a system for accounting of receipts, expenditures and reporting that meets the criteria of

---

[6] The County is a participant in the Catastrophic Health Care Cost Program, which provides financial assistance to medically indigent residents who are not eligible for medicaid or medicare benefits. *See* Idaho Code §§ 56-209f, 31-3517. Under this program, the County is required to pay for necessary medical services for its medically indigent residents, as approved by the County Commissioners, at a contracted reimbursement rate up to the total sum of $11,000 per resident in any consecutive 12-month period. Idaho Code § 31-3503(1). Costs exceeding $11,000 are paid by the Catastrophic Health Care Cost Program, *see* Idaho Code § 31–3503A(1), which is funded by the state of Idaho through the Catastrophic Health Care Cost Account, *see* Idaho Code § 57-813. If a county fails to act upon an application within certain times set forth in Idaho Code §§ 31-3501 to -3519, the application will be deemed approved and payment made as provided by the statute. Idaho Code § 31-3511(4). Prisco, who as County Clerk is responsible for initially reviewing and investigating applications for medical indigency payments, *see* Idaho Code §§ 31-3504 to -3505A, testified that consequences for failing to act on such applications may include the inability to first determine whether applicants would qualify for medicaid or medicare assistance, loss of the contracted reimbursement rate, and the County having to pay costs exceeding $11,000.

MEMORANDUM OF DECISION - 8

generally accepted accounting principles ("GAAP") or the GASB).  Accounting

for its financial activities in this manner facilitates greater transparency in the

reporting process and is intended to allow the County to ensure that its financial

activities comply with the restrictions placed on its revenue receipts and the funds

into which those receipts are allocated.

The County's budget for fiscal year 2011 (October 1, 2010 through

September 30, 2011) contemplates total expenditures of $9,352,734, allocated

amongst various, separate "funds."  Ex. 101.  These funds included the Current

Expense Fund (also referred to as the "General" Fund), the Justice Fund, the

District Court Fund, the Indigent Fund, the Revaluation Fund, the Tort Fund, the

Noxious Weeds Fund, the Solid Waste Fund, the Road and Bridge Fund, the Junior

College Tuition Fund, the Emergency Communications 911 Fund, two

snowmobile grooming funds (one for Idaho City – "Snowmobile IC8-A" – and the

other for Garden Valley – "Snowmobile GV8-B"), the Sheriff's Reserves Fund,

and the Sheriff's Vessel Fund.  *Id.*  To meet the anticipated expenditures in each of

these funds, the budget lists cash to be carried forward in each fund from the

previous year's budget, projects revenue from sources other than property taxes

(*e.g.*, federal and state grants and programs, payments in lieu of taxes, revenue

sharing, fees), and states the remaining amounts that would need to be levied as

property taxes to meet the expected expenditures in each fund.  *Id.*

MEMORANDUM OF DECISION - 9

As of March 1, 2011, the County had collected revenues of $6,007,950 and made expenditures of $3,040,595 for fiscal year 2011.  *See* Ex. 111 at 18.  With these revenues, less expenditures, and the moneys the County had accumulated over previous years, the County had the following cash balances in its various funds on the date of the bankruptcy filing: General – $1,589,733; Road & Bridge – $1,719,631; Justice – $759,152;  District Court – $546,692; Indigent – $647,597; Junior College Tuition – $135,506; Revaluation – $167,429; Solid Waste – $1,554,083; Tort – $26,040; Noxious Weeds – $357,791; Emergency Communications 911 – $262,166; Snowmobile IC8-A – $10,449; Snowmobile GV8-B – $1,035; Sheriff's Reserves – $11,941; and Sheriff's Vessel – $111,159. *Id.*[7]  In addition to these funds, the County had certain "trust accounts" totaling $2,045,383, s*ee* Ex. 111 at 18,[8] giving the County a total cash balance of $9,945,787 at the time of filing, *see* Ex. 106 at 3; Ex. 111 at 18.[9]

Although the County uses funds to account for and report its financial

---

[7]  Although Exhibits 106 and 111 also included an East Boise County Ambulance Fund containing $161,619, Prisco testified that the East Boise County Ambulance District was its own separate taxing authority, and that the County handled the Ambulance District's funds merely to aid the Ambulance District in administering those funds.

[8]  At the hearing, Prisco explained that although labeled as "trust accounts," these accounts did not truly satisfy the elements of a trust.  They contained, in large part, payments from the federal government in lieu of property taxes as well as interest earnings.

[9]  Because Exhibits 106 and 111 included the East Boise County Ambulance Fund, *see* note 8 *supra*, the total reflected in those exhibits was actually $10,107,406.

MEMORANDUM OF DECISION - 10

activities, its moneys are actually held in various accounts and investments.[10]

According to the "Statement of Treasurer's Cash," Ex. 106 at 6, prepared by April

Hutchings, the County Treasurer,[11] as of February 28, 2011, the day before filing,

the County's cash was spread among 11 different accounts.  These included an

office cash account of $1,000.00, a diversified bond fund of $2,479,620.80, a

Wells Fargo treasurer's general checking account of $402,887.47, a general

savings account of $807,987.12, a State of Idaho Local Government Investment

Pool account of $1,549,618.34, a Mountain West Bank Business Advantage

Money Market account of $225,634.79, a Mountain West Bank certificate of

deposit account of $501,077.83, a Mountain West Bank general checking account

of $50,000.00, a Mountain West Bank sweep investment account of

$2,891,525.65, a U.S. Bank treasurer's checking account of $8.43, and a general

operating investment account of $1,198,046.11.  *Id.*[12]  According to Hutchings, of

---

[10]   Idaho law authorizes and empowers a county treasurer to invest "surplus or idle funds" of the county in certain enumerated investments and accounts, with the interest received from such investments being paid into the county's general fund, unless otherwise provided by law.  Idaho Code §§ 57-127, 67-1210.  "Surplus or idle funds" are defined as the "excess of available moneys in the public treasury, including the reasonably anticipated revenues, over and above the reasonably anticipated expenditures chargeable to those moneys, taking into account the dates at which such revenues and expenditures may be expected to occur, the charges of expenses to revenues being done in such a manner as to produce the maximum amount of excess."  Idaho Code § 57-131.

[11]   Hutchings began serving as the County Treasurer in November 2009 when she replaced the previous treasurer who retired.  At the time, she had been working as deputy treasurer.  She was then elected County Treasurer in November 2010.

[12]   These several account balances totaled $10,107,406.54 as of February 28, 2011.  *See*
(continued...)

MEMORANDUM OF DECISION - 11

these accounts, the general operating investment account, which is tied up in a

Freddie Mac investment with a four-year maturity, is the only one that is illiquid.

To access those funds, which were invested in 2010, before the maturity date, the

County would be required to pay a $25,000 penalty.  The remaining accounts,

however, are liquid assets.

Hutchings testified that all of the money coming into the County is initially

deposited into the Wells Fargo general checking account, and that checks issued

by the County are made on that same account, on which she and Prisco are signors.

As Treasurer, Hutchings moves funds she deems to be idle or surplus to other

investments or accounts in order to maximize the return on the County's funds.

This also allows her to comply with the statutory requirement that no more than

50% of the County's cash be held in the same account at any one time.  Interest

earned on the investment accounts is paid into and accounted for in the County

Improvement Fund, one of the "trust accounts" identified in the County's financial

records.  *See* Ex. 111 at 18.

When moneys were moved from one account to another or into a particular

investment, the County Treasurer generally did not trace from which "funds" those

moneys were being drawn for accounting purposes.  As a result, moneys from

multiple funds were commingled in the investment accounts, making it impossible

---

[12](...continued)
Ex. 106.

MEMORANDUM OF DECISION - 12

to accurately determine what "funds" were represented in each account.

###### E. Postpetition Filings

On June 14, 2011, the County filed a Plan of Reorganization and accompanying Disclosure Statement.  Doc. Nos. 92 & 97.  The County's Plan proposes to pay Alamar $500,000 on its claim, relying on the limitation on damages contained in the Idaho Tort Claims Act, Idaho Code §§ 6-901 to -929. Doc. Nos. 92 at 1-2, 97 at 11-12.  It also proposes to pay $550,000 to unidentified medical providers for medical indigency claims, the amount of claims the County estimates should have been paid prepetition but were not.  Doc. Nos. 92 at 2, 97 at 11.

### DISCUSSION AND DISPOSITION

To be a debtor under chapter 9, an entity must meet the eligibility requirements of § 109(c).  That section provides:

> An entity may be a debtor under chapter 9 of this title if and only if such entity –
> (1) is a municipality;
> (2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;
> (3) is insolvent;
> (4) desires to effect a plan to adjust such debts; and
> (5) (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
> (B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in

MEMORANDUM OF DECISION - 13

amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
(C) is unable to negotiate with creditors because such negotiation is impracticable; or
(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

A chapter 9 petitioner must satisfy each of the mandatory provisions of § 109(c)(1)-(4), and one of the requirements under § 109(c)(5) to be eligible for relief under the Code. *Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280, 289 (9th Cir. BAP 2009). If a petitioner fails to meet the eligibility requirements of § 109(c), the bankruptcy court must dismiss the petition under § 921(c). *Id.* (noting that despite the permissive language of § 921(c) – *i.e.*, that the court "*may* dismiss" a petition if the debtor does not meet the eligibility requirements – courts have construed that statute to require mandatory dismissal of a petition filed by a debtor who fails to satisfy § 109(c) (citing *In re Cnty. of Orange*, 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995)); *see also* 6 Collier on Bankruptcy ¶ 921.04[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011) (hereafter "Collier").

The burden of establishing eligibility under § 109(c) rests on the debtor. *Vallejo*, 403 B.R. at 289 (citing *In re Valley Health Sys.*, 383 B.R. 156, 161 (Bankr. C.D. Cal. 2008)). In determining whether the debtor has met its burden, the bankruptcy court is to "construe broadly § 109(c)'s eligibility requirements 'to provide access to relief in furtherance of the Code's underlying policies.'" *Id.*

MEMORANDUM OF DECISION - 14

(quoting *Valley Health Sys.*, 383 B.R. at 163).  Although Alamar has not objected

to the County's eligibility on all aspects of § 109(c), the Court will, for purposes of

completeness, address each of the requirements.  In doing so, however, the Court

takes the question of the County's insolvency out of turn, considering it last.

### A.    Boise County is a municipality

"Municipality" is defined by § 101(40) of the Code as a "political

subdivision or public agency or instrumentality of a State."  Under Idaho law, the

County is a body politic of the state of Idaho.  *See* Idaho Code § 31-601.  As a

political subdivision of the state, the County qualifies as a municipality for

purposes of § 109(c)(1).

### B.    Boise County is authorized to be a debtor under chapter 9

Idaho Code § 67-3903 authorizes any "taxing district" in the state of Idaho

to file a petition under the Bankruptcy Code.  "Taxing district" is defined, for

purposes of Idaho Code § 67-3903, "to be a 'taxing district' as described in chapter

IX of an act of Congress entitled 'An act to establish a uniform system of

bankruptcy throughout the United States,' approved July 1, 1898, as amended."

Idaho Code § 67-3901.  Chapter IX of the Federal Bankruptcy Act of 1898, as

amended, was repealed with the enactment of the current version of the

Bankruptcy Code in 1978.  Bankruptcy Reform Act of 1978, Pub. L. No. 95-598,

§§ 101 & 401, 92 Stat. 2549 (codified as amended at 11 U.S.C. §§ 101-1532).  It

MEMORANDUM OF DECISION - 15

described a "taxing district" as any "municipality or other political subdivision of

any State, including (but not hereby limiting the generality of the foregoing) any

county, city, borough, village, parish, town, or township, unincorporated tax or

special assessment district, and any school, drainage, irrigation, reclamation, levee,

sewer, or paving, sanitary, port, improvement or other districts."  Bankruptcy Act

of 1898, ch. 9, sec. 80(a), 48 Stat. 798 (1934).

  The current Bankruptcy Code lacks a definition of "taxing district."

Instead, as noted above, it uses the term "municipality" to describe those entities

that may seek relief under chapter 9, provided they are authorized to do so under

state law.  *See* § 109(c).  This raises questions regarding the interpretation and

effect of Idaho Code §§ 67-3901 and -3903.  For example, does Idaho Code

§ 67-3901 continue to incorporate by reference the description of "taxing district"

contained in the now-repealed Bankruptcy Act of 1898, does it somehow embrace

the definition of "municipality" in the current version of the Code, or is the

definition of "taxing district" for purposes of Idaho Code § 67-3903 left open-

ended or untethered due to the repeal of the Bankruptcy Act?

  For purposes of this case, however, the Court determines such issues need

not be addressed.  Under both the description of "taxing district" found in the

Bankruptcy Act and the definition of "municipality" in the current Code, the

County qualifies.  Additionally, should there exist any question as to whether

either definition may be applied under a technical reading of Idaho Code

MEMORANDUM OF DECISION - 16

§§ 67-3901 and -3903, the Court concludes that Idaho's highest court would

interpret those state statutes as having been intended to authorize Idaho

municipalities such as the County to file a petition under federal bankruptcy law,

whatever the version currently in effect.[13]

Idaho Code § 67-3904 also requires that, before filing the petition, a taxing

district adopt a resolution authorizing the filing. Here, the County adopted such a

resolution following a public vote by the Board of Commissioners at the February

---

[13] *See In re McMurdie*, 448 B.R. 826, 829 (Bankr. D. Idaho 2010) ("When interpreting state law, this Court is bound by the decisions of the state's highest court. When state law is unsettled or has not directly addressed an issue, this Court 'must predict how the highest state court would decide the issue.'") (citing *In re Sterling Mining Co.*, 415 B.R. 762, 767-68 (Bankr. D. Idaho 2009)).

First, the Idaho statutory reference was never changed after the Bankruptcy Act's repeal and replacement by the Bankruptcy Code in 1978. This would appear to be a matter of legislative oversight. Nothing suggests the state intended to de-authorize municipalities (*nee* taxing districts) from eligibility to file after 1978.

Second, the term "taxing district" is defined elsewhere in the Idaho Code. Idaho Code § 63-201(28) defines "taxing district" as "any entity or unit with the statutory authority to levy a property tax." Under Idaho Code § 31-604 the County has the power to levy and collect property taxes and thus qualifies as a "taxing district" under this definition. Admittedly, by its terms application of Idaho Code § 63-201, including subsection (28), is limited to chapters 1 through 23 of the Idaho Revenue and Taxation Code, title 63, Idaho Code. This limitation, combined with Idaho Code § 67-3901's explicit reference to the Bankruptcy Act, militates against looking to Idaho Code § 63-201(28) to determine whether the County is a "taxing district" for purposes of Idaho Code § 67-3903. *See State v. Yzaguirre*, 163 P.3d 1183, 1189 (Idaho 2007) ("Legislative definitions of terms included within a statute control and dictate the meaning of those terms as used in the statute. Statutory definitions provided in one act do not apply 'for all purposes and in all contexts but generally only establish what they mean where they appear in that same act.'") (citations omitted). However, the Court may still consider the definition of "taxing district" contained in Idaho Code § 63-201(28) as guidance in predicting how the Idaho Supreme Court would interpret the term "taxing district" as used in Idaho Code §§ 67-3901 and -3903. *See McMurdie*, 448 B.R. at 829. ("In order to [predict how the highest state court would decide an issue], the Court may review decisions from the state court, decisions from other jurisdictions, statutes, treatises, and restatements for guidance.") (citing *Spear v. Wells Fargo Bank, N.A. (In re Bartoni-Corsi Produce, Inc.)*, 130 F.3d 857, 861 (9th Cir. 1997)).

MEMORANDUM OF DECISION - 17

28, 2011, County Commissioners' meeting.  *See* Ex. 208.[14]

The Court concludes that the County was specifically authorized by Idaho law to be a chapter 9 debtor and § 109(c)(2) is satisfied.

### C.    Boise County has demonstrated the requisite desire to effect a plan to adjust its debts

An entity may be a debtor under chapter 9 only if it "desires to effect a plan to adjust [its] debts."  Section 109(c)(4).  No bright-line test exists for determining whether a debtor desires to effect a plan.  *Vallejo*, 408 at 295.  The inquiry under § 109(c)(4) is a highly subjective one that may be satisfied with direct and circumstantial evidence.  A debtor may prove its desire by attempting to resolve claims, submitting a draft plan of adjustment, or by other evidence customarily offered to demonstrate intent.  *Id.*  "The evidence needs to show that the 'purpose of filing of the chapter 9 petition not simply be to buy time or evade creditors.'"  *Id.* (quoting 2 Collier  ¶ 109.04[3][d]).

The County has shown a desire to effect a plan to adjust its debts.  County officials worked at negotiating a settlement with Alamar before filing the petition.  The assertions of Commissioners Anderson, Fry, and Day that they view adjustment of Alamar's claim through bankruptcy as the only viable alternative given Alamar's escalating collection tactics and their obligation to keep the

---

[14]  To the extent Alamar suggests that use of the executive session procedure prior to the vote on the resolution to file was somehow improper and rendered the County ineligible to file for chapter 9 relief under Idaho law, it has not identified any authority supporting such a position, nor has this Court located independently any such authority.

MEMORANDUM OF DECISION - 18

County operating were credible.  Each of the Commissioners testified that they believed the Alamar Judgment was a valid debt that should be paid.  The purpose of filing the petition was not to evade Alamar but to find a way to pay the Judgment in a manner that County officials believed would comply with Idaho law and not cripple County operations.

Additionally, the County has continued its attempts to resolve Alamar's claim postpetition, as evidenced by correspondence between Blair Clark, bankruptcy counsel for the County, and Alamar's attorneys.  *See* Exs. 215-216, 219-222.  And, while the County's proposed plan treatment of Alamar – *i.e.*, the $500,000 payment on the theory that Alamar's District Court Judgment should and could be somehow reduced by this Court under the Idaho Tort Claims Act – would likely not pass muster at confirmation (for a number of reasons), submission of the Plan and Disclosure Statement may be considered by the Court as evidence of the County's desire to ultimately adjust its debts through a plan.

Based on the evidence of record, the Court finds that the County has met its burden under § 109(c)(4) of demonstrating a desire to effect a plan to adjust its debts.

### D.   For Boise County, further negotiation with Alamar had become impracticable

The next step is to determine whether the County satisfies at least one of the requirements of § 109(c)(5).  The County argues that by the time of filing further

MEMORANDUM OF DECISION - 19

negotiation with Alamar had become impracticable.  Section 109(c)(5)(C) requires the County demonstrate that it "is unable to negotiate with creditors because such negotiation is impracticable."  Whether negotiation with creditors is impracticable is dependent upon the circumstances of the case.  *Vallejo*, 408 B.R. at 298.  In the context of § 109(c)(5)(C), negotiation is impracticable where "(though possible) it would cause extreme and unreasonable difficulty."  *Id.* (quoting *Valley Health Sys.*, 383 B.R. at 163).  A petitioner may demonstrate impracticability by the sheer number of its creditors or by its need to file a petition quickly to preserve assets.  The need to act quickly to protect the public from harm may also show the impracticability of negotiation.  *Id.*

Here, the County filed its petition to fend off what it perceived to be imminent execution on the County's accounts.  The evidence demonstrates the parties had effectively reached an impasse in their negotiations, and that Alamar, through Woodard's February 24 letters and its application for the Writ, had demonstrated a sincere intent to promptly execute on its Judgment.  The County's need to preserve its cash assets in order to maintain County operations uninterrupted for the benefit of its residents made further negotiations with Alamar impracticable.

The Court finds that the County has met its burden under § 109(c)(5)(C).

MEMORANDUM OF DECISION - 20

### E.    Boise County had a reasonable belief that Alamar might attempt to obtain a transfer avoidable under § 547

Alternatively, the County contends that it has satisfied § 109(c)(5)(D). Section 109(c)(5)(D) provides that an entity may be a debtor under chapter 9 if it "reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of [title 11]."  The Court agrees that the County has demonstrated that at the time of filing it reasonably believed Alamar may attempt to obtain a preferential transfer avoidable under § 547.[15]

As a noted treatise explains, § 109(c)(5)(D) is intended to allow a "municipality to file its petition and obtain the benefits of the automatic stay while it negotiates its plan with creditors, when aggressive creditor action may result in a

---

[15]  Under § 547(b) of the Code,

a trustee may avoid any transfer of an interest of the debtor in property–
    (1) to or for the benefit of a creditor;
    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3) made while the debtor was insolvent;
    (4) made–
        (A) on or within 90 days before the date of the filing of the petition;
        . . .
    (5) that enables such creditor to receive more than such creditor would receive if–
        (A) the case were a case under chapter 7 of this title;
        (B) the transfer had not been made; and
        (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The term "transfer" is defined by § 101(54)(D) as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with – (i) property; or (ii) an interest in property."

MEMORANDUM OF DECISION - 21

preferential payment, which by its nature is unfair to other creditors." 2 Collier ¶ 109.04[3][e][iv]. Such was the case here. Alamar's increasingly aggressive attempts to collect on its Judgment, including Woodard's February 24 correspondence and the February 28 Writ application, created a reasonable belief in the County that Alamar would obtain a payment that would prevent the County from fulfilling its other financial obligations. Had Alamar successfully utilized its Writ to execute on the County's accounts, it would have received a transfer of the County's property on account of the Judgment, an antecedent debt.

The Court finds the County's concern that it would be unable to withstand execution on the Alamar Judgment and effectively continue operations, and that such execution could constitute a potentially avoidable preference, was reasonable.

One of the elements of a preference is insolvency of the debtor at the time of the transfer. *See* § 547(b)(3). Here, and as discussed at length *infra*, insolvency of the County is disputed.[16] However, the requirement of § 109(c)(5)(D) focuses on the reasonable belief of the debtor municipality that a creditor may attempt to obtain a preferential transfer. It is thus sufficient that the County reasonably

---

[16]  Insolvency, for purposes of § 547(b)(3), is defined in § 101(32). That section provides, for most debtors, a balance sheet test. *See* § 101(32)(A) (defining insolvency as a "financial condition such that the sum of [the debtor's] debts is greater than all of [the debtor's] property, at a fair valuation, exclusive of" certain exempted or fraudulently transferred property); *Arrow Elecs., Inc. v. Justus (In re Kaypro)*, 218 F.3d 1070, 1076 (9th Cir. 2000). However, for a municipality, a different definition is provided. *See* § 101(32)(C), discussed *infra*.

MEMORANDUM OF DECISION - 22

believed it was insolvent, though it may not have in fact been so.[17]

 The Court therefore concludes that the County satisfies § 109(c)(5)(D).

### F. Boise County has not established that it was insolvent on the date of filing

 Finally, the Court addresses what has developed, in its view, into the major issue dividing the parties – whether at the time of filing the County was insolvent as required by § 109(c)(3). A municipality is insolvent if it is "(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due." Section 101(32)(C). The test under § 101(32)(C)(i) involves current, general nonpayment, while the test under § 101(32)(C)(ii) looks to future inability to pay. *Hamilton Creek Metro. Dist. v. Bondholders Colo. Bondshares (In re Hamilton Creek Metro. Dist.)*, 143 F.3d 1381, 1384 (10th Cir. 1998). The reference point for the insolvency analysis under both prongs is the petition date. *Id.* at 1384-85; *In re Pierce Cnty. Housing Auth.*, 414 B.R. 702, 710-11 (Bankr. W.D. Wash. 2009). As with other eligibility requirements, the petitioner bears the burden of proving one of the § 101(32)(C) insolvency tests is met. *Hamilton Creek*, 143 F.3d at 1385 (citing *Tim Wargo & Sons, Inc. v. Equitable Life Assurance Soc'y (In re Tim Wargo & Sons)*, 869 F.2d 1128, 1130 (8th Cir. 1989)).

### 1. Section 101(32)(C)(i)

---

 [17] It is further noted that § 547(f) provides, for preference purposes, a presumption of insolvency during the 90 days immediately preceding the petition.

MEMORANDUM OF DECISION - 23

The County concedes that at the time of filing it was paying its debts as they came due, with the exception of the estimated $550,000 in medical indigency claims it had neglected to process and submit to the Catastrophic Health Care Cost Program. It argues that these unpaid medical indigency claims represent a debt not paid when due, thus rendering the County insolvent under § 101(32)(C)(i). The Court disagrees.

Section 101(32)(C)(i) requires *general* nonpayment of debts as they become due. The County's failure to process and pay a single category of claims, which represents only a small portion of its budgeted expenditures, from what appear to be adequate funds does not rise to the level of the general nonpayment contemplated by § 101(32)(C)(i). *See In re Town of Westlake, Texas*, 211 B.R. 860, 864-65 (Bankr. N.D. Tex. 1997) (finding debtor municipality that was current on 76% of its obligations and delinquent on 24% due to a "temporary political dispute over authority to sign checks from admittedly ample funds" was not insolvent by reason of generally not paying its debts as they became due).

The evidence presented shows that the County Indigent Fund contained more than sufficient funds to pay the estimated outstanding medical indigency claims and still cover the projected claims for the remainder of fiscal year 2011. *See* Ex. 111 at 6. According to the County's figures, on the petition date there was a cash balance in the Indigent Fund of $647,597. Deducting the $550,000 in purported claims leaves a remaining balance of $97,597. For March and April

MEMORANDUM OF DECISION - 24

2011, the County's cash flow summary reflects an actual net change of negative

$2,569. For the remaining months of fiscal year 2011 (May through September),

the County projects a total net change of negative $50,272. Subtracting these

numbers from the $97,597 balance results in a positive cash balance of $44,756 in

the County's Indigent Fund for fiscal year 2011, even after accounting for the

$550,000 allegedly owed for medical indigency claims. *See id.*

In addition, the Court is not persuaded that the purported $550,000 in

medical indigency payments is in fact "due" for purposes of § 101(32)(C)(i).

"Due" in this context has been defined as "presently, unconditionally owing and

presently enforceable." *Hamilton Creek*, 143 F.3d at 1385. Accordingly, evidence

of when debts arose and amounts owed by a debtor without evidence of when the

amounts are actually payable is insufficient to prove the petitioner is not meeting

its debts. *Id.* (citing by analogy cases interpreting § 303(h)(1)).

Here, the County offered no evidence concerning when the medical

indigency payment claims became, or would become, payable. The evidence

presented at hearing was that the County is aware of certain applications for

medical indigency payments that were not processed, submitted, or paid according

to certain statutorily mandated time lines. Per Idaho Code § 31-3511(4), these

applications are deemed approved and payment will be made pursuant to the

provisions of the medical indigency statute, chapter 35, title 31, Idaho Code, but

only at some later date when the precise amounts of the claims have been

MEMORANDUM OF DECISION - 25

determined.

Prisco acknowledged in her testimony that the County had not actually been able to determine the amount of the indigency payments because it had yet to receive all of the bills and other documentation for those payments, though it has estimated these claims to be around $550,000. There is no evidence, however, as to when those amounts would actually be determined and the claims made payable. This is consistent with the representations made in Schedule F of the County's bankruptcy schedules. *See* Ex. 224-2 at 122.

The Court is thus left with evidence that a debt for medical indigency payments exists, equivocal evidence as to the amount of that debt, and no evidence concerning when the debt was or will be actually payable. Based on this showing, the Court cannot find that the debt is "due" under § 101(32)(C)(i).

## 2.      Section 101(32)(C)(ii)

The County also alleges insolvency under the second prong of § 101(32)(C), claiming it will be unable to pay the Alamar Judgment and meet its other expenses for supporting county operations.

The test under § 101(32)(C)(ii) is a prospective one, which requires the petitioner to prove as of the petition date an inability to pay its debts as they become due in its current fiscal year or, based on an adopted budget, in its next fiscal year. *In re City of Bridgeport*, 129 B.R. 332, 336-38 (Bankr. D. Conn. 1991); *see also Hamilton Creek*, 143 F.3d at 1384-85; *Westlake,* 211 B.R. at 864-

MEMORANDUM OF DECISION - 26

66.  This analysis is made on a cash flow, rather than a budget deficit, basis.

*Hamilton Creek*, 143 F.3d at 1386; *Pierce Cnty. Housing Auth.*, 414 B.R. at 711.

Alamar contends that the County's own financial records show that it has

sufficient cash on hand in its various investments and accounts to pay the

Judgment and meet the County's other expenses for the upcoming fiscal year.  The

County counters that, although it had close to $10 million in cash and investments

on the petition date, most of the cash in its accounts are "restricted" by federal and

state law to certain uses, which do not include payment of the Alamar Judgment.

The Court finds the County's arguments unpersuasive.

First, Prisco testified that the moneys in the so-called "trust accounts" (*i.e.*,

the County Improvement Fund, the Auditor's Trust, and the General Trust),

totaling $2,045,383, were not restricted as those moneys were comprised primarily

of payments in lieu of taxes and interest earnings which had not been appropriated

to any particular fund.  The County presented no other evidence of restrictions or

limitations on these funds.

Second, the County has also failed to convince this Court that it would be

unable to utilize the reserves it has accumulated in the General, Road & Bridge,

and Solid Waste Funds to pay the Judgment.[18]

---

[18]   To the extent the County has asserted legal restrictions on its use of funds to pay the
Alamar Judgment, this Court is obligated to consider those arguments in the context of its
insolvency analysis.  In doing so, the Court is appreciative of the divergent positions taken on the
legal issues presented by the parties and their respective counsel, including those with

(continued...)

MEMORANDUM OF DECISION - 27

Generally, counties in Idaho are prohibited from making expenditures in excess of their budget appropriations.  *See* Idaho Code § 31-1607.  As a means of assuring compliance with this provision, Idaho Code § 31-1607 provides that any expenditures made, liabilities incurred or warrants issued in excess of budget appropriations are the personal liability of the county official making or incurring such liability, expenditure, or issuing such warrant, and are not the liability of the county.  *See Garrity v. Bd. of Comm'rs of Owyhee Cnty.*, 34 P.2d 949, 955 (Idaho 1934).

There are exceptions, however, to the prohibition of expenditures in excess of a county's adopted budget.  One is for expenditures made upon an order of a court of competent jurisdiction.  Another is for certain emergencies enumerated in the Idaho Code.  *Id.*  Such emergencies include those

> caused by fire, flood, explosion, storm, epidemic, riot or insurrection, or for the immediate preservation of order or of public health or for the restoration to a condition of usefulness of public property, the usefulness of which has been destroyed by accident, or for the relief of a stricken community overtaken by a calamity, or the settlement of

---

[18] (...continued)
considerable experience and expertise in this area.  It is also cognizant of the complexity and uncertainty attendant to this field of law, exacerbated, according to some commentators, by the recent Idaho Supreme Court decisions in *City of Boise v. Frazier*, 137 P.3d 388 (Idaho 2006), and *City of Idaho Falls v. Fuhriman*, 237 P.3d 1200 (Idaho 2010).  *See generally* S.C. Danielle Quade, *Not to Build: City of Boise v. Frazier Further Restricts Local Governments' Ability to Finance Public Projects*, 43 Idaho L. Rev. 329 (2007); Daniel Dansie, *"Urgency" and "Uncertainty" are the Keywords for Local Governments After Frazier and Fuhriman*, The Advocate, Feb. 2011, at 16-18.  Mindful thereof, the Court addresses the parties' legal arguments for the limited purpose of determining whether the County has met its burden of establishing that it is in fact unable to meet its debts as they come due, interpreting applicable Idaho municipal law as it predicts the Idaho Supreme Court would.  *See* note 13 *supra*.

MEMORANDUM OF DECISION - 28

> approved claims for personal injuries or property damages, exclusive
> of claims arising from the operation of any public utility owned by the
> county, or *to meet mandatory expenditures required by law*, or the
> investigation and/or prosecution of crime, punishable by death or life
> imprisonment, when the board [of county commissioners] has reason
> to believe such crime has been committed in its county.

Idaho Code § 31-1608 (emphasis added).  These exceptions allow a county to meet

emergency expenses not anticipated by its annual budget.  *See Garrity*, 34 P.2d at

955; *Lloyd Corp. v. Bannock Cnty.*, 25 P.2d 217, 219-20 (Idaho 1933).[19]

All expenditures made under Idaho Code § 31-1608 are to be paid from

moneys on hand in the county treasury in the fund properly chargeable with such

expenditures.  If there are insufficient moneys available in the treasury to pay

warrants for any such expenditures, then those warrants must be registered and

bear interest.[20]  Idaho Code § 31-1608.  Until a warrant redemption levy is

established, the county treasurer is to identify ways of redeeming warrants,

including short term borrowing from other county funds at market interest rates

and interim financing from local financial institutions.  Idaho Code § 31-1507.

The total amount of emergency warrants issued, registered and unpaid, during the

current fiscal year are included in the annual budget submitted to the board of

---

[19]   Before making emergency expenditures, the board of county commissioners must
adopt, by the unanimous vote of the commissioners, a resolution "stating the facts constituting the
emergency and entering the same upon their minutes."  Idaho Code § 31-1608.

[20]   A "warrant" is "an order drawn by the board of county commissioners directing the
county treasurer to pay a specified amount to a person named or to the bearer."  A "registered
warrant" is "a warrant drawn on a fund which has insufficient funds to pay it."  Idaho Code § 31-
1510.

MEMORANDUM OF DECISION - 29

county commissioners by the county clerk,[21] and the board must include in their appropriations for the ensuing fiscal year an amount equal to the total of such registered and unpaid warrants.  Idaho Code § 31-1608.

If there is inadequate levy authority available in the obligated fund to redeem the outstanding warrants in the next fiscal year a warrant redemption fund must be established to redeem warrants.  Idaho Const. art. VII, § 15; Idaho Code § 31-1507.  To fund the redemption of warrants, the county is required to establish a warrant redemption levy, with a maximum levy of two-tenths of one percent (.2%) of the market value for assessment purposes of all taxable property in the county.  Idaho Code § 63-806(1).  In addition to the warrant redemption levy, all money in the county treasury on October 1 for the county current expense (general) fund, county road fund, county bridge fund or any other fund which is no longer needed for current expenses must be transferred to the warrant redemption

---

[21] For the County, the annual budgeting process, which is set by statute, begins in April. In May, each department or agency head submits a revenue and expense budget worksheet to the County Clerk, detailing probable revenues from sources other than taxation and all estimated expenditures. *See* Idaho Code § 31-1602.  Using those worksheets, the Clerk prepares and submits to the Board of Commissioners a suggested budget showing the complete financial program of the County for the ensuing fiscal year. *See* Idaho Code §§ 31-1603 and -1604.  A public hearing on the budget is held sometime in August, where at any taxpayer may appear and be heard on any part of the tentative budget.  Upon conclusion of the hearing, the County Commissioners adopt a final budget. *See* Idaho Code § 31-1605.  Per statute, the budget must be finalized on or before the Tuesday following the first Monday in September of each year. *Id.* The County's projections for fiscal year 2012 (beginning October 1, 2011) referred to in this Decision are based on estimates gathered by Prisco, the County Clerk, through this budgeting process.

MEMORANDUM OF DECISION - 30

fund by resolution of the county commissioners.  Idaho Code § 63-806(2).[22]

These provisions of the Idaho Code, among others, are part of a well-planned county financial program, enacted by the Legislature "to give the several counties of the state a balanced budget, in order that expenditures shall not exceed

---

[22]  Idaho Constitution article VII, § 15, provides, in relevant part:

[The legislature] shall also provide that whenever any county shall have any warrants outstanding and unpaid, for the payment of which there are no funds in the county treasury, the county commissioners, in addition to other taxes provided by law, shall levy a special tax, not to exceed ten mills on the dollar, of taxable property, as shown by the last preceding assessment, for the creation of a special fund for the redemption of said warrants; and after the levy of such special tax, all warrants issued before such levy, shall be paid exclusively out of said fund.  All moneys in the county treasury at the end of each fiscal year, not needed for current expenses, shall be transferred to said redemption fund.

Idaho Code § 63-806, in turn, states:

(1) Upon the same property and for the same year the county commissioners shall levy a property tax for the redemption of outstanding county warrants issued prior to the first day of October in said year, to be collected and paid into the county treasury and apportioned to the county warrant redemption fund, which levy shall be sufficient for the redemption of all outstanding county warrants, unless the amount of outstanding warrants exceeds the amount that would be raised by a levy of two-tenths of one percent (.2%) of the market value for assessment purposes on all taxable property in the county, in which case the county commissioners shall annually levy a property tax of two-tenths of one percent (.2%) of the market value for assessment purposes on all taxable property in the county for the redemption of such outstanding warrants.

(2) All property taxes levied in any year for the county current expense fund, county road fund and county bridge fund and collected on or after the first day of January in the succeeding year and any property tax levied for any purpose and which is no longer needed for such purpose when collected must be paid into the county treasury and apportioned to the county warrant redemption fund, except as otherwise provided by law.  All money in the county treasury on the first day of October to the credit of the county current expense fund, county road fund, county bridge fund or any other fund which is no longer needed must be transferred to the county warrant redemption fund upon the books of the county auditor and county treasurer by resolution of the county commissioners entered upon the records of the proceedings.

MEMORANDUM OF DECISION - 31

revenues." *Garrity*, 34 P.2d at 955.[23]  To that end county boards of commissioners

are enjoined to make sufficient levies to meet appropriations and permitted, when

necessary, to meet certain emergency expenses not anticipated by the budget.  To

further assure a balanced budget, ample provisions are made for expeditiously

satisfying any residual indebtedness accrued in making such expenditures through

the use of a county's levy authority and the transfer of funds not needed to meet

current expenses.  *See id.*

The Court is not persuaded the County is unable to pay the Alamar

Judgment under this system.  The County admits the Judgment is "a mandatory

expenditure required by law" under Idaho Code § 31-1608.  *See* Memorandum of

Boise County in Opposition to Motion to Dismiss, Doc. No. 96, at 10.[24]  Yet it

asserts, relying on *Lloyd Corp. v. Bannock Cnty.*, that Idaho Code § 31-1608 does

not authorize the Commissioners to incur indebtedness or make expenditures in

excess of the County's income for the year in order to satisfy the Judgment

because such authorization would violate Idaho Constitution, article VIII, § 3,

which places limitations on a county's expenditures.  Idaho Constitution, article

VIII, § 3, provides, in relevant part:

---

[23]  Article VII, § 15, of the Idaho Constitution also charges the Idaho Legislature with
providing, by law, "a system of county finance, as shall cause the business of the several counties
to be conducted on a cash basis."

[24]  Additionally, Prisco, the County Clerk, and Commissioners Anderson, Day, and Fry
acknowledged during testimony that the County had a legal obligation to pay the Alamar
Judgment.

MEMORANDUM OF DECISION - 32

No county, city, board of education, or school district, or other subdivision of the state, shall incur any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year, the income and revenue provided for it for such year, without the assent of two-thirds of the qualified electors thereof voting at an election to be held for that purpose, nor unless, before or at the time of incurring such indebtedness, provisions shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof, within thirty years from the time of contracting the same. Any indebtedness or liability incurred contrary to this provision shall be void: Provided, that this section shall not be construed to apply to the ordinary and necessary expenses authorized by the general laws of the state.

The Court reads *Lloyd* differently.

In *Lloyd*, a taxpayer of Bannock County commenced a proceeding to procure a writ prohibiting the county from issuing bonds to fund $347,548.06 of warrant indebtedness.  25 P.2d at 217.  Some of the warrants sought to be refunded were emergency warrants issued pursuant to Idaho Code § 30-1208 (1932) – a precursor to Idaho Code § 31-1608.[25]  *Id.* at 219.  A trial resulted in a judgment against the taxpayer and confirmation of the county's authorizing the issuance of the bonds.  *Id.* at 217-18.

On appeal, the taxpayer argued that Idaho Code § 30-1208, which authorized the expenditure of moneys in excess of the county's budget and the issuance of emergency warrants to meet those expenditures, violated Idaho

---

[25]   The language of Idaho Code § 30-1208 effective in 1933, the year *Lloyd* was decided, is virtually identical to that contained today in Idaho Code § 31-1608.  *See* Idaho Code § 30-1208 (1932).

MEMORANDUM OF DECISION - 33

Constitution, article VIII, § 3.  *Id.* at 219.  In rejecting the taxpayer's argument, the

Court determined that the issuance of refunding bonds for the purpose of retiring

the warrant indebtedness itself did not create an indebtedness or liability prohibited

by Idaho Constitution, article VIII, § 3, because it merely changed the form of

evidence of an already existing indebtedness.  *Id.* at 220 (citing *Butler v. City of*

*Lewiston*, 83 P. 234 (Idaho 1905); *Veatch v. City of Moscow*, 109 P. 722 (Idaho

1910); and *Sebern v. Cobb*, 238 P. 1023 (Idaho 1925)); *see also Hickey v. City of*

*Nampa*, 124 P. 280, 281-82 (Idaho 1912) (concluding that issuance of bonds to

fund pre-existing warrant indebtedness did not create "any new indebtedness, but

was rather the changing of the form of indebtedness, or paying an ordinary debt

already incurred").

Accordingly, the court examined whether the initial emergency

expenditures paid through the use of warrants were "ordinary and necessary

expenses" under the "proviso clause" of article VIII, § 3, of the Idaho

Constitution.[26]  Ultimately, it held in *Lloyd* that the expenditures in excess of the

county's budget made to meet emergent circumstances under Idaho Code § 30-

1208 were not prohibited by the Idaho Constitution given those expenditures

qualified as "ordinary and necessary expenses authorized by the general laws of

---

[26]  The language in Idaho Constitution article VIII, § 3, providing that the requirements
and limitations of that section do not apply to "ordinary and necessary expenses authorized by the
general laws of the state" is commonly referred to as the "proviso clause."  *See Fuhriman*, 237
P.3d at 1203.

MEMORANDUM OF DECISION - 34

the state." *Id.* at 219-20 (citing *Thomas v. Glindeman*, 195 P. 92 (Idaho 1921)).

The Idaho Supreme Court engaged in a similar analysis in *Butler v. City of Lewiston*, a decision entered nearly 30 years prior to *Lloyd*. There, the court was tasked with determining the legality of the issuance of bonds to pay warrant indebtedness, amounting to $62,500, accrued on account of city officer and employee salaries, a $10,000 judgment, and other municipal expenses. *Butler*, 83 P. at 235. The court was presented with the question of whether issuance of the bonds was prohibited by article VIII, § 3, of the Idaho Constitution. *Id.* at 237. Consistent with *Lloyd*, the court first concluded that the bonds themselves would not increase the legal indebtedness of the city, but simply change the form of existing indebtedness from warrant to bond. *Id.* at 238. It then proceeded to determine whether the warrant indebtedness arose from ordinary and necessary expenses authorized by the general laws of the state, such that it did not violate the Idaho Constitution. The court concluded that the judgment against the city, as well as the other expenses, were ordinary and necessary expenses covered by the proviso clause. *Id.*[27]

In summary, the Court reads *Lloyd* and *Butler* as standing for three propositions of importance here, which when combined refute the County's contention that the Idaho Constitution prohibits it from using registered warrants to

---

[27] The court specifically found that the payment of the judgment, "obtained by reason of a defective sidewalk in said city," was a necessary expense. *Butler*, 83 P. at 238.

MEMORANDUM OF DECISION - 35

satisfy the Alamar Judgment.  First, merely changing the form of evidence of an already existing indebtedness or liability does not run afoul of Idaho Constitution, article VIII, § 3.  Second, a county may issue registered warrants to meet expenditures, exceeding the county's revenue for the year, occasioned by emergencies described in Idaho Code § 31-1608 (formerly Idaho Code § 30-1208) without violating the Idaho Constitution, provided such expenditures are "ordinary and necessary."  *See also City of Pocatello v. Peterson*, 473 P.2d 644, 647 (Idaho 1970) ("The proviso to Article 8, § 3 requires both that the expenditure be authorized by the general laws of the state and that it be an ordinary and necessary one.").  And third, an expenditure to satisfy a tort judgment qualifies as an ordinary and necessary expense.

The Court questions whether an analysis under Idaho Constitution, article VIII, § 3 is required in the first instance.  As indicated by *Butler* and *Lloyd*, merely changing the form of an already existing indebtedness or liability does not implicate Idaho Constitution, article VIII, § 3.  Consequently, any application of article VIII, § 3, must be to the initial indebtedness or liability.  Here, that liability takes the form of a federal judgment.

The language of article VIII, § 3, provides limitations on the powers of the state and its political subdivisions.  It does not, however, limit the powers of a federal district court to order and impose judgment on a municipality of the state. The Idaho legislature has acknowledged as much by providing an exception to the

MEMORANDUM OF DECISION - 36

prohibition on outlays in excess of budget appropriations for expenditures made

"upon an order of a court of competent jurisdiction."  Idaho Code § 31-1607; *see*

*also McNeel v. Canyon Cnty.*, 277 P.2d 554, 557 (concluding that the exception for

court orders in Idaho Code § 31-1607 "indicates that the budget law was not

intended to control the courts").  Therefore, any use by the County of registered

warrants to change its pre-existing judgment liability to warrant indebtedness

would not be violative of the Idaho Constitution.[28]

Alternatively, even if article VIII, § 3, of the Idaho Constitution applies to

payment of the Judgment, the Court concludes, from the evidence and arguments

of the parties here, that the Alamar Judgment, like the tort judgment at issue in

*Butler*,[29] is an "ordinary and necessary" expense of the County for purposes of the

proviso clause.[30]

---

[28]   Under this rationale, an argument could also be made that the County could have paid the judgment through the issuance of bonds, thereby exchanging the judgment liability for the refunding bonds, another form of indebtedness.  *See Veatach*, 109 P. at 723 (citing with approval *Geer v. Bd. of Com'rs of Ouray Cnty.*, 97 F. 435 (8th Cir. 1899), wherein the court concluded that the exchange of judgments against a county for its refunding bonds merely changed the form of the obligation and therefore did not violate the Colorado Constitution).

[29]   An action for discrimination under the Fair Housing Act, such as the one brought by Alamar against the County, is, in effect, a tort action.  *Meyer v. Holley*, 537 U.S. 280, 285 (2003).

[30]   At hearing, the parties explored the concept of judicial confirmation in the context of determining whether the Alamar Judgment was an "ordinary and necessary" expense for purposes of the Idaho Constitution.  Judicial confirmation is a process by which a municipality or political subdivision such as the County may seek confirmation from a state district court that a particular expense is ordinary and necessary.  *See* Idaho Code §§ 7-1304 to -1313.  Such a process, like any other judicial proceeding, can be time consuming and expensive.  While the Commissioners and legal counsel discussed judicial confirmation in their consideration of the County's options for financing the Judgment, there is no indication that it was ever seriously pursued.

MEMORANDUM OF DECISION - 37

An expense is "ordinary 'if in the ordinary course of municipal business, or the maintenance of municipal property, it may be and is likely to become necessary.'" *City of Boise v. Frazier*, 137 P.3d 388, 391 (Idaho 2006).  Expenses may be "ordinary" and yet only occur at infrequent intervals. *Hickey*, 124 P. 281. Idaho law grants counties the power to sue and be sued.  Idaho Code § 31-604.  It is reasonable to conclude then that paying judgments arising from lawsuits against a county is consistent with "the ordinary course of municipal business" in operating the county and is a type of expense that "may be and is likely to become necessary."

An expense is "necessary" under Idaho Constitution article VIII, § 3, if there is "a necessity for making the expenditure at or during such year." *City of Idaho Falls v. Fuhriman*, 237 P.3d 1200, 1204 (Idaho 2010).  Necessary expenditures typically involve "immediate or emergency expenses, such as those involving public safety, or expenses the government entity in question was legally obligated to perform promptly." *Frazier*, 137 P.3d at 391.  The Alamar Judgment, a judgment issued by a federal court, represents a liability the County is legally obligated to perform promptly. *Id.* at 392, 394 (citing with approval *Butler*, 83 P. at 234, 238).  Indeed, it is the urgency of the obligation to pay the Judgment under law, according to the County, that forced it into filing bankruptcy.

The County further contends that Idaho Code § 31-1508 generally prohibits the transfer of any money from one fund to another, and Idaho Code § 40-709(7)

MEMORANDUM OF DECISION - 38

restricts the use of certain road funds.  However, those sections provide for

exceptions when specifically otherwise permitted by law.  The requirement of

Idaho Code § 63-806(2) that a county transfer to the warrant redemption fund all

money in the county treasury no longer needed and, in particular, all money to the

credit of the county road fund, appears to fall within these exceptions.

The County further argues that the use of registered warrants would be

insufficient due to the 3% limit on levy increases imposed by Idaho Code § 63-

802.[31]  However, the 3% levy limit only impacts the amount of property taxes the

County may levy to fund a warrant redemption fund; it does not restrict the amount

of surplus funds the County can transfer from other funds, including the General

Fund, Road & Bridge Fund, and Solid Waste Fund, to redeem outstanding

warrants.  As discussed *infra*, the evidence demonstrates there are sufficient

surplus moneys in these other funds to fund any warrant indebtedness incurred to

pay the Alamar Judgment, without having to exceed the levy limits for the warrant

---

[31]  Idaho Code § 63-802 provides, in pertinent part:

[N]o taxing district shall certify a budget request for an amount of property tax
revenues to finance an annual budget that exceeds the greater of paragraphs (a)
through (i) of this subsection inclusive:
    (a) The dollar amount of property taxes certified for its annual budget for any
    one (1) of the three (3) tax years preceding the current tax year, whichever is
    greater, for the past tax year, which amount may be increased by a growth factor
    of not to exceed three (3%) plus the amount of revenue calculated as described
    in this subsection.

MEMORANDUM OF DECISION - 39

redemption fund (.2%) or the overall levy limit (3%).[32]

In short, the County has not convinced the Court of legal impediments to the issuance of registered warrants, the creation of a warrant redemption fund, and the transfer, at the appropriate time under the statute, of the surplus moneys in the General, Road & Bridge, and Solid Waste funds as a means to pay the Alamar Judgment.[33]  Nor has the County established a factual impediment to such an

---

[32]  Buxton, an attorney experienced in the area of municipal finance law who was retained by the County in January 2011 to examine possible methods for paying the Judgment, testified that her concern with the use of registered warrants was that, based on the then, still-developing picture of the County's financial status, the cash available to the County was inadequate to fund the warrants after exhausting the County's levy authority under the Idaho Code.  Recall that Prisco, who became County Clerk in January, had only been in office close to a month at the time she was reviewing the County's finances with Buxton in the context of negotiations with Alamar.  Yet she testified that it was not until April, after the petition was filed, that she felt confident about the financial information she was able to provide the Commissioners and legal counsel for the County.  As discussed in more detail *infra*, the evidence presented at trial concerning the County's finances, which was compiled and generated in April and, according to Prisco, represented the most complete picture of the County's finances, indicates that there was sufficient cash on hand in the County's accounts to fund the warrant indebtedness, without even having to exercise additional levy authority.

[33]  In addition to the County's arguments, the Court has carefully considered *Garrity*, in which the Idaho Supreme Court held that a warrant redemption fund may not be converted into a "current expense fund" for the payment of current ordinary and necessary expenses of county government.  34 P.2d at 953.  Upon a close reading, *Garrity* is distinguishable from the facts in this case.  There, the county commissioners had budgeted $38,048.02 for the warrant redemption fund for the fiscal year.  *Id.* at 950.  Sometime thereafter, the county incurred certain ordinary and necessary expenses over and above the expenses for which warrants had been issued, amounting to some $4,085.95.  *Id.* at 950-51.  The incoming board denied claims for these expenses as they would have been in excess of the total anticipated revenues.  The claimants appealed the board's decision to the district court and then, after losing there, to the Idaho Supreme Court.  *Id.* at 951.  The court was presented with question of whether the county's warrant redemption fund could be used to pay the claimants.  It concluded that they could not because the warrant redemption fund, under Idaho law, was to be used exclusively for the redemption of warrants outstanding at the time the warrant redemption levy was made, and the expenses at issue were incurred post-levy. *Id.* at 952-53.  The court rejected the notion that the warrant redemption fund could be converted into a "current expense fund" for payment of ordinary and necessary expenses of the county.  *Id.* at 953.

    This case is not plagued with the problems addressed in *Garrity*.  The County currently
(continued...)

MEMORANDUM OF DECISION - 40

approach.

The evidence establishes that the County has sufficient surplus moneys to satisfy the Alamar Judgment and continue operations. According to the County's cash flow summaries, the General Fund will have a cash balance of $1,087,659 at the end of fiscal year 2011, and a projected net cash flow of negative $45,125 for fiscal year 2012, thus leaving $1,042,534 which will not be needed to cover expenses in fiscal year 2012 and could be transferred into a warrant redemption fund on October 1, 2011. *See* Exs. 111 at 1, 112 at 1.

The Road & Bridge Fund will have an ending cash balance for fiscal year 2011 of $1,239,999. Ex. 111 at 2. The County projects a positive net cash flow of $249,196 in the Road & Bridge Fund for fiscal year 2012, Ex. 112 at 2, making the entire $1,239,999 available on October 1 for transfer into a warrant redemption fund as it will not be needed to meet expenses in the upcoming year.

Lastly, the County represents that the Solid Waste Fund will have an ending cash balance of $1,127,128 for fiscal year 2011. Ex. 111 at 9. Projections for fiscal year 2012 show a positive net cash flow of $18,758. The County, however, asserts that it is required by the Environmental Protection Agency and federal

---

[33] (...continued)
does not have a warrant redemption fund. It may issue warrants in order to pay the Alamar Judgment, and thereafter establish and fund a warrant redemption fund through its levy authority and the transfer of surplus moneys from other funds, which may then be used to satisfy outstanding warrants. In this manner the County may simply avail itself of the "ample provisions" made in the Idaho County Budget Law for meeting emergency expenses. *See id.* at 955.

MEMORANDUM OF DECISION - 41

regulations to set aside and maintain approximately $297,000 in its Solid Waste

fund for costs of closing the County landfill, including any corrective action that

may be required.  After deducting the $297,000, there nevertheless remains

$830,128 that would not be needed for current expenses and that could also be

contributed to a warrant redemption fund on October 1, 2011.

When added together, these excess funds total $3,112,661.  Based on the

County's own projections, these moneys would not be needed to meet expenses for

the remainder of the current fiscal year or for fiscal year 2012.  The County has not

carried its burden of establishing that it is prohibited from accessing these various

funds to satisfy warrants that could be used to pay the Alamar Judgment.

Combining the $2,045,383 immediately available in the County's "trust accounts"

with these excess moneys in the General, Road & Bridge, and Solid Waste Funds

yields $5,158,044, more than enough to pay Alamar's Judgment.

For the reasons stated above, the Court finds that the County has not

established it was insolvent under § 101(32)(C)(ii).

**CONCLUSION**

The Court finds Alamar's objection to be well taken.  The County did not

meet its burden of proving it was insolvent under § 109(c)(3) and, therefore, is

ineligible to be a debtor under chapter 9.  Alamar's Motion, Doc. No. 69, will be

MEMORANDUM OF DECISION - 42

granted and the County's chapter 9 case will be dismissed pursuant to § 921(c).[34]

Counsel for Alamar shall submit an order in accordance with this Decision.

DATED: September 2, 2011

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

---

[34]  Because the Court concludes the County, having failed to show it is insolvent under § 109(c)(3), is ineligible to be a chapter 9 debtor, it need not, and does not, address Alamar's claim that the County's petition should be dismissed under § 921(c) because it was not filed in good faith.

MEMORANDUM OF DECISION - 43